UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
XETHANOL CORPORATION,

            Plaintiff,

   -against-

DEUTSCHE BANK SECURITIES, INC.,

            Defendant.
------------------------------------------------------------------X

*Judge Hellerstein*

**COMPLAINT**

Case No. 07 CV 11161

**JURY TRIAL DEMANDED**

RECEIVED DEC 11 2007 U.S.D.C. S.D.N.Y. CASHIERS

Plaintiff Xethanol Corporation by its attorneys, Meister Seelig & Fein LLP, as and for its Complaint against Deutsche Bank Securities, Inc., alleges as follows:

## NATURE OF THE ACTION

1. This action arises from Defendant Deutsche Bank Securities, Inc.'s ("DB's") violations of Section 12(a)(1) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77l, as DB was the underwriter of, and offered for sale to Plaintiff Xethanol Corporation ("Xethanol"), an alternative energy company, certain auction rate securities known as "Pivot-1" and "Camber-8" (collectively Pivot-1 and Camber-8 are referred to herein as the "ARS"). Neither the Pivot-1 nor the Camber-8 securities were registered pursuant to Section 5 of the Securities Act, and neither had a valid exemption from registration. Xethanol lost $1,588,500 on its transactions in the ARS and, in this action, seeks to recover the losses.

2. Auction rate securities are debt instruments with long term nominal maturity for which the interest rate is periodically reset via reverse, or "dutch," auctions. Auction rate securities are issued at par value. The interest rate is usually reset every seven, twenty-eight, or thirty-five days by means of a dutch auction where bidders submit

proposed rates at which they will purchase the auction rate securities. The lowest interest rate at which all sellers of the auction rate securities can be matched to willing buyers for their auction rate securities becomes the interest rate on the auction rate securities until the next auction is held.

3. With any auction rate security there exists the possibility that there will not be a sufficient number of buyers to match the holders of the auction rate securities that want to sell in any given auction. If this happens then the auction "fails," in the parlance of the industry. A failed auction means that holders of auction rate securities will not be able to sell their auction rate securities at par value. In short, a failed auction means the auction rate security becomes illiquid.

4. DB offered the ARS at issue here, to investors including Xethanol. The ARS were never registered with the Securities and Exchange Commission as required by Section 5 of the Securities Act. Rather than register the ARS, DB attempted to sell the ARS in a private placement, which was to be exempt from registration.

5. In order to ensure that the ARS could be sold in a private placement, the ARS were to be offered for sale only to certain buyers that presumably were capable of evaluating the risks of the purchase of the ARS and had the financial resources to shoulder such risks. To that end, the private placement memoranda ("PPMs") prepared for the ARS specifically limited their sale to certain qualified institutional buyers ("QIBs") and qualified purchasers ("QPs").

6. Despite the restrictions on who could purchase the ARS set forth in the PPMs, DB permitted Xethanol to purchase the ARS even though Xethanol was neither a QIB nor a QP. Indeed, DB did not even follow standard industry practice and obtain a

written representation in a signed subscription agreement from Xethanol that it was a QIB or a QP.

7. In August 2007, Xethanol sought to liquidate its ARS position to provide it with cash for its business operations. At approximately the same time, however, the disruptions in the credit markets led to the failure of the auctions for the ARS.

8. In September 2007, faced with the fact that the ARS had become illiquid and its continued need for cash, Xethanol sold its ARS at a discount from par value of $1,588,500. This action seeks to recover that loss, pursuant to Section 12(a)(1) of the Securities Act, which provides for recovery in case of the sale of unregistered securities that are not otherwise exempt from registration.

## PARTIES, JURISDICTION AND VENUE

9. Plaintiff Xethanol is a corporation organized and existing under the laws of the state of Delaware, with a principal place of business at 1185 Avenue of the Americas, 20th Floor, New York, New York 10036.

10. Defendant DB is a corporation organized and existing under the laws of the state of Delaware, with offices at 60 Wall Street, New York, New York 10005.

11. Jurisdiction of this Court is based upon Section 22 of the Securities Act, (15 U.S.C. §77v); 28 U.S.C. §§1331 and 1337.

12. Venue is proper in this District under Section 22 of the Securities Act, and 28 U.S.C. §1391(b) in that a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

13. Beginning in the Spring of 2007, DB offered the ARS for sale to the public without registering the securities with the Securities and Exchange Commission.

14. DB prepared separate Private Placement Memoranda (each a "PPM" and collectively "PPMs") in connection with the offerings of the ARS.

15. In the case of both Pivot-1 and Camber-8, the PPMs provided that the ARS were being sold exclusively to 'qualified institutional buyers' as defined in Rule 144A under the Securities Act. (Pivot's PPM also provided that purchasers of Pivot must be "qualified purchasers" as defined by section 2(a)(51)(A) of the Investment Company Act of 1940.)

16. Xethanol is not a QIB, pursuant to Rule 144A of the Securities Act. Rule 144A of the Securities Act defines a QIB as an entity such as an insurance company, investment company, employee benefit plan, 501(c)(3) organization, or investment advisor, acting for its own account or the accounts of other QIBs that in the aggregate owns and invests on a discretionary basis at least $100 million of securities of issuers that are not affiliated with the entity.

17. Xethanol is also not a QP pursuant to section 2(a)(51)(A) of the Investment Company Act of 1940 which defines a QP as any person, including a company, acting for its own account or the accounts of other qualified purchasers, who in the aggregate owns and invests on a discretionary basis, not less than $ 25,000,000 in investments.

18. On June 4, 2007, through its broker, Northeast Securities, Inc. ("Northeast"), Xethanol purchased a $6,800,000 position in the PIVOT-1 auction security

(CUSIP: 725809AA5) (specifically, this security is described as Pivot Master Trust AR CLNS Certificates Series FLTG 144A dated 5/8/07 with a maturity date of 9/20/17).

19. On June 13, 2007 acting through Northeast, Xethanol purchased a $6,500,000 position in the CAMBER-8 auction security (CUSIP: 13200DAA0) (specifically, this security is described as Camber Master Trust dated 1/19/07 with a maturity date of 12/20/16).

20. Xethanol was never provided a copy of either PPM prior to acquiring its positions in the ARS.

21. At no time did Xethanol represent that it was a QIB or a QP. Xethanol never signed and returned subscription agreements, a standard practice in the securities industry, prior to purchase of the ARS.

22. Xethanol is not a QIB or a QP.

23. Xethanol's Quarterly Report filed on May 15, 2007 with the United States Securities and Exchange Commission on Form 10-Q for the quarter ended March 31, 2007 reported that Xethanol's net worth was approximately $48 million and that the total value of its cash was approximately $21 million.

24. Xethanol relies on a certain level of liquidity in order to sustain its business, pay salaries, debts and other customary business expenses.

25. In August 2007, Xethanol, acting through Northeast, ordered a partial sale of the Pivot position.

26. On August 27, 2007, DB notified Northeast that an auction had failed and the partial sale of the Pivot position Xethanol had ordered could not be completed.

27. In a follow-up telephone conversation with DB's Auction Rate Securities Desk, on August 28, 2007, representatives of DB told Northeast that starting on August 13, 2007, DB had declared all of the Pivot-1 and Camber-8 auction rate securities "failed auctions" and suggested that liquidity might only be available at discounted prices. On the same phone call, DB advised Northeast that the upcoming September 5, 2007 auction in Xethanol's second holding, Camber-8, was expected to fail, as DB was unwilling to change its approach regarding liquidity for these securities.

28. Unlike a QIB or QP investor that has significant resources to deal with circumstances of illiquidity, Xethanol does not have the liquidity to meet its day-to-day cash requirements without the proceeds from the ARS. Accordingly, when the auctions failed, Xethanol's only option to obtain the cash needed to sustain its business was to liquidate its investment at an amount below par.

29. Thus, on September 20, 2007, Xethanol sold its position in Pivot-1 at 90.5% of par value and its position in Camber-8 at 85.5% of par value, for a total loss of $1,588,500.

**First Claim for Relief**
**Violation of Section 12(a)(1) of the Securities Act**

30. Xethanol repeats and realleges paragraphs 1 – 29 above as if fully set forth herein.

31. The ARS are securities within the meaning of the Securities Act.

32. DB has offered to sell the ARS within the meaning of the Securities Act.

33. The ARS that DB sold to Xethanol were not registered with the Securities and Exchange Commission and there was no effective registration statement as to the ARS when DB sold the ARS to Xethanol.

34. There was no valid exemption in effect that permitted the ARS's offer and sale.

35. The offer and sale of the ARS violated §5 of the Securities Act.

36. Pursuant to Section 12 of the Securities Act, any person who offers or sells a security in violation of §5 is liable to a purchaser for the amount paid for such security with interest thereon, less any income received thereon, upon the tender of such security, or for damages if the security is no longer owned.

37. Xethanol sold its position in Pivot at 90.5% of par value and its position in Camber at 85.5% of par value, for a total loss of $1,588,500.

38. For the foregoing reasons, DB, Pivot and Camber are liable to Xethanol for damages in an amount of at least $1,588,500 plus interest, or such greater amount as may be determined at trial.

**WHEREFORE**, the Plaintiff demands judgment:

A. on the First Claim for Relief, for damages in the amount of $1,588,500 plus interest as permitted by law;

B. for the costs and disbursements of this action, including reasonable attorneys fees; and

C. for such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial on all issues in this action.

Dated: New York, New York
       December 11, 2007

MEISTER SEELIG & FEIN LLP

By: Howard S. Koh (HK 4730)
2 Grand Central Tower
140 East 45th Street – 19th Floor
New York, New York 10017
(212) 655-3500

To:

Deutsche Bank Securities, Inc.
60 Wall Street
New York, New York 10005