UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
XETHANOL CORPORATION,

                              Plaintiff,                    **Case No. 07 CV 11161 (AKH)**

        -against-

DEUTSCHE BANK SECURITIES, INC.,
PIVOT MASTER TRUST, and
CAMBER MASTER TRUST,

                              Defendants.
-------------------------------------------------------------------X

### DECLARATION OF HOWARD S. KOH IN OPPOSITION TO DEUTSCHE BANK SECURITIES, INC.'S MOTION TO DISMISS THE ORIGINAL COMPLAINT

HOWARD S. KOH, under the penalties of perjury, declares:

1.      I am a member of Meister Seelig & Fein LLP, counsel to plaintiff, Xethanol Corporation ("Xethanol"). I make this Declaration in opposition to Deutsche Bank Securities, Inc.'s Motion to Dismiss the original complaint in this action mainly to transmit documents to the Court and to provide several additional facts.

### Xethanol has served an Amended Complaint

2.      Xethanol, an alternative energy company, commenced this action against DB on December 12, 2007 alleging a single claim – violation of Section 12(a)(1) of the Securities Act of 1933 (the "12(a)(1) Claim"). After obtaining Xethanol's agreement to extend its time to respond to the Complaint, DB served a motion to dismiss the Complaint on January 25, 2007. In response, after reviewing DB's motion to dismiss, Xethanol served and filed, as was its right pursuant to Fed. R. Civ. P. 15(a)(1), an

Amended Complaint. A Copy of the Amended Complaint is attached as <u>Exhibit A</u>.  A copy of the original Complaint is attached as <u>Exhibit B</u>.

3.    The Amended Complaint adds two additional defendants, Pivot Master Trust and Camber Master Trusts and adds two causes of action against all of the defendants named in the Amended Complaint; a claim under section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder (the "10b-5 claim") and a claim of common law fraud (the "Fraud claim").   Upon serving the Amended Complaint Xethanol requested that DB withdraw its motion to dismiss the original complaint, without prejudice to any motion Xethanol might wish to make against the Amended Complaint.  DB however, rejected this sensible proposal which would have saved the Court's time and Xethanol's legal costs, and insisted that Xethanol oppose DB's motion to dismiss the original Complaint.

**DB sold Xethanol Auction Rate Securities that had not been registered with the SEC and for which there was no valid exemption from registration.**

4.    The core of Xethanol's Section 12(a)(1) claim is that DB, acting as an underwriter, sold Xethanol certain "auction rate securities," defined in the Complaint and the Amended Complaint as the "ARS," that had not been registered with the Securities and Exchange Commission (the "SEC") and which were without a valid exemption from registration as required by Section 5 of the Securities Act of 1933.

5.    As explained in the Amended Complaint, auction rate securities are debt instruments with long term nominal maturity for which the interest rate is periodically reset via reverse, or "dutch," auctions. Auction Rate Securities have been much in the news lately as a large number of auctions have been failing because the number of investors wishing to sell the auction rate securities has, apparently, been far in excess of

the number of investors wishing to buy. Various news article concerning the auction rate securities market are attached as Exhibit C.

6.      Auction rate securities can be sold either with or without registration with the SEC. If the auction rate securities are not to be registered with the SEC they are often sold as a part of a "private placement." When auction rate securities are sold as part of a private placement, their sale is typically limited to a class of buyers called "qualified institutional buyers" ("QIBs"), which are defined as in SEC Rule 144A.

7.      SEC Rule 144A defines a QIB as an entity such as an insurance company, investment company, employee benefit plan, 501(c)(3) or an investment advisor, acting for its own account or the accounts of other QIBS that in the aggregate owns and invests on a discretionary basis at least $100 million of securities of issuers that are not affiliated with the entity.

8.      In this case, DB sold auction rate securities that had not been registered with the SEC to Xethanol. Private Placement Memoranda that were prepared for the ARS specified that the ARS were only to be sold to QIBs. Xethanol is not a QIB. The private placement memorandum and related documents, sometimes referred to as "Series Pricing Supplements" for the ARS also provided that the auction rate securities could only be sold to "qualified purchasers" ("QPs") which the Private Placement Memorandum defined. Xethanol was not a QP either. These are the facts that support Xethanol's claim that it sold auction rate securities that were not registered with the SEC and without a valid exemption from registration. They are set forth in the Amended Complaint at, among other places, paragraphs 17 through 37.

**Contrary to the practice in the Securities Industry DB never sought a representation that Xethanol was qualified to purchase the ARS.**

9.      Typically, when underwriters sell auction rate securities that can only be sold to QIBs, the underwriter insists that the purchaser of the auction rate security, *i.e.* the "end user" sign a representation that it is a QIB and is otherwise qualified to buy the auction rate security.

10.      In this case, Xethanol placed a buy order for the ARS, through its broker, Northeast Securities, Inc. ("Northeast"). Northeast never owned or took title to the ARS. (If Northeast had taken title to the ARS that would have violated the securities laws because Northeast, itself, was neither a QIB or QP.) Contrary to the typical practice in the Securities Industry, DB never insisted upon, or even asked for, a written representation that the purchaser of the auction rate securities was a QIB or QP and Xethanol was never provided the Private Placement Memoranda or the Series Pricing Supplements for the ARS. Under these circumstances there was no way for Xethanol to know that the ARS were only supposed to be sold to QIBs that were also QPs. These facts demonstrate DB is liable on Xethanol's Section 12(a)(1) claim.

11.     Reduced to its core, DB's argument in its motion to dismiss is that Plaintiff failed to allege one of the following two facts: either that DB was not in privity with and did not sell any security to Xethanol; or that DB did not solicit Xethanol.  As discussed in the accompanying Memorandum of Law in Opposition to Deutsche Bank Securities, Inc.'s Motion to Dismiss the original Complaint. The Amended Complaint directly addresses these purported defects in the original Complaint and the Court is respectfully referred to that memorandum of law.

I declare under the penalties of perjury that the foregoing is true and correct.

Executed: February 29, 2008

HOWARD S. KOH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
XETHANOL CORPORATION,

               Plaintiff,

    -against-

DEUTSCHE BANK SECURITIES, INC.,
PIVOT MASTER TRUST, and
CAMBER MASTER TRUST,

               Defendants.
-------------------------------------------------------------------X

**AMENDED COMPLAINT**

**Case No. 07 CV 11161 (AKH)**

**JURY TRIAL DEMANDED**

     Plaintiff Xethanol Corporation by its attorneys, Meister Seelig & Fein LLP, as and for its Complaint against Deutsche Bank Securities, Inc. ("DB"), Pivot Master Trust ("Pivot") and Camber Master Trust ("Camber") alleges as follows:

<u>**NATURE OF THE ACTION**</u>

    1.    This action arises from Defendants' violations of Sections 12(a)(1) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77l and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and United States Securities Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. Defendants are also guilty of common law fraud.

    2.    DB was the underwriter of, and sold to Plaintiff Xethanol Corporation ("Xethanol"), an alternative energy company, certain auction rate securities known as "Pivot-1" and "Camber-8" (collectively Pivot-1 and Camber-8 are referred to herein as the "ARS"). Pivot and Camber issued the Pivot 1 and Camber 8 ARS respectively. Neither the Pivot-1 nor the Camber-8 securities were registered pursuant to Section 5 of the Securities Act, and neither had a valid exemption from registration. As a result,

Defendants are strictly liable for Xethanol's losses in connection with its purchases of the ARS, which totaled $1,588,500.

3.    Additionally, Defendants sold the ARS by means of false and misleading statements in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder. These false and misleading statements, which also provide the basis for Xethanol's common law fraud claim, included statements that DB would provide daily liquidity, at par value, in the event the purchasers of the ARS wished to liquidate their investment.

4.    Auction rate securities are debt instruments with long term nominal maturity for which the interest rate is periodically reset via reverse, or "dutch," auctions. Auction rate securities are issued at par value. The interest rate is usually reset every seven, twenty-eight, or thirty-five days by means of a dutch auction where bidders submit proposed rates at which they will purchase the auction rate securities. The lowest interest rate at which all sellers of the auction rate securities can be matched to willing buyers for their auction rate securities becomes the interest rate on the auction rate securities until the next auction is held.

5.    With any auction rate security there is the possibility that there will not be a sufficient number of buyers to match the holders of the auction rate securities that want to sell in any given auction. If this happens then the auction "fails," in the parlance of the industry. A failed auction means that holders of auction rate securities will not be able to sell their auction rate securities at par value. In short, a failed auction means the auction rate security becomes illiquid.

6.      Defendants sold the ARS at issue here, to investors including Xethanol. The ARS were never registered with the Securities and Exchange Commission as required by Section 5 of the Securities Act. Rather than register the ARS, DB attempted to sell the ARS in a private placement, which was to be exempt from registration.

7.      In order to ensure that the ARS could be sold in a private placement, the ARS were to be offered for sale only to certain buyers that presumably were capable of evaluating the risks of the purchase of the ARS and had the financial resources to shoulder such risks. To that end, the private placement memoranda ("PPMs") prepared for the ARS specifically limited their sale to certain qualified institutional buyers ("QIBs") and qualified purchasers ("QPs").

8.      Despite the restrictions on who could purchase the ARS set forth in the PPMs, Defendants sold Xethanol the ARS even though Xethanol was neither a QIB nor a QP. Indeed, Defendants did not even follow standard industry practice and obtain a written representation from Xethanol that it was a QIB or a QP.

9.      In August 2007, Xethanol sought to liquidate its ARS position to provide it with cash for its business operations. At approximately the same time, however, the disruptions in the credit markets coincided with the failure of the auctions for the ARS.

10.     In September 2007, faced with the fact that the ARS had become illiquid and its continued need for cash, Xethanol sold its ARS at a discount from par value of $1,588,500.

## PARTIES, JURISDICTION AND VENUE

11.     Plaintiff Xethanol is a corporation organized and existing under the laws of the state of Delaware, with a principal place of business at 1185 Avenue of the Americas, 20th Floor, New York, New York 10036.

12.     Defendant DB is a corporation organized and existing under the laws of the state of Delaware, with offices at 60 Wall Street, New York, New York 10005.

13.     Pivot is a statutory trust organized and existing under the laws of the state of Delaware, with a registered agent for service of process at BNYM, White Clay Center, Route 273, Newark Delaware 19711.

14.     Camber is a statutory trust organized and existing under the laws of the state of Delaware, with a registered agent for service of process at BNYM, White Clay Center, Route 273, Newark Delaware 19711.

15.     Jurisdiction of this Court is based upon Section 22 of the Securities Act, (15 U.S.C. §77v), section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§1331, 1337 and 1367.

16.     Venue is proper in this District under Section 22 of the Securities Act, and 28 U.S.C. §1391(b) in that a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

17.     Camber was created in 2007 by DB or one of its affiliates for the purpose of issuing series of auction rate securities.

18.     Pivot was created in 2007 by DB or one of its affiliates for the purpose of issuing series of auction rate securities.

19.     After DB or its affiliates created Pivot and Camber the Pivot and Camber Trusts issued series of auction rate securities, including the ARS at issue in this action.

20.     DB acquired the ARS and offered the ARS for sale to the public as the sole underwriter.

21.     Defendants did not register the ARS with the Securities and Exchange Commission.

22.     Defendants prepared separate PPMs in connection with the offerings of the ARS.

23.     In the case of both Pivot and Camber, the PPMs provided that the ARS were being sold exclusively to 'qualified institutional buyers' *i.e.* QIBs as defined in SEC Rule 144A.

24.     Pivot's PPM also provided that purchasers of Pivot must be "qualified purchasers" as defined by section 2(a)(51)(A) of the Investment Company Act of 1940, *i.e.* QPs.

25.     With respect to Camber, the requirement that purchasers of Camber must be "qualified purchasers" as defined by section 2(a)(51)(A) of the Investment Company Act of 1940, *i.e.* QPs was added by means of a "Series Pricing Supplement."

26.     Xethanol is not a QIB, as defined by Rule 144A of the Securities Act. Rule 144A of the Securities Act defines a QIB as an entity such as an insurance company, investment company, employee benefit plan, 501(c)(3) organization, or investment advisor, acting for its own account or the accounts of other QIBs that in the aggregate owns and invests on a discretionary basis at least $100 million of securities of issuers that are not affiliated with the entity.

27.     Xethanol is also not a QP pursuant to section 2(a)(51)(A) of the Investment Company Act of 1940 which defines a QP as any person, including a company, acting for its own account or the accounts of other qualified purchasers, who in the aggregate owns and invests on a discretionary basis, not less than $ 25,000,000 in investments.

28.     Xethanol engaged Northeast Securities, Inc. ("Northeast") as its broker to assist it with a cash management program, the objective of which to invest cash that Xethanol did not immediately need for its operations in short term, liquid securities that would not be subject to market risk.

29.     DB represented that the ARS were similar to money market fund investments and that they were not subject to market risk.

30.     DB also represented that it would provide daily liquidity at par for investments in ARS.

31.     DB also represented that the value of the ARS was not in any way associated with investments in "subprime" debt.

32.     On June 4, 2007, Xethanol purchased a $6,800,000 position in the PIVOT-1 auction security (CUSIP: 725809AA5) (specifically, this security is described as Pivot Master Trust AR CLNS Certificates Series FLTG 144A dated 5/8/07 with a maturity date of 9/20/17).

33.     On June 13, 2007, Xethanol purchased a $6,500,000 position in the CAMBER-8 auction security (CUSIP: 13200DAA0) (specifically, this security is described as Camber Master Trust dated 1/19/07 with a maturity date of 12/20/16).

34.    With respect to Xethanol's purchases of the Pivot and Camber ARS, Northeast acted as a broker placing the "buy" orders on Xethanol's behalf.

35.    Thus, title to the ARS passed from DB to Xethanol.

36.    Alternatively, title to the ARS passed from Pivot and Camber to Xethanol.

37.    DB knew or should reasonably have known that when Northeast purchased the ARS DB was not acting for its own account and instead was acting as a broker purchasing the ARS for a client.

38.    When selling unregistered securities which, may only be sold to QIBs or QPs, it is the standard practice in the Securities Industry to obtain a written representation, signed by the purchaser of the securities that the purchaser is a QIB or QP.

39.    Xethanol was never provided a copy of either PPM prior to acquiring its positions in the ARS.

40.    Defendants never sought or obtained a written representation from Xethanol that it was a QIB or a QP.

41.    At no time did Xethanol represent that it was a QIB or a QP.

42.    Xethanol is not a QIB or a QP.

43.    Xethanol's Quarterly Report filed on May 15, 2007 with the United States Securities and Exchange Commission on Form 10-Q for the quarter ended March 31, 2007 reported that Xethanol's net worth was approximately $48 million and that the total value of its cash was approximately $21 million.

44.    Xethanol relies on a certain level of liquidity in order to sustain its business, pay salaries, debts and other customary business expenses.

45.    In August 2007, Xethanol ordered a partial sale of the Pivot position.

46.    Thereafter Northeast, acting as broker, placed sell orders with respect to the ARS.

47.    On or about August 27, 2007, DB notified Northeast that an auction had failed and the partial sale of the Pivot position Xethanol had ordered could not be completed.

48.    DB also refused to purchase the ARS at par thereby breaching its representation that it would provide daily liquidity with respect to the ARS.

49.    In a follow-up telephone conversation with DB's Auction Rate Securities Desk, on August 28, 2007, representatives of DB told Northeast that starting on August 13, 2007, DB had declared all of the Pivot-1 and Camber-8 auction rate securities "failed auctions" and suggested that liquidity might only be available at discounted prices.

50.    On the same phone call, DB advised Northeast that the upcoming September 5, 2007 auction in Xethanol's second holding, Camber-8, was expected to fail, as DB was unwilling to change its approach regarding liquidity for these securities.

51.    Ultimately, the September 5, 2007 auction of the Camber-8 ARS failed.

52.    Unlike a QIB or QP investor that has significant resources to deal with circumstances of illiquidity, Xethanol does not have the liquidity to meet its day-to-day cash requirements without the proceeds from the ARS.  Accordingly, when the auctions failed, Xethanol's only option to obtain the cash needed to sustain its operations was to liquidate its investment at an amount below par.

53.     Thus, on September 20, 2007, Xethanol sold its position in Pivot-1 at 90.5% of par value and its position in Camber-8 at 85.5% of par value, for a total loss of $1,588,500.

**First Claim for Relief**
**Violation of Section 12(a)(1) of the Securities Act**

54.     Xethanol repeats and realleges paragraphs 1 – 53 above as if fully set forth herein.

55.     The ARS are securities within the meaning of the Securities Act.

56.     Defendants has offered to sell and sold the ARS to Xethanol within the meaning of the Securities Act.

57.     Defendants offered and sold the ARS by the use of the instrumentalities of interstate commerce.

58.     The ARS that Defendants offered and sold to Xethanol were not registered with the Securities and Exchange Commission and there was no effective registration statement as to the ARS when Defendants sold the ARS to Xethanol.

59.     There was no valid exemption in effect that permitted the ARS's offer and sale without registration under the Securities Act.

60.     The offer and sale of the ARS violated §5 of the Securities Act.

61.     Pursuant to Section 12 of the Securities Act, any person who offers or sells a security in violation of §5 is liable to a purchaser for the amount paid for such security with interest thereon, less any income received thereon, upon the tender of such security, or for damages if the security is no longer owned.

62.     Xethanol sold its position in Pivot at 90.5% of par value and its position in Camber at 85.5% of par value, for a total loss of $1,588,500.

1C38.38                                    9

63.    For the foregoing reasons, Defendants are liable to Xethanol for damages in an amount of at least $1,588,500 plus interest, or such greater amount as may be determined at trial.

**Second Claim for Relief**
**Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5**

64.    Xethanol repeats and realleges the allegations of paragraphs 1 through 63 of the Complaint as if fully set forth herein.

65.    Defendants made false and misleading statements of material fact in connection with the sale of the ARS, including:  that the ARS were similar to money market fund investments in that they were not subject to market risk, that DB would provide daily liquidity at par for investments in ARS, and that the value of the ARS was not in any associated with investments in "subprime" debt.

66.    At the time Defendants made these false and misleading statements, Xethanol did not know and could not have known through the exercise of due care that the statements were false and misleading.

67.    Defendants also omitted to state material facts concerning the ARS, namely that they could only be purchased by an investor that was both and QIB and QP and the ARS had not been registered with the SEC and had no valid exemption from registration with the SEC.

68.    At the time Defendants failed to state these material facts, Xethanol did not know and could not have known through the exercise of due care of the existence of these material facts.

69.    Defendants made their false statements of material fact and omitted to state material facts with scienter and for the purpose and intent of inducing buyers such as Xethanol to purchase the ARS.

70.    Had Xethanol known that the that the ARS were subject to market risk, that DB would not provide daily liquidity at par for investments in ARS, and that the ARS could only be purchased by entities that were both a QIB and QP, Xethanol would not have purchased the ARS and thus Xethanol justifiably relied on Defendants' material false statements of fact and omissions.

71.    By reason of the foregoing conduct, Defendants knowingly, or recklessly through the use of the instrumentalities of interstate commerce, and in connection with the purchase and sale of the ARS violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that Defendants (i) employed devices, schemes and artifices to defraud; (ii) made false statements of material fact or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, transactions, practices and a course of business that operated as a fraud and deceit upon Xethanol.

72.    Because of the foregoing conduct, Xethanol was required to sell its position in Pivot at 90.5% of par value and its position in Camber at 85.5% of par value, for a total loss of $1,588,500.

73.    For the foregoing reasons, Defendants are liable to Xethanol for damages in an amount of at least $1,588,500 plus interest, or such greater amount as may be determined at trial.

### Third Claim for Relief
### <u>Common Law Fraud</u>

74.     Xethanol repeats and realleges the allegations of paragraphs 1 through 73 of the Complaint as if fully set forth herein.

75.     Defendants made false representations of material fact to Northeast, which was acting as agent for Xethanol in connection with the sale of the ARS, including:  that the ARS were similar to money market fund investments in that they were not subject to market risk, that DB would provide daily liquidity at par for investments in ARS, and that the value of the ARS was not in any associated with investments in "subprime" debt.

76.     At the time Defendants made these false and misleading statements, Xethanol did not know and could not have known through the exercise of due care that the statements were false and misleading.

77.     Defendants also omitted to state material facts to Northeast which was acting as agent to Xethanol concerning the ARS, namely that they could only be purchased by an investor that was both and QIB and QP and that the ARS had not been registered with the SEC and had no valid exemption from registration with the SEC.

78.     At the time Defendants failed to state these material facts, Xethanol did not know and could not have known through the exercise of due care of the existence of these material facts.

79.     Defendants made their false statements of material fact and omitted to state material facts with scienter and for the purpose and intent of inducing buyers such as Xethanol to purchase the ARS.

80.     Had Xethanol known that the ARS were subject to market risk, that DB would not provide daily liquidity at par for investments in ARS, and that the ARS could

only be purchased by entities that were both a QIB and QP, Xethanol would not have purchased the ARS and thus Xethanol justifiably relied on Defendants' material false statements of fact and omissions.

81.    By reason of the foregoing conduct, Defendants fraudulently induced Xethanol to purchase the ARS.

82.    Because of the foregoing conduct, Xethanol was required to sell its position in Pivot at 90.5% of par value and its position in Camber at 85.5% of par value, for a total loss of $1,588,500.

83.    For the foregoing reasons, Defendants are liable to Xethanol for damages in an amount of at least $1,588,500 plus interest, or such greater amount as may be determined at trial.

**WHEREFORE**, the Plaintiff demands judgment:

A. on all Claims for Relief, for damages in the amount of $1,588,500 plus interest as permitted by law;

B. for the costs and disbursements of this action, including reasonable attorneys fees; and

C. for such other and further relief as the Court deems just and proper.

### JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial on all issues in this action.

Dated: New York, New York
      February 14, 2008

             MEISTER SEELIG & FEIN LLP

             By: Howard S. Koh (HK 4730)
             2 Grand Central Tower
             140 East 45th Street – 19th Floor
             New York, New York 10017
             (212) 655-3500

TO:

Deutsche Bank Securities, Inc.
60 Wall Street
New York, New York 10005

Pivot Master Trust
c/o BNYM
White Clay Center
Route 273
Newark, Delaware 19711

Camber Master Trust
c/o BNYM
White Clay Center
Route 273
Newark, Delaware 19711

◆AO 440  (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

_____ Southern _____    District of    _____ New York _____

XETHANOL CORPORATION,

      Plaintiff,

       V.

DEUTSCHE BANK SECURITIES, INC.,

      Defendant.

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER:

## 07 CV 11161

### Judge Hellerstein

TO: (Name and address of Defendant)

DEUTSCHE BANK SECURITIES, INC.
60 Wall Street
New York, New York 10005

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

MEISTER SEELIG & FEIN, LLP
2 Grand Central Tower
140 East 45th Street - 19th Floor
New York, New York 10017

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

## J. MICHAEL McMAHON

CLERK    _Marcos Quintero_         DATE _____

(By) DEPUTY CLERK

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |
| NAME OF SERVER *(PRINT)* | TITLE |

| *Check one box below to indicate appropriate method of service* |
|---|

☐ Served personally upon the defendant.  Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

    Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

## DECLARATION OF SERVER

      I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____    _____
               Date             *Signature of Server*

                                _____
                                *Address of Server*

_____

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

XETHANOL CORPORATION,

                              Plaintiff,

          -against-

DEUTSCHE BANK SECURITIES, INC.,

                              Defendant.
--------------------------------------------------------------X

*Judge Hellerstein*

**COMPLAINT**

Case No. CV 11161

**JURY TRIAL DEMANDED**

RECEIVED
DEC 11 2007
U.S.D.C. S.D.N.Y.
CASHIERS

     Plaintiff Xethanol Corporation by its attorneys, Meister Seelig & Fein LLP,

and for its Complaint against Deutsche Bank Securities, Inc., alleges as follows:

## NATURE OF THE ACTION

     1.     This action arises from Defendant Deutsche Bank Securities, Inc.'s

("DB's") violations of Section 12(a)(1) of the Securities Act of 1933 (the "Securities

Act"), 15 U.S.C. §77l, as DB was the underwriter of, and offered for sale to Plaintiff

Xethanol Corporation ("Xethanol"), an alternative energy company, certain auction rate

securities known as "Pivot-1" and "Camber-8" (collectively Pivot-1 and Camber-8 are

referred to herein as the "ARS").  Neither the Pivot-1 nor the Camber-8 securities were

registered pursuant to Section 5 of the Securities Act, and neither had a valid exemption

from registration. Xethanol lost $1,588,500 on its transactions in the ARS and, in this

action, seeks to recover the losses.

     2.     Auction rate securities are debt instruments with long term nominal

maturity for which the interest rate is periodically reset via reverse, or "dutch," auctions.

Auction rate securities are issued at par value.  The interest rate is usually reset every

seven, twenty-eight, or thirty-five days by means of a dutch auction where bidders submit

proposed rates at which they will purchase the auction rate securities. The lowest interest rate at which all sellers of the auction rate securities can be matched to willing buyers for their auction rate securities becomes the interest rate on the auction rate securities until the next auction is held.

3.      With any auction rate security there exists the possibility that there will not be a sufficient number of buyers to match the holders of the auction rate securities that want to sell in any given auction. If this happens then the auction "fails," in the parlance of the industry. A failed auction means that holders of auction rate securities will not be able to sell their auction rate securities at par value. In short, a failed auction means the auction rate security becomes illiquid.

4.      DB offered the ARS at issue here, to investors including Xethanol. The ARS were never registered with the Securities and Exchange Commission as required by Section 5 of the Securities Act. Rather than register the ARS, DB attempted to sell the ARS in a private placement, which was to be exempt from registration.

5.      In order to ensure that the ARS could be sold in a private placement, the ARS were to be offered for sale only to certain buyers that presumably were capable of evaluating the risks of the purchase of the ARS and had the financial resources to shoulder such risks. To that end, the private placement memoranda ("PPMs") prepared for the ARS specifically limited their sale to certain qualified institutional buyers ("QIBs") and qualified purchasers ("QPs").

6.      Despite the restrictions on who could purchase the ARS set forth in the PPMs, DB permitted Xethanol to purchase the ARS even though Xethanol was neither a QIB nor a QP. Indeed, DB did not even follow standard industry practice and obtain a

written representation in a signed subscription agreement from Xethanol that it was a QIB or a QP.

7.      In August 2007, Xethanol sought to liquidate its ARS position to provide it with cash for its business operations.  At approximately the same time, however, the disruptions in the credit markets led to the failure of the auctions for the ARS.

8.      In September 2007, faced with the fact that the ARS had become illiquid and its continued need for cash, Xethanol sold its ARS at a discount from par value of $1,588,500.  This action seeks to recover that loss, pursuant to Section 12(a)(1) of the Securities Act, which provides for recovery in case of the sale of unregistered securities that are not otherwise exempt from registration.

## PARTIES, JURISDICTION AND VENUE

9.      Plaintiff Xethanol is a corporation organized and existing under the laws of the state of Delaware, with a principal place of business at 1185 Avenue of the Americas, 20th Floor, New York, New York 10036.

10.      Defendant DB is a corporation organized and existing under the laws of the state of Delaware, with offices at 60 Wall Street, New York, New York 10005.

11.      Jurisdiction of this Court is based upon Section 22 of the Securities Act, (15 U.S.C. §77v); 28 U.S.C. §§1331 and 1337.

12.      Venue is proper in this District under Section 22 of the Securities Act, and 28 U.S.C. §1391(b) in that a substantial part of the events or omissions giving rise to the claims occurred in this district.

3

## FACTUAL ALLEGATIONS

13.    Beginning in the Spring of 2007, DB offered the ARS for sale to the public without registering the securities with the Securities and Exchange Commission.

14.    DB prepared separate Private Placement Memoranda (each a "PPM" and collectively "PPMs") in connection with the offerings of the ARS.

15.    In the case of both Pivot-1 and Camber-8, the PPMs provided that the ARS were being sold exclusively to 'qualified institutional buyers' as defined in Rule 144A under the Securities Act. (Pivot's PPM also provided that purchasers of Pivot must be "qualified purchasers" as defined by section 2(a)(51)(A) of the Investment Company Act of 1940.)

16.    Xethanol is not a QIB, pursuant to Rule 144A of the Securities Act. Rule 144A of the Securities Act defines a QIB as an entity such as an insurance company, investment company, employee benefit plan, 501(c)(3) organization, or investment advisor, acting for its own account or the accounts of other QIBs that in the aggregate owns and invests on a discretionary basis at least $100 million of securities of issuers that are not affiliated with the entity.

17.    Xethanol is also not a QP pursuant to section 2(a)(51)(A) of the Investment Company Act of 1940 which defines a QP as any person, including a company, acting for its own account or the accounts of other qualified purchasers, who in the aggregate owns and invests on a discretionary basis, not less than $ 25,000,000 in investments.

18.    On June 4, 2007, through its broker, Northeast Securities, Inc. ("Northeast"), Xethanol purchased a $6,800,000 position in the PIVOT-1 auction security

(CUSIP: 725809AA5) (specifically, this security is described as Pivot Master Trust AR

CLNS Certificates Series FLTG 144A dated 5/8/07 with a maturity date of 9/20/17).

19.    On June 13, 2007 acting through Northeast, Xethanol purchased a

$6,500,000 position in the CAMBER-8 auction security (CUSIP: 13200DAA0)

(specifically, this security is described as Camber Master Trust dated 1/19/07 with a

maturity date of 12/20/16).

20.    Xethanol was never provided a copy of either PPM prior to acquiring its

positions in the ARS.

21.    At no time did Xethanol represent that it was a QIB or a QP.  Xethanol

never signed and returned subscription agreements, a standard practice in the securities

industry, prior to purchase of the ARS.

22.    Xethanol is not a QIB or a QP.

23.    Xethanol's Quarterly Report filed on May 15, 2007 with the United States

Securities and Exchange Commission on Form 10-Q for the quarter ended March 31,

2007 reported that Xethanol's net worth was approximately $48 million and that the total

value of its cash was approximately $21 million.

24.    Xethanol relies on a certain level of liquidity in order to sustain its

business, pay salaries, debts and other customary business expenses.

25.    In August 2007, Xethanol, acting through Northeast, ordered a partial sale

of the Pivot position.

26.    On August 27, 2007, DB notified Northeast that an auction had failed and

the partial sale of the Pivot position Xethanol had ordered could not be completed.

27.    In a follow-up telephone conversation with DB's Auction Rate Securities Desk, on August 28, 2007, representatives of DB told Northeast that starting on August 13, 2007, DB had declared all of the Pivot-1 and Camber-8 auction rate securities "failed auctions" and suggested that liquidity might only be available at discounted prices. On the same phone call, DB advised Northeast that the upcoming September 5, 2007 auction in Xethanol's second holding, Camber-8, was expected to fail, as DB was unwilling to change its approach regarding liquidity for these securities.

28.    Unlike a QIB or QP investor that has significant resources to deal with circumstances of illiquidity, Xethanol does not have the liquidity to meet its day-to-day cash requirements without the proceeds from the ARS. Accordingly, when the auctions failed, Xethanol's only option to obtain the cash needed to sustain its business was to liquidate its investment at an amount below par.

29.    Thus, on September 20, 2007, Xethanol sold its position in Pivot-1 at 90.5% of par value and its position in Camber-8 at 85.5% of par value, for a total loss of $1,588,500.

### First Claim for Relief
### Violation of Section 12(a)(1) of the Securities Act

30.    Xethanol repeats and realleges paragraphs 1 – 29 above as if fully set forth herein.

31.    The ARS are securities within the meaning of the Securities Act.

32.    DB has offered to sell the ARS within the meaning of the Securities Act.

33.    The ARS that DB sold to Xethanol were not registered with the Securities and Exchange Commission and there was no effective registration statement as to the ARS when DB sold the ARS to Xethanol.

34.     There was no valid exemption in effect that permitted the ARS's offer and sale.

35.     The offer and sale of the ARS violated §5 of the Securities Act.

36.     Pursuant to Section 12 of the Securities Act, any person who offers or sells a security in violation of §5 is liable to a purchaser for the amount paid for such security with interest thereon, less any income received thereon, upon the tender of such security, or for damages if the security is no longer owned.

37.     Xethanol sold its position in Pivot at 90.5% of par value and its position in Camber at 85.5% of par value, for a total loss of $1,588,500.

38.     For the foregoing reasons, DB, Pivot and Camber are liable to Xethanol for damages in an amount of at least $1,588,500 plus interest, or such greater amount as may be determined at trial.

**WHEREFORE**, the Plaintiff demands judgment:

A.  on the First Claim for Relief, for damages in the amount of $1,588,500 plus interest as permitted by law;

B.  for the costs and disbursements of this action, including reasonable attorneys fees; and

C.  for such other and further relief as the Court deems just and proper.

7

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial on all issues in this action.

Dated: New York, New York
December 11, 2007

MEISTER SEELIG & FEIN LLP

By: Howard S. Koh (HK 4730)
2 Grand Central Tower
140 East 45th Street – 19th Floor
New York, New York 10017
(212) 655-3500

To:

Deutsche Bank Securities, Inc.
60 Wall Street
New York, New York 10005

8

**MARKET PLACE**

# New Trouble in Auction-Rate Securities

**By JENNY ANDERSON**
**and VIKAS BAJAJ**

SOME well-heeled investors got a big jolt from **Goldman Sachs** this week: Goldman, the most celebrated bank on Wall Street, refused to let them withdraw money from investments that they had considered as safe as cash.

The investments at issue are so-called auction-rate securities, instruments at the center of the latest squeeze in the credit markets.

Goldman, Lehman Brothers, Merrill Lynch and other banks have been telling investors the market for these securities is frozen — and so is their cash.

The banks typically pitch these securities to corporations and wealthy individuals as safe alternatives to cash, investors said. The bonds are, in fact, long-term securities. But the banks hold weekly or monthly auctions to set the interest rates and give holders the option of selling the securities.

Only this week almost 1,000 of these auctions failed. The banks also refused to support the auctions, leaving many investors wondering when they will get their money back.

"Investors have lost confidence in the liquidity of these instruments," said G. David MacEwen, the chief investment officer for fixed income at American Century Investments, a mutual fund company.

"These types of instruments depend on new investors showing up to own the securities."

The $330 billion auction-rate market is dominated by municipalities and other tax-exempt institutions like the Port Authority of New York and New Jersey, which had issued some auction securities and had its interest rate soar to 20 percent on Wednesday. Closed-end mutual funds, student loan companies and corporations also issue such securities.

A failed auction does not mean the securities go into default, because the issuer continues to pay interest at the higher rate, or "fail rate."

The market, however, has a troubled

*Andrew Ross Sorkin contributed reporting.*

## A Liquid Market?

Auction-rate securities have not sold well recently. Here is a breakdown of the market.



TOTAL = $330 billion

**53%** Tax-exempt market
*(Student loans and other tax-exempt collateral)*

Taxable market
*(Mostly student loan asset-backed securities)*

**26%**

Taxable closed-end funds preferred shares

**10%**

Tax-exempt market closed-end funds preferred shares

**5%**

Corporate preferred shares
**3%**

Source: Capital Advisors Group    THE NEW YORK TIMES

history. In 2006, the Securities and Exchange Commission reached a $13 million settlement with 15 investment banks, and the industry agreed to impose a voluntary code of conduct for the auction-rate market.

The S.E.C. investigation centered on how bidding was conducted for these securities. Critics complain that investment banks have the upper hand in bidding because they can bid after seeing what other investors have bid.

Brokerage firms are not legally obligated to make a market in auction securities, or give clients a price even if there is not one in the market. But clients who are unable to sell are likely to argue that they were wrongly put into long-term securities when their intention was to buy shorter-term debt.

"If these were pitched as cash equivalents, if that is what the broker said they were, the banks may be held responsible for losses and clients' inability to get their money out," said Jacob H. Zamansky, a securities lawyer who represents individual investors.

Goldman Sachs and Merrill Lynch declined to comment.

The situation is an awkward one for investment banks and brokers that have had to tell clients that their cash is frozen until at least the next auction — if not longer. One affluent New Jersey family has sued Lehman Brothers for the declining value of its cash in auction-rate securities. Lehman has said it acted properly.

Money managers, chief executives and individual investors have been swept up by the latest turmoil in the credit markets. One wealthy investor said Goldman Sachs had sold him auction-rate securities and had described the instruments as equivalent to cash.

"It's a moral outrage," said this investor, who asked not to be named because he still has to deal with the bank. "Their pitch was, keep your cash with us, we get a higher rate."

This year, **Bristol-Myers Squibb**, the drug maker, took a $275 million write-off on money it had invested in auction-rate securities that it was unable to sell because of failed auctions.

Analysts say the biggest investors in auction-rate securities are individuals and corporations because money market funds cannot own the bonds. Many bond fund managers also shy away from the securities because of the uncertainty.

But the failed auctions do have one upside: the securities are resetting to rates that are far higher than those on other types of bonds.

Mr. MacEwen of American Century said his firm was considering buying auction-rate bonds for the first time because the rates have been reset to an attractive level.

"A lot of the municipalities or the closed-end funds that underlie this are high quality," Mr. MacEwen said. "Whether its 20 percent or 5 percent, that looks like a good purchase if you are willing to forgo the liquidity."

Not all auction-rate securities with failed auctions are resetting to very high rates. The penalty rates are governed by the terms of the bond, and in some cases they are tied to short-term interest rates like the London interbank offered rate, which has been falling for much of the year as the Federal Reserve has cut its benchmark interest rate.

UARY 15, 2008                                    ON                                    A23

**PAUL KRUGMAN**

# A Crisis of Faith

A decade ago, during the last global financial crisis, the word on everyone's lips was "contagion." Troubles that began in a far-away country of which most people knew nothing (Thailand) eventually spread to much bigger countries with no obvious connection to Southeast Asia, like Russia and Brazil.

Today, we're witnessing another kind of contagion, not so much across countries as across markets. Troubles that began a little over a year ago in an obscure corner of the financial system, BBB-minus subprime-mortgage-backed securities, have spread to corporate bonds, auto loans, credit cards and now — the latest casualty — student loans.

Indeed, this week the state of Michigan suspended a major student-loan program because of the sudden collapse of another $300 billion market you've never heard of, the market for auction-rate securities.

Why has a crisis that began with loans to a limited group of home buyers ended up disrupting so much of the financial system? Because, ultimately, it's more than a subprime crisis; indeed, it's more than a housing crisis. It's a crisis of faith.

I know that sounds dramatic. But let me talk about what just happened to auction-rate securities.

Like many of the financial innovations that are now being called into question, auction-rate securities are complicated deals that seemed to offer something for nothing.

They seemed to offer the borrowers — typically, local governments, or, quasi-governmental agencies, like the Port Authority of New York and New Jersey and the Michigan Higher Education Student Loan Authority — a way to borrow long term without paying the relatively high interest rates investors usually demand on long-term loans.

At the same time, they seemed to offer investors an asset that was as good as cash — readily available whenever needed — but paid higher interest rates than bank deposits.

The operative word in all of this, of course, is "seemed."

Auction-rate securities seemed as good as cash because they involve regular, well, auctions, held as often as once a week, in which investors wanting out sell their positions to investors wanting in. In principle, it was always possible for auctions to fail for lack of enough willing buyers — but that wasn't ever supposed to happen.

Meanwhile, these securities seemed like a good deal for borrowers, despite the fact that they contain a penalty clause: if an auction fails, the interest rate the borrower pays jumps up. (The Port Authority, which had a failed auction last week, just saw the interest rate it pays leap from 4.3 percent to 20 percent.) You see, there weren't ever supposed to be failed auctions, so the penalties weren't supposed to be relevant.

Now, what wasn't ever supposed to happen has. In the last few weeks, a series of auctions have failed, leaving investors who thought they had ready ac-

cess to their cash stuck, even as borrowers find themselves paying penalty rates.

The collapse of the auction-rate security market doesn't reflect newly discovered problems with the borrowers: the Port Authority is as financially sound today as it was a month ago. Instead, it's contagion from the broader credit crisis.

One channel of "contagion" involves monoline bond insurers, the specialized insurance companies that are supposed to guarantee debt. These companies insured buyers of local government debt against losses — but they also guaranteed a lot of subprime-related investments, which makes everyone wonder whether they'll actually have the money to compensate losers in other markets.

More important, however, is the way the ever-widening financial crisis has shaken investors' faith in the whole system. People no longer trust assurances that fancy financial instruments will function the way they're supposed to — after all, they know what happened to

---

## A minor-key reprise of 1930-1931

---

people who thought their subprime-backed securities were safe, AAA-rated investments. Why, then, should they believe that auction-rate securities are as good as cash?

And loss of trust can be a self-fulfilling prophecy. Now that new investors won't buy auction-rate securities because they no longer believe that they're as good as cash, those securities become a much worse investment.

Needless to say, all of this is bad for the economy. I like to think of what's happening as a sort of minor-key reprise of the banking crisis that swept America in 1930 and 1931. Frustrated investors who can't get their money out of auction-rate securities aren't as photogenic as angry mobs milling outside closed banks, but the principle is the same. And so are the effects: would-be borrowers can't get credit, and the economy suffers.

One simple measure of the seriousness of the credit problem is this: although the Federal Reserve has sharply cut the interest rate it controls over the past few weeks, the borrowing costs facing many companies and households have actually gone up.

And the financial contagion is still spreading. What market is next? □

ONLINE: OPINION TODAY
**Domestic Disturbances.** Judith Warner: The belief that Americans are too quick to take prescription drugs may not be supported by facts.
nytimes.com/opinion

*FYI.*
*Ken*

# PERSON

## Pie

**COMMON SENSE** | *By James B. Stewart*

# Risks of a 'Safe' Investment Are Found Out the Hard Way

They were sold as a liquid, safe, slightly higher-yielding, tax-exempt alternative to money-market funds. I should know, since I bought some. For several years I've been parking a good part of my cash in auction-rate preferred shares.

These are typically shares of a closed-end fund that used the proceeds to buy triple-A-rated securities. (In my case, municipal bonds.) There was virtually no interest-rate risk since the rate was set at frequent auctions of the shares. My shares were issued by **BlackRock,** the asset-management firm almost half-owned by **Merrill Lynch;**

**SMARTMONEY** many other firms also sold the securities. When I needed cash, I simply redeemed shares, as I did last month when I took advantage of the market downturn to buy stocks.

Last week, when I read that some tax-exempt entities, even the Metropolitan Museum of Art, were suddenly paying exorbitant rates because of "failed" auctions for municipal bonds, I didn't suspect this would have any immediate impact on me. I heard nothing from Merrill Lynch, which sold me the ARPS. My account statement continues to show the shares at full face value.

I became more concerned as news reports of failed auctions continued last week. Finally, I called a broker to ask about the status of my ARPS. I learned that recent auctions of these preferred shares have indeed failed, which means there were no buyers at rates acceptable to the sellers. The market has virtually collapsed. There is no guarantee the shares can be sold. Indeed, it's highly unlikely they can be. What was a ready source of cash is now essentially frozen.

Last year, when some money-market funds turned out to hold some mortgage-backed securities and faced a liquidity crisis, their sponsors stepped in and redeemed the shares at face value. This seemed the only decent course, not to mention a good investment in customer loyalty.

But when I asked a broker at Merrill Lynch if it would do the same for owners of these money-market equivalents, the answer was "no"—not after the multibillion-dollar write-offs Merrill has taken on illiquid assets. Merrill Lynch and the other big banks that sold these shares have stopped making a market in them, which is a major reason the auctions have failed.

Merrill Lynch, when asked for comment, told me: "We are offering our clients loans which can give them liquidity." It wasn't yet clear whether these would be interest-free loans, which they certainly should be, in my opinion.

BlackRock commented on its Web site that "We do not see any issues with the financial health or fundamentals of these funds as a result of the failed auctions." The firm also said it "continues to closely monitor developments in the ARPS market."

The amount of auction-rate preferred shares outstanding is massive—an estimated $330 billion. Many firms besides Merrill Lynch sold the shares. Fortunately, I have no immediate need for the cash. But given that these securities were marketed as money-market alternatives, I'm sure that there are plenty of people who do, and will be in for a rude shock when they try to redeem them.

I hope that this will be a temporary paralysis and the market will come to its senses. These securities still carry a triple-A rating. None of the underlying bonds have defaulted. Interest is still being paid, at a slightly higher rate than before.

In my view, any failure of the big banks to honor what is at least a moral commitment to the people to whom they sold these shares is appalling. At least two states are investigating, and I would expect them to be joined by the Securities and Exchange Commission.

So is any fixed-income security short of U.S. Treasurys and the biggest, most liquid money-market funds safe at this point? I'd like to think so, but if you own any securities that depend on investor confidence or raise any liquidity issues, be aware of the risks.

*James B. Stewart, a columnist for Smart-Money magazine and SmartMoney.com, writes weekly about his personal investing strategy. Unlike Dow Jones reporters, he may have positions in the stocks he writes about. For his past columns, see: www.smartmoney.com/commonsense.*



*By Tom Herman*

sprung up, vey by Har pleteTax, a electronic f cies: State s ducted, and tal-loss wr home at a l

Confusi ernment ha der an ec signed into Bush. Base are some wi and how to struggle wi

**■ Myth:** *Sir there's no r because th Treasury o*

**■ Reality:** limit. If you file, you ge three years was due, in lect that ref nal Revenu

Many p year ago, th claimed refi lion were av ple who had tax return money, thos file with an deadline of

**■ Myth:** *I wo stimulus pa $75,000 las ried and fili* **■ Reality:** N who made

**Home Security**

PERSONAL JOURNAL D1

# URNAL.

★★★★ $1.50

*Wall Street Journal*
*2/13/08*
*, p. A1*

.78 ▽ $0.81  **GOLD** $907.40 ▽ $15.50  **EURO** $1.4585  **YEN** 107.27

# Obama

ally while polls were clos-
ck East, she tested what ap-
d to be an increasingly pop-
message, attacking big com-
s and promising a sharp
in the minimum wage.
a victory rally in Madison,
Sen. Obama also used such
ric, telling a cheering
d, "We need a president
will listen not just to Wall
t, but to Main Street."
the Republican primaries,
na's longtime Sen. McCain
ated Mr. Huckabee, the
er Arkansas governor and
hern Baptist minister. In
nia and the District of Co-
ia, that was enough to give
all 76 convention delegates
r grabs in those winner-
all contests. In Maryland,
l of the 34 delegates are allo-
t to the winners of each con-
sional district.
till, the closeness of the out-
e in Virginia was a worri-
*Please turn to page A28*

# Building

iway congestion. Railroads
a load can be moved by rail us-
about a third as much fuel as
kes to haul it by truck. And
transport is becoming more
ient still, they say, as opera-
s speed their lines and logis-
companies build huge ware-
se areas along routes.
Demand for rail service in-
ased sharply when the U.S.
nomy and Asian imports
ged starting in 2003. Tight ca-
ity on major routes enabled
lroads to raise prices. The
wth in freight volume has
wed along with economic
wth, but shippers say they're
l planning to increase their
*Please turn to page A24*

# Credit Woes Hit Funding For Loans To Students

By Liz Rappaport
And Randall Smith

The credit crunch that has so
far caused more than $100 bil-
lion of losses for big Wall Street
investment firms now extends
to students in Michigan, and it
could soon hit many other bor-
rowers, ranging from California
museums to the prestigious
Deerfield Academy prep school
in Massachusetts.

Yesterday, the Michigan
Higher Education Student Loan
Authority, a state agency, said
on its Web site that "due to the
current and unprecedented cap-
ital-markets disruption" it will
stop making loans under the
state's Michigan Alternative
Student Loan, or MI-Loan, pro-
gram. More than 100 Michigan
colleges and universities partici-
pate in the program.

In the past few days, prob-
lems have mounted for many
borrowers as an obscure—but
important—corner of the credit
market has gone into a deep
freeze. Borrowers ranging from
student-loan authorities to mu-
nicipalities to big bond funds de-
pend on this market, which al-
lows them to use loans or bonds
as collateral to raise money to
make new loans or fund
projects. They do so by selling se-
curities whose interest rates are
reset every week as they change
hands in auctions arranged by
Wall Street firms like Goldman
Sachs Group Inc., Citigroup Inc.
and J.P. Morgan Chase & Co.

Moody's Investors Service es-
*Please turn to page A21*

# Credit Woes Hit Student Lending

**Continued from Page One**

timates the size of the market at $325 billion to $360 billion.

In recent days, the money managers and other investors who buy these securities have been balking, out of fear the credit turmoil is spreading. The remaining bidders have commanded higher interest rates from borrowers including Deerfield, San Francisco's de Young Museum, New York's Carnegie Hall and many others. Meantime, many investors who hold the securities would like to sell them but can't.

Of roughly $20 billion in such securities auctioned yesterday, half, or about $10 billion, failed to generate enough demand from money managers to sell, according to one trading executive at a top dealer. The failures pushed up borrowing costs of these securities to levels ranging from 4.6% to 18%, as their interest rates reset to so-called "penalty" rates which kick in when an auction fails.

### 'Wave of Panic'

"I think this is a wave of panic, but it could signify a real change in the banks' tolerance for taking debt onto their balance sheets," says Matt Fabian, managing director of Municipal Market Advisors, an independent research firm.

Many of the more than 100 auctions that failed on Wall Street yesterday were held on behalf of closed-end mutual funds, which use auction-rate securities as a way to borrow to enhance the returns in their funds. The managers of the funds included such household names as Nuveen Investments Inc., BlackRock Inc. and Allianz SE's Pacific Investment Management Co.

Student-loan authorities in places like Mississippi and Montana were also on the list of failures, as was de Young and Carnegie Hall.

The Michigan loan authority wasn't on the list of failed auctions. It has issued auction-rate bonds, though it isn't clear whether that was the a cause of its current financial crunch. Spokespeople for the authority weren't immediately available for comment.

"If student loan providers are having trouble raising money, then that's a concern for us," says Justin Draeger, spokesman for the National Association of Student Financial Aid Administrators. He says the federal programs tend to go to low-income students. "If there's a problem with getting the funds, then they may not be able to pay for their education."

Peter Warren, vice president of government relations for the Education Finance Council, which represents non-profit lenders and state lending agen-

cies, said that while Michigan may be the only state yet to announce a student-loan halt, others are "seriously evaluating" the viability of their programs.

Problems in the auction-rate securities market have been mounting for days. Last week, about $3 billion in auctions of these securities failed. The tally of failed auctions grew as investors' fear multiplied. Wall Street firms generally stayed on the sidelines, taking few of these securities onto their books. One list of failed auctions compiled by Citigroup and circulated by some market participants totaled $6.6 billion in securities in 105 auctions. But one person in the market said the amounts were larger.

The market allows borrowers with long-term financing needs to tap investors who want to hold short-term investments that can be readily turned into cash. Wall Street firms hold auctions of these securities regularly, allowing investors to roll them over with new interest rates or to sell them to somebody else. When auctions fail, which is unusual, investors like funds and corporate treasuries can find themselves suddenly saddled with long-term securities.

A big problem with some of these instruments is that they are insured by troubled U.S. bond insurers like MBIA Inc. and Ambac Financial Group Inc., which have sold guarantees on securities tied to ill-fated subprime mortgages. The insurers run the risk of losing their triple-A credit ratings because of their subprime exposure, and that, in turn, has investors running from other instruments they back. The Michigan Higher Educational Student Loan Authority has issued some auction-rate securities backed by such bond insurance.

### New Rounds of Turmoil

Trouble in the credit markets has been cascading for months, with moments of quiet interrupted by new rounds of turmoil. Wall Street firms like Bear Stearns Cos., Merrill Lynch & Co., UBS AG and Citigroup have taken more than $100 billion of write-offs because of their mortgage-linked securities holdings. Along the way, problems rippled into other obscure short-term lending markets, like commercial paper tied to mortgages, and short-term funding entities called structured investment vehicles run by banks.

The new woes in auction-rate securities could be a problem for corporate treasurers who invest their cash holding in this market.

Bristol-Myers Squibb Co. earlier this month recorded a $75 million charge, attributing it to the global

credit crisis and its effects on the company's short-term investment portfolio. The company held some auction-rate securities tied to mortgage and corporate-bond debt.

### Caught Off Guard

The charge contributed to a net loss for the company in the fourth quarter and it is now seeking a new treasurer. The company's chief financial officer, Andrew Bonfield, told analysts in late January that the company was unable to unload some of its securities in the auction process.

The problems in the market have caught many investors off guard. In the past, the Wall Street firms that conduct the auctions and underwrite the securities have often acted as a buyer of last resort. But with their own balance sheets already bloated with other assets they don't want to hold, Citigroup, Goldman and others have decided to limit the market.

As one banker in the market said, they are not obligated to be "liquidity providers."

"It is like a multi-car pileup," said one auction rate securities trader, who declined to be identified. The trader says that investors saw last week's failures and "people are nervous because they want to have a liquid product."

Spokesmen for J.P. Morgan and Goldman Sachs declined to comment, while a Citigroup spokeswoman repeated a comment she made Monday, saying the firm "has seen widening spreads, reduced demand for certain auction rate securities and failed auctions, including some auctions which Citi acted as broker dealer."

The auction-rate securities problems could also affect the many closed-end mutual funds that use this market. The auction failures raise the specter that these funds could sell some of their assets as their financing costs increase.

"It all came to a head today. Investors wanted liquidity—they're afraid of the next shoe to drop even if they don't know what the next shoe will be," says William Adams, executive vice president at Nuveen.

A spokesman for MFS Investment Management confirmed that its MFS Municipal Income Trust tapped the auction-rate market for funding but didn't have information about what impact the turmoil there might have. Representatives from other mutual-fund firms couldn't be reached for comment or declined to comment.

*—Tom Lauricella, Robert Tomsho, Karen Richardson and Romy Varghese contributed to this article.*

## Leg Co

BY JAMES

Legg ment unit in Count naling co ica Corp. purchase or that C own.

The B disclose trywide ing, curre lion, from Legg M shares ir pill prov purchase pany.

Bank month a wide in a about $ 80% be market over the the com faults, f filed by and inv tors.

By ac son took arbitrag said, the prices p recent v traded

### In

I foun its c the trie fau

dy po qua as a

lio cos loa its los: $2.

ab are an the

# Business Day

## The New York Times

FRIDAY, FEBRUARY 15, 2008

C1

C/N

# Municipalities Feel Pinch as Another Debt Market Falters

### Credit Squeeze

The interest rates of a type of municipal debt known as auction-rate securities are set at periodic auctions. But there has been a shortage of buyers recently, which raises their rates, causing financial strain to the debt issuers.



**Yield of municipal auction-rate securities**

- · · · SIFMA auction rate one-month index

5.0%
4.5
4.0
3.5

'07    '08

*Source: Bloomberg*

THE NEW YORK TIMES

By JULIE CRESWELL
and VIKAS BAJAJ

The credit crisis paining Wall Street is reaching out across the nation, afflicting municipalities, hospitals and cultural touchstones like the Metropolitan Museum of Art.

In recent days another large but obscure corner of the financial world has come under acute stress. Alarmed by the running turmoil in the debt markets, investors have refused to buy certain securities that not long ago many regarded as equivalent to cash.

Even though the securities are long term, banks hold auctions periodically to reset the interest rates. During the last three days, almost 1,000 of these auctions failed because there were not enough buyers. The banks that marketed the investments will revive, if at all.



LIBRADO ROMERO/THE NEW YORK TIMES

The Metropolitan Museum of Art is paying 15 percent on some of its debt.

struments, known as auction-rate securities, also declined to buy.

The Port Authority of New York and New Jersey now finds itself paying a rate of 20 percent on $100 million of its debt, almost quadruple its costs a week ago. The Metropolitan Museum of Art is now paying 15 percent on auction securities. It is unclear how long such high rates will persist, or when the market for these instruments will revive, if at all.

#### A JOLT FOR WEALTHY INVESTORS

Some who invested in "safe as cash" auction securities have found their money frozen. Market Place, Page C6.

ments will revive, if at all.

"What is going on here is a credit crunch," said G. David MacEwen, chief investment officer for fixed income at American Century Investment, the big mutual fund company. "And the cost of the credit and the availability of credit even for good borrowers has clearly taken a big hit."

The failed auctions are tied to and exacerbating the larger problems in the financial markets. On Thursday, financial stocks led the market down and bond investors drove up mortgage rates.

At the top of investors' list of worries are the bond insurers MBIA and the Ambac Financial Group, longtime linchpins of the capital markets. Many fear the insurers, which guarantee interest and principal payments on nearly half of all municipal bonds, will lose their triple-A credit ratings. On Thursday, Moody's Investors Service downgraded the triple-A rating of a smaller insurer, the Financial Guaranty Insurance Company.

At a daylong hearing on Thursday in Washington, members of the House Financial Services Committee discussed the possibility of a federal bailout for

*Continued on Page 6*

# Municipalities Feel a Debt Market's Pinch

*From First Business Page*

latest bond issue is it more the issuers said was not needed.

The nation's securities markets for a small or about $350 billion in securities.

Some municipalities but can suddenly become an overnight expensive, even though their interest rates to stimulate the economy. The turmoil has heightened worries about how states and towns, particularly poorer ones, will pay their bills as a weakening housing market and potential recession squeeze tax revenues.

For some communities and government authorities, even a small increase in interest rates — consistently measured in basis points, or hundredths of a percentage point, or for example, will have its weekly interest payments on $100 million in auction-rate securities soar to $389,000 from $83,600.

Other recent casualties in the auction rate market include: universities like Georgetown, student loan providers like the College Loan Corporation, municipalities like Washington, States like Wisconsin and cultural institutions like the de Young Museum in San Francisco.

Faced with higher costs, some borrowers are moving to overhaul the variable-rate auction securities. Among the options municipalities are considering are redeeming the bonds, reorganizing them into long-term fixed-rate securities, or turning to banks for alternative financing.

Wisconsin is moving fast after the rate onerous of its $350 million of auction securities...

Michael M. Grynbaum contributed reporting.

---

### A dearth of buyers for securities once seen as trustworthy as cash.

securities jumped to 10 percent this week from 3.2 percent last month. The rate its reset every 28 days.

"We are in the process of replacing some or all of this program with something else," said Frank R. Hoadley, Wisconsin's director for capital finance.

Some borrowers are considering other short-term note called variable-rate demand obligations which also have their rates reset daily or weekly. Unlike auction-rate securities, the demand obligations are supported by bank letters of credit, which allow buyers to "put," or sell, the bonds to the banks.

This may have been an easy fix a few weeks ago, but now, Wall Street banks...

have become more reticent to issue such letters, or are demanding higher interest rates, because they do not want to be left holding billions of dollars of these floating-rate bonds.

"It is becoming difficult to get letters of credit, and we're trying to avoid paying too much," said Sharon A. Dumas, director of the department of finance for the city of Cleveland, whose auctions have been successful but which has had its interest rate climb.

The problems in the auction-rate market resemble the crisis that hit the so-called structured investment vehicles last summer. After a plan brokered by the Treasury Department sputtered, many of the banks ended up taking the SIVs back onto their own books; others SIVs were...

about $63 billion in auction-rate securities that are issued by closed-end funds, which are variations on mutual funds. These funds invest in stocks and bonds and raise money by selling shares and issuing bonds, including auction-rate securities. The funds have also seen auctions fail recently.

But the dearth of buyers this week that caused interest rates to spike may attract new buyers in coming auctions, especially because investors view issuers of auction-rate securities like the Port Authority and the State of Wisconsin as very safe.

"At the end of the day," said Cathryn P. Steeves, portfolio manager at Nuveen Investments, "people will still be willing to buy paper from the Metropolitan Museum of Art at very favorable tax-exempt rates."