UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
XETHANOL CORPORATION,

                         Plaintiff,                     **Case No. 07 CV 11161 (AKH)**

            -against-                                    **DECLARATION OF BOAZ
                                                        RAHAV IN OPPOSITION
DEUTSCHE BANK SECURITIES, INC.,                         TO DEFENDANTS'
PIVOT MASTER TRUST, and                                 MOTION TO DISMISS
CAMBER MASTER TRUST,

                         Defendants.
-----------------------------------------------------------------X


BOAZ RAHAV, under the penalties of perjury, declares:

1.      I am a Managing Director with Northeast Securities, Inc. ("Northeast"), which

        was the broker for the transactions in which Xethanol Corporation ("Xethanol")

        purchased the Auction Rate Securities (the "ARS") that are at issue in this action.

        I make this affidavit in opposition to the defendants' Motion to Dismiss the

        Amended Complaint.

2.      I have been a Managing Director at Northeast for 3 years and have experience in

        acting as a broker for investors buying and selling auction rate securities.

3.      Northeast placed the orders for Xethanol's purchase of the Pivot-1 and Camber-8

        auction rate securities that are the subject of this action by telephoning the auction

        bond desk of Deutsche Bank Securities, Inc. ("DB").   When Northeast placed

        these orders it requested specific dollar amounts of the ARS on behalf of its

        cleints.

4.    Thus, on June 4, 2007, Northeast's trader telephoned DB's auction bond desk and placed an order for $6.8 million of the Pivot 1 ARS on Xethanol's behalf.  On June 13, 2007, Northeast's trader telephoned DB's auction bond desk and placed an order for $6.5 Million of Camber 8 on Xethanol's behalf.

5.    Auction rate securities can be registered with the Securities and Exchange Commission ("SEC"), in which case a Registration Statement must be filed with the SEC or auction rate securities can be sold without registration as part of a private placement.  Routinely, investment banks that sell unregistered auction rate securities demand written representations from the purchaser of the security, *i.e.* the end-user of the security, that the end-user of the security is qualified to purchase the security.  Such unregistered securities are referred to as being on a "QIB List," signifying that these securities may only be purchased by QIBs, *i.e.* Qualified Institutional Buyers. It is my experience and  a common practice in the Industry for investment banks to refuse to complete transactions in auction rate securities that were on the QIB List until such time as the end-user provided written certification that it was qualified to purchase the securities.

6.    In the case of the ARS at issue in this litigation, none of the defendants ever sought written certification that the end-user was qualified to purchase the ARS. Prior to placing the orders for the ARS on Xethanol's behalf, I never received a copy of the private placement memorandum for neither Camber 8 nor the Pivot 1 that I subsequently learned had been prepared for the ARS on behalf of the Defendants Pivot Master Trust and Camber Master Trust and were signed by DB.

7.      Drafts of the private placement memoranda for Pivot-1 and Camber-8, which we only obtained after the purchase of the auction on behalf of Xethanol are attached hereto as <u>Exhibit A</u> and <u>Exhibit B</u>, respectively.  Moreover, prior to placing the orders for the ARS on Xethanol's behalf I was never informed that the specific ARS should have been on a QIB List.

8.      Before Northeast placed the orders for the ARS, I  was aware of the fact that Xethanol was seeking to invest its funds in a high rated, liquid investment as part of its cash management program.  In fact, in mid-July Xethanol has expressed concerns  re possible exposure to "subprime" mortgage debt as problems with subprime mortgages were becoming apparent.  Thus, following Xethanol's specific request for additional information re the ARS holdings and subprime exposure in the Securities it already held through Northeast.   I joined one of our fixed income traders and arranged for a call with Andreas Ponce, a trader with DB's auction bond desk.  Mr. Ponce assured us that the ARS were still of solid AAA quality with no subprime or mortgage exposure and actually forwarded us an asset breakdown excel spreadsheet for the Pivot 1 right after our telephone call to make this point clear. The excel spreadsheet showed a list of 125 high grade names including Unilever N.V, Texas Instruments, Inc, Sunoco, Inc. and Johnson & Johnson, etc.  Mr. Ponce also re stated to us  that DB would  assure daily liquidity in its AAA ARSs for investors who may  require immediate liquidity, including the capacity of buying the auctions back at par even on "non auction" dates.

The only request Mr. Ponce made was to make sure the sell was made before 3 p.m. Mr. Ponce also stated that DB's auction desk was rebuilding itself and that they will support us and our clients 110% (we later learned that the SEC had prior issues with the way DB was handling and marketing its auction securities before). Never during that call Mr. Ponce made any reference to the QIB nature of the specific ARS and/or required as to the qualification of Xethanol as such.

9.    I returned to Xethanol and repeated DB's message: "No subprime" & "Daily Liquidity at Par". I also shared the asset breakdown provided by DB with Xethanol. It seemed that the ARS were still a suitable investment alternative for Xethanol taking DB's latest statements into account. I was shocked when I first learned on August 27th that the auction for the ARS had failed. Moreover, I have learned that DB has told us about the failed status of its ARS securities only after we called in DB's auction desk with Xethanol's order to sell $500k of its Pivot 1 position. Even though DB knew that the auctions for the Camber-1 through 7 series have been failing on a daily basis for two weeks before our sell order came in. DB never disclosed to Northeast, or to my knowledge, to Xethanol, that there is no market for their Camber and Pivot securities. Right after I learned that the Pivot 1 auction had failed, I telephoned Mr. Ponce at DB's auction desk  to attempt to discuss how the ARS could have become illiquid when just a few weeks earlier DB had assured daily liquidity.  I also tried to explain that this is a very serious matter as Xethanol may fail to meet its daily cash needs. In response,

Mr. Ponce told me that DB's legal department had instructed the auction bond desk not to speak with customers about the failure of any auctions for auction rate securities and could only speak with customers that wished to place an order, and that the best he can do is to provide me a bid that will be substantially lower than par. I communicated DB's stand post the fail status to Xethanol.

I declare under the penalties of perjury that the foregoing is true and correct.

Executed on: May 21st, 2008

_____

BOAZ RAHAV

Attached please find an electronic copy of the preliminary private placement memorandum (the "Preliminary Private Placement Memorandum"), dated [●], 2007, relating to the AR CLNs Certificates offered by Pivot Master Trust.

The Preliminary Private Placement Memorandum is subject to completion and amendment. The certificates described herein may not be sold nor may offers to buy such certificates be accepted prior to the time a final offering memorandum is completed.

The Preliminary Private Placement Memorandum is highly confidential and does not constitute an offer to any person other than the recipient or to the public generally to subscribe for or otherwise acquire the certificates described therein. The Preliminary Private Placement Memorandum is not an offer to sell the certificates and is not a solicitation of an offer to buy such certificates in any jurisdiction where the offer or sale is not permitted.

DISTRIBUTION OF THE PRELIMINARY PRIVATE PLACEMENT MEMORANDUM TO ANY PERSONS OTHER THAN THE PERSON RECEIVING THIS ELECTRONIC COPY FROM THE INITIAL PURCHASER AND ANY PERSONS RETAINED TO ADVISE THE PERSON RECEIVING THIS ELECTRONIC TRANSMISSION FROM THE INITIAL PURCHASER WITH RESPECT THERETO IS UNAUTHORIZED. ANY PHOTOCOPYING, DISCLOSURE OR ALTERATION OF THE CONTENTS OF THE PRELIMINARY PRIVATE PLACEMENT MEMORANDUM, AND ANY FORWARDING OF A COPY OF THE PRELIMINARY PRIVATE PLACEMENT MEMORANDUM BY ANY MEANS TO ANY PERSON OTHER THAN THE PERSON RECEIVING THIS COPY FROM THE INITIAL PURCHASER IS PROHIBITED. BY ACCEPTING DELIVERY OF THE PRELIMINARY PRIVATE PLACEMENT MEMORANDUM, THE RECIPIENT AGREES TO THE FOREGOING.

This Preliminary Private Placement Memorandum is subject to completion and amendment. The Certificates offered may not be sold nor may offers to buy be accepted prior to the time a final private placement memorandum is completed. This Preliminary Private Placement Memorandum shall not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of these Certificates, in any jurisdiction in which such offer or sale would be unlawful prior to registration, qualification or exemption under the securities laws of any such jurisdiction.

Subject to Completion and Amendment, Dated [Φ]

PRIVATE PLACEMENT MEMORANDUM

# PIVOT MASTER TRUST
# AR CLNs CERTIFICATES

*(Issuable in Series)*

## Deutsche Bank Securities Inc.

*as Initial Purchaser and Broker-Dealer*

## The Bank of New York

*as Auction Agent*

*and*

## Deutsche Bank AG,
## acting through its London branch

*as Counterparty*

Each series of certificates offered hereby (the "Certificates") will be issued by Pivot Master Trust, a limited purpose Delaware statutory trust (the "Trust") acting for a series of the Trust (the Trust acting for a series is referred to hereinafter as a "Series"). The Trust was formed pursuant to a Declaration of Trust and Trust Agreement (the "Declaration of Trust"), dated as of April [•], 2007, under which The Bank of New York will act as trustee for the benefit of the registered holders (the "Holders") of the Certificates and The Bank of New York (Delaware) will act as Delaware Trustee. Each Series will be created on the date of issuance of the Certificates of such Series by the Counterparty (as defined below), the Trustee and the Delaware Trustee entering into a series agreement creating a series of the Trust (the "Series Agreement").

The Certificates will be sold from time to time in amounts and on terms determined at the time of sale, which terms will be disclosed in a series pricing supplement (with respect to any Series of Certificates, the "Series Pricing Supplement") to this Private Placement Memorandum. Each Certificate will represent an undivided interest in (i) the credit-linked notes described in the Series Pricing Supplement (the "CLNs"), (ii) the rights of the Series under the ISDA Master Agreement, schedule and confirmation (the "Basis Swap"), dated as of the Issue Date, between Deutsche Bank AG, acting through its London branch (the "Counterparty") and the Series, and (iii) all proceeds of the foregoing. The Certificates will be the sole class of securities issued by the Series. The Series will be subject to early liquidation upon the occurrence of certain events specified under the caption "The Series Agreement—Liquidation of a Series" in this Private Placement Memorandum.

Distributions in respect of the Certificates will be subject to receipt by the Series of payments under the CLNs and of amounts due from the Counterparty pursuant to the Basis Swap. The Prospectus for the CLNs will be attached as an Appendix to the Series Pricing Supplement. See such Prospectus and "The Basis Swap" below. *There can be no assurance that upon early liquidation of the Series the Holders will have received distributions equal to the original purchase price of their Certificates.*

THE CERTIFICATES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND

NEITHER THE TRUST NOR THE SERIES HAS BEEN REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "1940 ACT"). AS A RESULT, THE CERTIFICATES ARE SUBJECT TO RESTRICTIONS ON TRANSFER. THE CERTIFICATES ARE BEING OFFERED AND SOLD EXCLUSIVELY TO "QUALIFIED INSTITUTIONAL BUYERS" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT ARE ALSO "QUALIFIED PURCHASERS" AS DEFINED IN SECTION 2(A)(51) OF THE 1940 ACT. EACH PURCHASER OF CERTIFICATES WILL BE DEEMED, BY ITS ACCEPTANCE OF SUCH CERTIFICATES, TO HAVE MADE CERTAIN REPRESENTATIONS AND AGREEMENTS INTENDED TO RESTRICT TRANSFER OF THE CERTIFICATES, AS SET FORTH IN THIS PRIVATE PLACEMENT MEMORANDUM UNDER "NOTICE TO PURCHASERS AND TRANSFEREES."

It is a condition to issuance of the Certificates of any Series that they shall have been rated "AAA" by Fitch Ratings ("Fitch") and "AAA" by Standard and Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P").

THIS PRIVATE PLACEMENT MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITY IF NOT ACCOMPANIED BY A SERIES PRICING SUPPLEMENT.

## Deutsche Bank Securities Inc.

Dated May [4], 2007.

## NOTICE TO PURCHASERS AND TRANSFEREES

A Series Pricing Supplement disclosing the pricing terms of each series of Certificates offered hereby and attaching the Prospectus for the related CLNs will be provided to prospective investors in connection with the offering and sale of such Series. The Series will make available to each prospective purchaser, prior to such purchaser's purchase of Certificates, the opportunity to ask questions of, and receive answers from, the Trustee, the Initial Purchaser and the Broker-Dealer concerning the terms and conditions of this offering and the Series.

No person is authorized to give any information or to make any representation concerning the offering of the Certificates not contained in this Private Placement Memorandum and the related Series Pricing Supplement, and any such information or representation not contained or incorporated by reference herein or therein should not be relied upon as having been authorized by or on behalf of the Broker-Dealer, the Trustee, the Delaware Trustee or the Counterparty. Neither the delivery of this Private Placement Memorandum and the related Series Pricing Supplement, nor any sale made hereunder or thereunder should, at any time, imply that the information contained herein or therein is correct as of any date subsequent to their respective dates.

This Private Placement Memorandum and the Series Pricing Supplement do not constitute an offer to sell or a solicitation of any offer to buy any security other than the Certificates offered hereby and thereby nor do they constitute an offer to sell or a solicitation of an offer to buy any of the Certificates to any person in any jurisdiction in which it is unlawful to make such an offer or solicitation to such person.

Each purchaser of Certificates (whether as initial purchaser or transferee) will be deemed by its acceptance of its Certificates to have made certain representations and agreements as set forth in this section.

See "Special Considerations" in this Private Placement Memorandum for a description of certain factors that should be considered in connection with an investment in the Certificates.

This Private Placement Memorandum has been prepared solely for use in connection with the offering of the Certificates. Except as set forth below, distribution of this Private Placement Memorandum and the Series Pricing Supplement to any person other than the offeree and those persons, if any, retained to advise such offeree with respect thereto is unauthorized, and any disclosure of any of their contents without the prior written consent of the Broker-Dealer is prohibited. Except as set forth below, each prospective purchaser, by accepting delivery of this Private Placement Memorandum, agrees to the foregoing and to make no photocopies of this Private Placement Memorandum, the Series Pricing Supplement or any documents attached hereto and, if the offeree does not purchase the Certificates or the offering is terminated, to return this Private Placement Memorandum, the Series Pricing Supplement and all documents attached hereto to: Deutsche Bank Securities Inc. – New York, 60 Wall Street, New York, New York 10005, Attention: Yury Gruzglin, telephone (212) 250-8206 or Ernest Goodrich, telephone (212) 250-7636.

Neither the Initial Purchaser, the Broker-Dealer nor any of their affiliates nor the Series assumes any obligation to update or correct any inaccuracies that may become apparent in this Private Placement Memorandum or the Series Pricing Supplement or any other information made available in connection with the Certificates.

In making an investment decision, investors must rely on their own examination of the terms of the Certificates and the CLNs, including the merits and risks involved. The contents of this Private Placement Memorandum and the Series Pricing Supplement hereto and any accompanying information should not be construed as legal, business or tax advice. Each prospective investor should consult its own legal, business and tax advisors as to legal, business and tax advice.

NOTICE TO NEW HAMPSHIRE RESIDENTS: NEITHER THE FACT THAT NO REGISTRATION STATEMENT OR APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

Each purchaser of Certificates, whether as initial purchaser or as transferee, by its acceptance thereof (directly or through a nominee), will be deemed to have represented and agreed as follows:

(i)     it understands that the Certificates are being offered only in a transaction not involving any public offering within the meaning of, and have not been and will not be registered under, the Securities Act of 1933, as amended (the "Securities Act"), or any securities law of any state of the United States or any other jurisdiction;

(ii)    it is acquiring the Certificates for its own account or an account or accounts with respect to which it exercises sole investment discretion and it or each such account is a "Qualified Institutional Buyer" as defined in Rule 144A under the Securities Act ("Rule 144A");

(iii)   it and each account for which it is purchasing any Certificates is a "Qualified Purchaser," as defined in Section 2(a)(51)(A) of the 1940 Act and Rule 2a51-1 promulgated thereunder;

(iv)    (1) it is not, and will not be, an employee benefit plan as described in Section 3(3) of the Employment Retirement Income Security Act of 1974, as amended ("ERISA"), and subject to Title I of ERISA, or a plan to which Section 4975 of the Internal Revenue Code of 1986, as amended, applies, or an entity whose assets are treated as assets of any such plan, and (2) it will not sell or otherwise transfer any Certificate to any person without first obtaining these same foregoing representations, warranties and covenants from that person;

(v)     it and each account for which it is purchasing the Certificates has all necessary power and authority to acquire the Certificates and such acquisition will not contravene any law, rule or regulation binding on it or such account or any investment guideline or restriction applicable to it or such account;

(vi)    it will comply with all applicable laws and regulations in effect in any jurisdiction in which it purchases or sells Certificates and obtain any consent, approval or permission required by it for such purchase or sale under the laws and regulations of any jurisdiction to which it is subject or in which it makes such purchases or sales, and none of the Trustee, the Initial Purchaser, the Series, Series Agent, the Counterparty, the Broker-Dealer, the Auction Agent or any of their affiliates shall have any responsibility therefor;

(vii)   in deciding whether or not to purchase the Certificates, (a) it has carefully read and fully understands this Private Placement Memorandum and the Series Pricing Supplement; (b) it has made its own independent evaluation, based upon such investigation and analysis as it deems appropriate, of the business prospects and creditworthiness of the Series, the issuer of the CLNs (the "CLNs Obligor") and the Counterparty, and of the terms and provisions of the Certificates and other instruments and agreements that are

described or referred to in this Private Placement Memorandum and in the Series Pricing Supplement; (c) it is not relying on any communication (written or oral) from the Series, the CLNs Obligor, the Initial Purchaser, the Broker-Dealer or the Counterparty as investment advice or as a recommendation to purchase the Certificates, it being understood that information and explanations related to the terms and conditions of the Certificates and the agreements that are described in this Private Placement Memorandum and in the Series Pricing Supplement shall not be considered investment advice or a recommendation to purchase the Certificates; (d) it has been afforded the opportunity to ask questions of, and receive answers from, the Trustee, the Initial Purchaser and the Broker-Dealer concerning the terms of the Certificates, the offering contemplated by this Private Placement Memorandum and the Series Pricing Supplement, the Series and related matters; and (e) it has the knowledge, expertise and experience in financial matters to evaluate the risks involved in purchasing the Certificates;

(viii)  it acknowledges and agrees that none of the Counterparty, the Initial Purchaser, the Broker-Dealer, the Series, Series Agent, the Auction Agent, the Trustee or the Delaware Trustee has made any representation to it regarding the legality of its investment in the Certificates under applicable legal investment or similar laws or regulations and that the appropriate characterization of the Certificates under various legal investment restrictions may be subject to significant interpretative uncertainties;

(ix)  it understands that the Certificates will bear a restrictive legend stating that the Certificates have not been registered under the Securities Act and setting forth the restrictions on transfer of the Certificates described herein and stating that each purchaser of any Certificate will be deemed, by its acceptance thereof, to have made the representations and agreements set forth in this "Notice to Purchasers and Transferees";

(x)  it will notify any proposed purchaser of Certificates from it of the resale restrictions referred to herein and prior to its sale of the Certificates, deliver a copy of this Notice to Purchasers and Transferees to such proposed purchaser; and

(xi)  it understands that if at any time the Trustee determines, or is notified by the Initial Purchaser or the Broker-Dealer, that (A) a Holder was, at the time of acquisition of its Certificates, in breach of the deemed representations and agreements set forth in this "Notice to Purchasers and Transferees" or (B) at any time since such acquisition, such Certificates are being held by a Holder (based on reputable independent legal advice) in violation of the applicable deemed representations and agreements set forth in this "Notice to Purchasers and Transferees," the Trustee may (in the case of clause (A) or clause (B)) consider the acquisition of the Certificates by such Holder null and void and rescinded or may require that the Certificates purchased by such Holder be transferred to a person designated by the Trustee, the Initial Purchaser or the Broker-Dealer at a price determined by the Broker-Dealer or the Initial Purchaser as the case may be, based upon its estimation of the prevailing price of the Certificates and, by its acceptance of its Certificate, it authorizes the Trustee, the Initial Purchaser and the Broker-Dealer to take such action if warranted and understands that neither the Trustee, the Initial Purchaser, nor the Broker-Dealer will be responsible for any losses that may be incurred as a result of any such transfer.

The foregoing restrictions are subject to amendment under certain circumstances by the Trustee with the consent of the Counterparty. By its acceptance of a Certificate, each purchaser shall be deemed to have agreed to any such amendment, provided that no such amendment shall have a material adverse effect on the holders of Certificates then outstanding.

This Private Placement Memorandum and the Series Pricing Supplement do not constitute an offer to sell or a solicitation of any offer to buy any security other than the Certificates offered hereby, nor do they constitute an offer to sell or a solicitation of an offer to buy any of the

Certificates to any person in any jurisdiction in which it is unlawful to make such an offer or solicitation to such person.

NOTICE TO FLORIDA INVESTORS: The Certificates have not been registered under the Florida Securities Act. If sales are made to five or more investors in Florida, any Florida investor may, at his or her option, void any purchase hereunder within a period of three days after he or she first tenders or pays to the Initial Purchaser or the Broker-Dealer, an agent of the Initial Purchaser or the Broker-Dealer, or an escrow agent the consideration required for purchase of a Certificate, whichever occurs later. To accomplish this, it is sufficient for a Florida investor to send a letter or telegram to the Broker-Dealer within a three day period, stating that it is voiding and rescinding the purchase. If an investor sends a letter, it is prudent to do so by certified mail, return receipt requested, to ensure that it is received and to evidence the time of mailing.

The Trustee has not participated in the preparation of this Private Placement Memorandum or the Series Pricing Supplement and assumes no responsibility for their contents.

TABLE OF CONTENTS

NOTICE TO PURCHASERS AND TRANSFEREES ............................................................................... iv

SUMMARY OF PRINCIPAL TERMS ............................................................................................................ 1

SPECIAL CONSIDERATIONS ...................................................................................................................... 9

USE OF PROCEEDS ................................................................................................................................... 15

DESCRIPTION OF THE CERTIFICATES .................................................................................................... 15

AUCTION PROCEDURES ........................................................................................................................... 19

THE TRUST ................................................................................................................................................. 28

THE SERIES AGREEMENT ........................................................................................................................ 28

THE BASIS SWAP ...................................................................................................................................... 34

CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS .................................................................. 38

GENERAL INFORMATION .......................................................................................................................... 44

LEGAL MATTERS ....................................................................................................................................... 44

## SUMMARY OF PRINCIPAL TERMS

The following summary is qualified in its entirety by reference to the detailed information appearing elsewhere herein and by reference to the information contained in the Series Pricing Supplement delivered in connection with the offering and sale of a particular series of Certificates. Each series of Certificates offered hereby will be issued by Pivot Master Trust, a limited purpose Delaware statutory trust (the "Trust"), on behalf of a series of the Trust (the Trust acting for such series, the "Series"). The Trust was formed pursuant to a Declaration of Trust and Trust Agreement (the "Declaration of Trust") among the Counterparty, the Trustee and the Delaware Trustee, dated as of April [•], 2007.  It was established for the primary purpose of creating separate Series of the Trust. Each Series will be created to (i) issue separate series of Certificates representing undivided interests in a Series and the related Series Property (as described below), (ii) acquire the CLNs described in the Series Pricing Supplement and (iii) enter into a Basis Swap with the Counterparty. The Certificates of a Series will be issued pursuant to a Series Agreement (the "Series Agreement") among the Counterparty, the Trustee and the Delaware Trustee, creating the Series that issues those Certificates. Each Series Agreement will incorporate by reference a Terms Schedule attached thereto as Appendix 1, Auction Procedures attached thereto as Appendix 2, and Standard Terms of Series attached thereto as Appendix 3. The date of the Series Agreement and of the issuance of such Certificates is referred to herein as the "Issue Date." No securities other than Certificates will be issued by any Series.

*Certain capitalized terms used and not defined in this Summary are defined elsewhere in this Private Placement Memorandum. See "Index of Defined Terms."*

| | |
|---|---|
| The Certificates: | Each Series will issue a single issue of Certificates pursuant to its Series Agreement. A Series will not issue any securities other than the Certificates. The terms of the Certificates of a Series will be as set forth herein and in the Series Pricing Supplement. |
| Broker-Dealer: | Deutsche Bank Securities Inc. or, with respect to each Series, any other entity appointed by the Counterparty to act as a Broker-Dealer that is a party to a Broker-Dealer Agreement. |
| Initial Purchaser: | Deutsche Bank Securities Inc. |
| Auction Agent: | The Bank of New York. |
| Trustee: | The Bank of New York. |
| Delaware Trustee: | The Bank of New York (Delaware). |
| Counterparty: | Deutsche Bank AG, an affiliate of Deutsche Bank Securities Inc., acting through its London branch. |
| Initial Certificate Principal Balance: | As specified in the Series Pricing Supplement. |
| Certificate Principal Balance: | On any date, an amount equal to: |
| | the Initial Certificate Principal Balance multiplied by the Current Factor where: |
| | the "Current Factor" is a fraction equal to A/B, and |
| | "A" is the Notional Principal Amount of the CLNs on such date, as such term is defined in the Prospectus for the CLNs; and |

"B" is the Original Principal Amount of the CLNs. The "Original Principal Amount" is the Principal Amount of the CLNs, as such term is defined in the Prospectus for the CLNs.

| | |
|---|---|
| Weighted Average Certificate Principal Balance: | For any Coupon Accrual Period, an amount equal to (i) the sum of the Certificate Principal Balance on each day of such period divided by (ii) the number of days in such period. |
| Issue Date: | As specified in the Series Pricing Supplement. |
| Issue Price: | 100%. |
| Authorized Denominations: | U.S. $100,000 and integral multiples of U.S. $50,000 in excess thereof. |
| Currency: | U.S. $ |
| Record Date: | The Business Day immediately preceding each Coupon Distribution Date. |
| Business Days: | Any day other than a Saturday, Sunday, a day on which the Trustee is authorized or obligated by law to be closed or a day on which the New York Stock Exchange is closed. |
| Business Day Convention: | Following Business Day Convention. |
| Scheduled Coupon Accrual Dates: | As specified in the Series Pricing Supplement. |
| Coupon Accrual Dates: | Each Scheduled Coupon Accrual Date subject to adjustment in accordance with the Following Business Day Convention. |
| Coupon Accrual Period: | Each period from, and including, one Coupon Accrual Date to, but excluding, the immediately following Coupon Accrual Date. |
| | The Interest Amount payable on a Coupon Distribution Date will be the Interest Amount calculated with reference to the Coupon Accrual Period ending on, but excluding, the Coupon Accrual Date that is (or is closest in time to) that Coupon Distribution Date or, in the case of the final Coupon Accrual Period, ending on, and excluding the Scheduled Final Distribution Date. |
| Coupon Distribution Dates: | Each Coupon Accrual Date except that if the Final Distribution Date falls after the Scheduled Final Distribution Date, the Scheduled Final Distribution Date shall not be a Coupon Distribution Date and the Final Distribution Date shall be the final Coupon Distribution Date. |
| Distribution on the Scheduled Final Distribution Date: | Unless the Certificates have been previously subject to a Certificate Exchange, a Counterparty Call or Series Liquidation Event, the final distribution of principal on the Certificates will be made on the Scheduled Final Distribution Date in an amount in U.S. $ equal to the Certificate Principal Balance, subject to "Postponement of Final Distribution" below. See also "Certificate Exchange Right," "Liquidation of the Series; Basis Swap Early Termination Unwind," and "Counterparty Call Right" below in this Summary. |

| | |
|---|---|
| Scheduled Final Distribution Date: | The date specified as such in the Series Pricing Supplement. |
| Final Distribution Date: | The Scheduled Final Distribution Date, unless the Maturity Date (as such term is defined in the Prospectus for the CLNs) of the CLNs falls after the Scheduled Final Distribution Date in which case "Final Distribution Date" shall mean the date which is two Business Days after the Maturity Date of the CLNs. |
| Postponement of Final Distribution: | The distribution of principal of the Certificates on the Scheduled Final Distribution Date will be funded from the proceeds received by the Series on the redemption of the CLNs. The Scheduled Final Distribution Date of the Certificates is the same as the scheduled maturity date of the CLNs. The terms of the CLNs permit the payment of some or all of the redemption monies due on the CLNs to be delayed beyond the scheduled maturity date of the CLNs in certain circumstances described in the Prospectus for the CLNs. In such a scenario, the Holders will not receive a USD amount equal to the Certificate Principal Balance on the Scheduled Final Distribution Date but will receive a lesser amount. See "Description of the Certificates—Postponement of Final Distribution" below. |
| Interest Amount: | Each Certificate's pro rata share (rounded down to the nearest cent) of the aggregate of:<br><br>(a) the product of:<br><br>(i)  the Weighted Average Certificate Principal Balance in respect of such Coupon Accrual Period; and<br><br>(ii)  a per annum rate equal to the Applicable Rate (calculated on the basis of the actual number of calendar days in such Coupon Accrual Period divided by 360); and<br><br>(b) the sum of the Additional Interest Amounts and the related Accrued Interest Amounts if such Coupon Distribution Date follows a date on which the CLNs have paid the amounts referred to under those names in the Prospectus for the CLNs.<br><br>"Additional Interest Amount" in respect of any Coupon Distribution Date, shall be calculated by the Counterparty in its discretion based on the calculation of such amount in the Prospectus for the CLNs except that references to "Interest Payment Dates" and "Additional Interest Payment Dates" shall be read as "Coupon Distribution Dates", references to "Interest Accrual Date" as "Coupon Accrual Date" and "Interest Period" as "Coupon Accrual Period," that interest shall be deemed to accrue at the Applicable Rate rather than the "Coupon Rate" and that the "Adjustment Period" means the period from the respective Event Determination Date (as such term is defined in the Prospectus for the CLNs) to but excluding the Coupon Distribution Date on which such Additional Interest Amount is to be paid.<br><br>"Accrued Interest Amount" means in respect of any Coupon Distribution Date, the amount calculated by the Counterparty in its |

discretion based on the calculation of such amount in the Prospectus for the CLNs except that references to "Additional Interest Payment Date" shall be read as "Coupon Distribution Dates" and references to "Relevant Coupon Accrual Date" shall be read as the "Event Determination Date" (as such term is defined in the Prospectus for the CLNs).

| | |
|---|---|
| Interest Rate: | The rate at which interest will accrue on the Weighted Average Certificate Principal Balance for each Coupon Accrual Period following the first Coupon Accrual Period (the "Applicable Rate") will be established pursuant to the Auction Procedures as specified under "Auction Procedures" herein. The Applicable Rate for the first Coupon Accrual Period will be specified in the Series Pricing Supplement. For all other Coupon Accrual Periods, the Applicable Rate will be either: (a) if there are Sufficient Clearing Bids, the Winning Bid; (b) if all the Certificates are subject to Submitted Hold Orders, the Minimum Applicable Rate; or (c) if Sufficient Clearing Bids do not exist, the Maximum Applicable Rate. |
| Payments of Principal and Interest: | Accrued interest on the Certificates prior to the Final Distribution Date will be distributed in arrear on each Coupon Distribution Date (including the Final Distribution Date). The rights of Holders of Certificates to receive distributions thereon out of amounts available to the Series upon any early liquidation of the Series will be subject to the priorities of payment specified herein. See "The Series Agreement—Liquidation of a Series." |
| Certificate Exchange Right: | The Counterparty and any of its affiliates may exchange any Certificates held for its own account, including any Certificates purchased by the Counterparty or any affiliate in the open market (a "Certificate Exchange"). Upon such exchange by the Counterparty or any affiliate, the portion of the CLNs relating to the Certificates being exchanged will be distributed in-kind to the Counterparty or its affiliate, as applicable. In such event, the notional amount of the Basis Swap relating to such Certificates will be proportionally reduced, based on the amount of Certificates being exchanged, without the payment of any Termination Payment. See "Description of the Certificates—Certificate Exchange Right." |
| Reduction of Certificate Principal Balance: | On any date on or prior to the Final Distribution Date, if the Notional Principal Amount of the CLNs is reduced in accordance with the terms thereof, then as of such date the Certificate Principal Balance will be reduced in an equal amount. See "Special Considerations—CLNs." For an explanation of the circumstances in which the Notional Principal Amount of the CLNs can be reduced, see the Prospectus for the CLNs, which will be attached as an Appendix to the Series Pricing Supplement.<br><br>*If the Certificate Principal Balance is reduced to zero prior to the Final Distribution Date, then the Series will be liquidated.* |
| Counterparty Call Right: | The Certificates will be callable (in whole but not in part) on any Coupon Distribution Date at the option of the Counterparty. The amount payable in connection with a Counterparty Call (the |

|                                    | 'Counterparty Call") of the Certificates will be the Certificate Principal Balance plus any accrued interest thereon. Amounts payable in respect of a Counterparty Call will be made in cash. |
| --- | --- |
| Liquidation of the Series; Basis Swap Early Termination Unwind: | The Series will be liquidated (i) if the Certificate Principal Balance is reduced to zero, (ii) upon the Trustee's receipt and distribution of all amounts owed to the Series in respect of the Series Property, (iii) upon the occurrence of an event of default on the CLNs which has not been cured or waived to the satisfaction of the trustee of the CLNs (a "CLNs Event"), (iv) upon the occurrence of an Expense Liquidation Event, (v) at the direction of the Counterparty or Holders whose Certificates represent at least two-thirds of the principal amount of the Certificates, upon the occurrence of a Series Regulatory/Tax Liquidation Event, (vi) upon the early redemption of the CLNs in whole but not in part, or (vii) upon the termination of the Basis Swap other than as a result of an event described in items (i) through (vi) above (items (i) through (vii) above being referred to herein, in each case, as a "Series Liquidation Event"). Upon the liquidation of the Series on the occurrence of any of the events described in (iii) to (vii) above (each a "Basis Swap Early Termination Unwind"), each Holder will be entitled, subject to the priority of payments described herein, to a pro rata share of the CLNs or the redemption proceeds thereof in the case of the early redemption of the CLNs in whole but not in part, plus the Termination Payment if one is owed from the Counterparty to the Series, and minus the Termination Payment if one is owed by the Series to the Counterparty. See "Special Considerations—Basis Swap; Termination Payments; Counterparty Priority". Notwithstanding the foregoing, if the Basis Swap Early Termination Unwind is a result of a Counterparty Downgrade Default, each Holder will be entitled, subject to the priority of payments described herein, to a pro rata share of the CLNs plus a sum equal to the aggregate of (i), any Unpaid Amounts (as defined in the Basis Swap) owed to the Series and (ii) without duplication, an amount calculated on the same basis as the Interest Amount but in respect of the period from and including the immediately preceding Coupon Accrual Date to but excluding the Early Termination Date; minus any Unpaid Amounts owed to the Counterparty by the Series.  No Termination Payment will be payable upon the termination of the Basis Swap as a result of a Counterparty Downgrade Default. |
| Priority of Payments: | In connection with any early liquidation of the Series, the Trustee will distribute amounts to the extent of available funds, and will distribute the CLNs in kind to the Holders, in the following order of priority (the "Priority of Payments"): |
|  | (a) *first*, to the Trustee, any Extraordinary Expenses incurred by the Series and any other expenses of the Trust not paid by a third party; |
|  | (b) *second*, to the Counterparty, (i) any amounts due to the Counterparty (other than any Termination Payment) and, |

(ii) unless the Series is liquidated in connection with a termination of the Basis Swap following a Default by the Counterparty, any Termination Payment due to the Counterparty from the Series;

(c) *third*, to the Holders; and

(d) *fourth*, if the Basis Swap is terminated early because of a Default by the Counterparty, any Termination Payment due to the Counterparty from the Series.

If practicable, the Trustee will attempt to satisfy the amounts due to Holders on the early liquidation of the Series by delivering CLNs pro rata to the Holders. If this is not possible due to the denominations of the CLNs, Holders will receive a combination of cash and CLNs in satisfaction of amounts then due in respect of the Certificates in such proportions as shall be determined by the Trustee in its sole discretion. The Trustee will only sell CLNs to the extent they are required to be sold to fund any amounts due to the Counterparty or the Trustee or if the denominations of the CLNs require their sale in order to make a pro rata distribution to the Holders.

If the Series is liquidated early, Holders may not receive property equivalent in value to full payment of accrued interest on and full repayment of the principal of their Certificates. In connection with any such liquidation of the Series, a Termination Payment may be payable by the Series to the Counterparty or by the Counterparty to the Series. The amount of such Termination Payment will, if such amount is owed to the Counterparty, unless the Basis Swap is terminated because of a Default by the Counterparty, be paid prior to any payments or distributions being made out of the Series Property to the Holders. If a Termination Payment is due to the Counterparty, the Trustee will be required to sell an amount of the CLNs sufficient to fund such payment. If Termination Payment is payable to the Counterparty upon an early termination of the Basis Swap, such payment will reduce the amount available to make payments to the Holders and could result in a loss to Holders.

If, upon the payment in full by the Series of all obligations and liabilities of the Series and the remaining Certificate Principal Balance and accrued interest thereon, any Series Property remains in the Series, then all such remaining property shall be distributed to the Holders.

| | |
|---|---|
| Rating Agency: | Fitch and S&P. |
| Rating: | As of the Issue Date, "AAA" by Fitch and "AAA" by S&P. |
| Listing: | The Certificates will not be listed on any established securities market. |
| Form: | The Certificates will be issued in book-entry form and will be represented by one or more Global Certificates registered in the name of Cede & Co., as nominee for DTC. See "Description of the Certificates — Book-Entry Registration" in this Private Placement |

|                              | Memorandum. |
|------------------------------|-------------|
| Series Property:             | The Series Property will consist of (i) the CLNs, (ii) the rights of the Series under the Basis Swap, and (iii) the proceeds of the foregoing. |
| The CLNs:                    | The CLNs will be identified in the Series Pricing Supplement. A Prospectus for the CLNs will be attached as an Appendix to the Series Pricing Supplement. |
| The Basis Swap:              | Payments made by the Series and the Counterparty under the Basis Swap will be based on an exchange of: (i) cash flows received by the Series on the CLNs in respect of interest, for (ii) amounts equal to the sum of (a) the Interest Amount payable on each Coupon Distribution Date, (b) the fees of the Broker-Dealers, Auction Agent and Trustee, (c) the Trustee Ordinary Expenses and the Auction Agent Ordinary Expenses up to agreed per annum dollar limits and (d) any interest payable on the Final Distribution Date. The cash flows to be received by the Series under the Basis Swap are designed to be sufficient to make scheduled distributions of interest in respect of the Certificates. See "The Basis Swap" below. |
| Series Agent:                | Deutsche Bank Securities Inc. (or an affiliate thereof) will act as agent for the Series (the "Series Agent") and in that capacity, amongst other things, will sell the CLNs on behalf of the Series in accordance with the Sale Procedures, if and when required. |
| Private Placement; Transfer Restrictions: | The Certificates have not been and will not be registered under the Securities Act. Certificates will be offered only to Qualified Institutional Buyers that are also Qualified Purchasers in minimum amounts for any single beneficial owner as set forth herein and in the Series Pricing Supplement. See "Description of the Certificates—Transfer Restrictions." |
| Tax Considerations:          | The Series will be treated as a grantor trust for U.S. federal income tax purposes and will not be subject to U.S. federal income taxation. Subject to the Integration Regulations discussed herein, each Holder will be treated as the owner of its proportionate share of the assets of the Series for U.S. federal income tax purposes. See "Certain U.S. Federal Income Tax Considerations." |
| ERISA Considerations:        | Certificates are not a suitable investment for employee benefit plans subject to ERISA and certain other plans. Investors will be deemed to represent that they are not such plans. See "Certain ERISA Considerations." |
| Trustee as the holder of the CLNs: | The Trustee as holder of the CLNs has the right to vote and give consent and waivers in respect of the CLNs, except as limited herein or in the Series Pricing Supplement. In the event that the Trustee receives a request from the trustee of the CLNs for its consent to any amendment, modification or waiver of the CLNs, their documentation or any other document relating thereto, or receives any other solicitation for any action with respect to the CLNs, the Trustee shall notify each Holder of record on such date such proposed amendment, modification, waiver or solicitation to each Holder of record on such date. The Trustee shall request |

instructions from the Holders as to whether or not to consent to or to vote to accept such amendment, modification, waiver or solicitation. The Trustee shall consent or vote, or refrain from consenting or voting, in the same proportion as each Holder actually voted as of a date determined by the Trustee prior to the date on which such consent or vote is required. Notwithstanding anything to the contrary, the Trustee shall at no time vote or consent to any matter unless (i) such vote or consent would not (based on the opinion of counsel) alter the tax status of the Series, and (ii) such vote or consent would not alter the timing or amount of any payment on the CLNs. The Trustee shall have no liability for any failure to act as a result of a Holder's late return of directions, or failure to return directions requested by the Trustee from the Holders.

All notices received by the Trustee as holder of the CLNs that relate to the occurrence of a credit event under the portfolio credit default swap entered into between the CLNs Obligor and the Counterparty in connection with the issuance of the CLNs (the "Default Swap") will be promptly sent to the Holders of record on such date.

## SPECIAL CONSIDERATIONS

*The purchase of the Certificates involves certain risks, including without limitation, the risks described below. This Private Placement Memorandum does not purport to describe all risks of an investment in Certificates, either as such risks exist at the date hereof or as such risks may change in the future.*

### Ability to Sell Certificates at an Auction or to Receive a Market Rate at an Auction

Holders of the Certificates may not be able to sell some or all of their Certificates at an Auction if the Auction fails; that is, if there are more Certificates offered for sale than there are buyers for those Certificates. Also, if a Holder places a Bid (an order to retain its Certificates) at an Auction only at a specified rate, and that specified rate exceeds the Applicable Rate set at the Auction, the Holder will not retain its Certificates. If a Holder submits a Hold Order for its Certificates the Auction may set an Applicable Rate which may be different from the rate the Holder was expecting to receive.

As noted above, if there are more Certificates offered for sale than there are buyers for those Certificates in any Auction, the Auction will fail and the Holder may not be able to sell some or all of its Certificates at that time.

### CLNs

The only investments to be made by the Series are the CLNs and the Basis Swap. The amount of principal that Holders are entitled to be paid on the Scheduled Final Distribution Date, the Final Distribution Date, upon a Counterparty Call, or the monies that the Holders will receive upon a Series Liquidation Event and the amount of interest that Holders are entitled to receive, is dependent upon the Certificate Principal Balance which tracks the Notional Principal Amount of the CLNs. Reductions to the Notional Principal Amount of the CLNs due to losses incurred by the CLNs Obligor under the Default Swap will therefore directly affect the interest and principal payable on the Certificates. The occurrence of a CLNs Event will cause a liquidation of the Series and could result in a Termination Payment being owed to the Counterparty.

If the Notional Principal Amount of the CLNs is reduced to zero, the Certificate Principal Balance will be reduced to zero and the Series will be liquidated. In these circumstances the Holders will receive no redemption monies or interest.

A Prospectus for the CLNs is attached to the Series Pricing Supplement. Prospective purchasers of the Certificates are urged to read such Prospectus as carefully as if they were making a direct investment in the CLNs.

### Risks Associated with the CLNs

The Holders are exposed to the credit of the CLNs. If losses are allocated to the CLNs in accordance with their terms, reducing their principal amount, or the CLNs Obligor fails to pay any principal payment on the CLNs, whether in whole or in part, then the principal repaid to the Holder could be less than the Holder's original investment. Any failure by the CLNs Obligor to make required principal payments on the CLNs will reduce payments on the Certificates and will result in losses thereon.

Failure by the CLNs Obligor to pay any interest or principal payment on the CLNs could result in the occurrence of a CLNs Event. Such occurrence may adversely affect the Holders because a CLNs Event constitutes a termination event under the Basis Swap and the Series may be required to make a Termination Payment to the Counterparty as described below.

A Prospectus for the CLNs is attached to the Series Pricing Supplement. Prospective purchasers of the Certificates are urged to read such Prospectus as carefully as if they were making a direct investment in the CLNs.

### Risks of Reference Entities and CLNs Obligor

The likelihood of a Holder being paid interest on and the principal of the Certificates will be highly dependent on the financial status of the reference entities to which the CLNs are credit linked (the "Reference Entities"). The creditworthiness of each Reference Entity may be affected by a variety of factors that are inherently difficult to predict, such as business, financial, market and legal uncertainties, and domestic or international economic and political developments (including terrorist attacks, wars and other hostilities).

### CLNs Event

Any event of default in relation to the CLNs which has not been cured or waived to the satisfaction of the trustee of the CLNs will cause the liquidation of the Series and result in the Holders receiving a pro rata share of the CLNs, plus the Termination Payment if one is owed from the Counterparty to the Series or minus the Termination Payment if one is owed by the Series to the Counterparty. The events of default that are applicable to the CLNs are more fully described in the Prospectus for the CLNs and include the failure by the CLNs Obligor to make, when due, any payment on the CLNs or any asset swap pertaining thereto or under the Default Swap and an event of default on the Collateral (as such term is defined in the Prospectus for the CLNs).

### Payment-in-kind on the Liquidation of the Series

Upon the liquidation of the Series upon the occurrence of any of the events described in (iii) to (vii) of the definition of "Series Liquidation Event," the Holders are entitled to a pro rata share of the CLNs, plus the Termination Payment if one is owed from the Counterparty to the Series or minus the Termination Payment if one is owed by the Series to the Counterparty. If practicable, the Trustee will attempt to satisfy the amounts due to a Holder on a liquidation of the Series by delivering CLNs with an outstanding principal balance equal to such Holder's claim. If this is not possible due to the denominations of the CLNs, Holders will receive a combination of cash and CLNs in satisfaction of amounts then due in respect of the Certificates in such proportions as shall be determined by the Trustee in its sole discretion. The Trustee will only sell CLNs to the extent they are required to be sold to fund a Termination Payment to the Counterparty or if the denomination of the CLNs requires their sale in order to pay amounts then due to the Holders. There may be no market or only a very limited market in the CLNs. Consequently the market value of the CLNs, especially in the case where the liquidation of the Series has been triggered by a CLNs Event, may well be substantially below their outstanding principal amount. While the Auction process is intended to create liquidity for Holders, it is possible that no market may develop for the CLNs and consequently, Holders must be prepared to hold such CLNs potentially until their maturity date.

### Limited Recourse

The Certificates will evidence undivided interests in the Series Property subject to the Basis Swap, and will not be obligations or responsibilities of, and will not be guaranteed by, the Trustee, the Delaware Trustee, the Counterparty, the Initial Purchaser, the Auction Agent, the Broker-Dealer or any company in the same group of companies as, or any affiliate of, any of the foregoing. Distributions on the Certificates will be made solely from the Series Property, and not from the property of any other series of the Trust. Each Holder, by its holding of its Certificate, will be deemed to agree that distributions on the Certificates of a Series will be payable solely from the Series Property. If the Series is not able to meet its payment obligations in respect of the

Certificates, then the obligations of the Series in respect of the Certificates will be limited to proceeds of the Series Property. Any shortfall will be borne by the Holders in accordance with the priority of payments specified herein.

### Secondary Market

The Broker-Dealer may assist in resales of the Certificates, but it is not required to do so. A secondary market for the Certificates may not develop. If a secondary market does develop, it might not continue or it might not be sufficiently liquid to allow resale of any of the Certificates.

Furthermore, the auction procedures and transfer requirements described herein may limit the liquidity and marketability of the Certificates and therefore may not yield an owner the best price for the Certificates.

### Buying Certificates at Auction

Bids in the Auction by Existing Holders or Potential Holders constitute irrevocable offers to buy the Certificates if certain parameters are met. If a bid is not revoked prior to the Submission Deadline and the required parameters are met, an Existing Holder will be bound to continue to hold its Certificates and a Potential Holder will be bound to purchase the Certificates notwithstanding that the Certificate Principal Balance at the time of settlement may be lower than it was when the Bid was submitted or on the Submission Deadline, as the case may be.

### Broker-Dealer Bidding in Auctions

The Broker-Dealer may submit Orders in auctions for its own account. In the Broker-Dealer Agreement, each Broker-Dealer will agree to handle customers' orders in accordance with its duties under applicable securities laws and rules. If the Broker-Dealer submits an Order for its own account in any Auction, it could have an advantage over other Potential or Existing Holders in that it would have knowledge of other Orders placed through it in that Auction. A Broker-Dealer would not, however, have specific knowledge of Orders submitted by other non-affiliated Broker-Dealers, if any. The Counterparty may prohibit all Broker-Dealers from submitting Bids in Auctions for their own accounts.

### Dependence on Counterparty

An investment in the Certificates will entail reliance upon the Counterparty to make payments in accordance with the Default Swap relating to the CLNs and the Basis Swap. Any delay or cessation in the making of such payments by the Counterparty under either swap may be expected to result in delays or reductions in payments to Holders and could in some circumstances lead to a liquidation of the Series and a loss to Holders. Thus, Holders are exposed to the credit of the Counterparty.

### Basis Swap; Termination Payments; Counterparty Priority

The Basis Swap is subject to termination under certain circumstances, in which case a Termination Payment may be payable by or to the Series. The Termination Payment will be calculated by the Counterparty based on Loss (as defined in the Basis Swap). In determining such Termination Payment, the Counterparty will take into account the losses and costs (or gains, in which case expressed as a negative number) in connection with the termination of the Basis Swap including any loss of bargain, cost of funding or, at the election of the Counterparty but, without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). If a Termination Payment is payable by the Series to the Counterparty, unless the Basis Swap has

been terminated because of a Default by the Counterparty, the Counterparty's right to receive such payment will be senior in right of payment to the Holders. If the Basis Swap is terminated early because of a Default by the Counterparty, any Termination Payment due to the Counterparty will be subordinated in right of payment to the Holders. In either case, if a Termination Payment is payable by the Series to the Counterparty, such payment could be substantial and, if it does not result from a Default by the Counterparty, will reduce the amount available for payment to the Holders. Payment of a Termination Payment to the Counterparty may result in a return to Holders of less than the full amount of their principal investment. However, in certain circumstances, a Termination Payment may be owing to the Series under the terms of the Basis Swap and in such event the amounts available for payment to the Holders may be increased.

### Limited Right to Enforce Series Property

The CLNs generally will be registered in the name of the Trustee on behalf of the Series, and the Basis Swap will be executed by the Counterparty and the Trustee on behalf of the Series. No Holder will have the contractual right to act directly with respect to the CLNs or the Basis Swap or to proceed directly against the CLNs Obligor or the Counterparty. Such rights are reserved to the Trustee on behalf of the Series. The Trustee will, however, pass through the voting rights on the CLNs to Holders.

No Holder will have any right to bring an action in the name of the Series except in accordance with applicable law and unless the Majority Holders of such Series join in bringing such action. See "The Series Agreement — Rights of Holders."

### Variable Interest Rate

After the initial Coupon Accrual Period, the rate at which interest will accrue on the Certificates will be reset on a periodic basis in accordance with the Auction Procedures described herein. Those Auction Procedures provide that the Applicable Rate will be reset in accordance with bids submitted through Broker-Dealers to an Auction Agent. As a result, the Applicable Rate at which interest will accrue on the Certificates will reflect the willingness of investors and potential investors in the Certificates to hold those Certificates for successive Coupon Accrual Periods. There is no assurance that the Applicable Rate will reflect yields earned by other investors on fixed income securities comparable to the Certificates.

### Failure of Auction; Maximum Applicable Rate; Minimum Applicable Rate

If no Auction is held with respect to a Coupon Accrual Period, then the Applicable Rate for such Coupon Accrual Period will be the Maximum Applicable Rate. In addition, if the aggregate principal amount of the Certificates that are the subject of Submitted Sell Orders by Existing Holders (including Submitted Bids at rates in excess of the Maximum Applicable Rate) exceeds the aggregate principal amount of Certificates that are the subject of Submitted Bids (so that there are not Sufficient Clearing Bids), then the Applicable Rate for the next succeeding Coupon Accrual Period will be equal to the Maximum Applicable Rate on the date of such Auction. In either such event, Existing Holders that have placed Sell Orders for Certificates will not be able to sell all, and may not be able to sell any, Certificates in the Auction.

If all of the Certificates with respect to any Auction are subject to Submitted Hold Orders, there will be no Available Certificates, and the Applicable Rate for the next Coupon Accrual Period will be the Minimum Applicable Rate.

**Legal Investment**

The appropriate characterization of the Certificates under various legal investment restrictions, and thus the ability of investors subject to those restrictions to purchase the Certificates, may be subject to significant interpretative uncertainties. No representation is made as to the proper characterization of the Certificates for legal investment purposes, or for risk-weighting, securities valuation, regulatory accounting or other financial institution regulatory regimes of the National Association of Insurance Commissioners, any state insurance commissioner, any federal or state banking authority or any other regulatory body. Investors should consult with their own legal advisors in determining whether, and to what extent, the Certificates will constitute legal investments for them and the consequences of such an investment.

**Counterparty as Secured Party**

The CLNs and the other property of the Series (other than the interest of the Series in the Basis Swap) will be pledged to the Counterparty as security for the obligations of the Series to the Counterparty under the Basis Swap. Although the Counterparty's rights to receive payments will be subject to the terms of the Basis Swap and the Series Agreement as described herein, such pledge will afford the Counterparty secured party status with respect to the property of the Series.

**Tax Considerations**

Prospective investors in Certificates should carefully consider the U.S. federal income tax treatment of the Certificates as described herein and are urged to consult their tax advisors regarding the U.S. federal income tax consequences of the purchase, ownership and disposition of Certificates, particularly with respect to the timing and character of income, loss or deduction associated with holding an interest in the CLNs and the Basis Swap, as described herein. See "Certain U.S. Federal Income Tax Considerations."

**Rating of the Certificates**

The Certificates will be rated by Fitch and by S&P at the request of the Series and will have such ratings as are specified in the Series Pricing Supplement. Ratings are subject to reconsideration at the rating agencies' sole discretion and may be subject to suspension, downgrade or withdrawal at any time by the relevant rating agency. Any rating issued with respect to the Certificates is not a recommendation to purchase, sell or hold a security and does not address the suitability of an investment for any particular investor. There can be no assurance that any rating will remain in effect for any given period of time.

**Limited Information**

Neither the Private Placement Memorandum nor the Series Pricing Supplement provide nor are they intended to provide any significant amount of information concerning the Reference Obligations (as defined in the Prospectus for the CLNs) and Reference Entities to which the CLNs are credit-linked, or concerning the CLNs Obligor. Each of the Initial Purchaser, the Broker-Dealer, the Auction Agent, the Counterparty and their respective affiliates may, whether by virtue of the types of relationships described above or otherwise, at the date hereof or at any time hereafter, be in possession of information in relation to the Reference Entities referenced by the Default Swap that is or may be material in the context of the Certificates and that is or may not be known to the general public. None of the Initial Purchaser, the Broker-Dealer, the Auction Agent, the Counterparty or their affiliates has any contractual obligation, and the offering of the Certificates does not create any contractual obligation on the part of any of the Initial Purchaser, the Broker-Dealer, the Auction Agent, the Counterparty or their affiliates, to disclose to the Holders any such relationship or information (whether or not confidential).

13

None of the Initial Purchaser, the Broker-Dealer, the Counterparty or any of their respective affiliates has any contractual obligation, and the offering of the Certificates does not create any contractual obligation on the part of any of the Initial Purchaser, the Broker-Dealer, the Counterparty or any of their affiliates, to disclose to any Holder any such relationship or information (whether or not confidential). Accordingly, each prospective purchaser of the Certificates is urged to conduct its own independent investigation of the Reference Obligations and Reference Entities to which the CLNs are credit linked, and of the CLNs Obligor and to not rely upon the Series, the Broker-Dealer, the Initial Purchaser, the Auction Agent, the Counterparty or any affiliate thereof as a source of information concerning the Reference Obligations, the Reference Entities or the CLNs Obligor.

## USE OF PROCEEDS

The Series will use the proceeds of the sale of the Certificates to acquire the CLNs.

## DESCRIPTION OF THE CERTIFICATES

*The following is a general summary of the terms and conditions of the Certificates. The summary is qualified in its entirety by reference to the Series Pricing Supplement and to the Series Agreement, copies of which are available upon request from the Broker-Dealer or the Trustee. Capitalized terms used herein and not otherwise defined in the Private Placement Memorandum have the meanings ascribed to such term in the Series Agreement unless the context otherwise requires.*

### General

Each series of Certificates offered hereby will be issued by a series of a Delaware statutory trust (the "Trust", and the Trust acting for such series, the "Series"). The Trust was formed pursuant to a Declaration of Trust and Trust Agreement (the "Declaration of Trust") among the Counterparty, the Trustee and the Delaware Trustee, dated as of April [●], 2007.  It was established for the primary purpose of issuing separate series of Certificates representing undivided interests in a Series and the related Series Property (as described below), acquiring the CLNs described in the Series Pricing Supplement and entering into a Basis Swap with the Counterparty. The Certificates of a Series will be issued pursuant to a Series Agreement (the "Series Agreement") among the Counterparty, the Trustee and the Delaware Trustee, dated as of the Issue Date creating the Series that issues those Certificates. No securities other than Certificates will be issued by any Series.

The Certificates will represent undivided interests in the Series and the Series Property and will be available for purchase only in minimum denominations of U.S. $100,000 and integral multiples of U.S. $50,000 in excess thereof (collectively, the "Authorized Denominations"). Each Certificate of the same denomination will be entitled to an identical undivided interest in the Series Property. The Series Property will consist of (i) the CLNs, (ii) the rights of the Series under the Basis Swap, and (iii) any proceeds of the foregoing. Holders will not have any right in or claim to any specific part of the Series Property. No further Certificates will be issued by the Series after the Issue Date. The Certificates will be issued in book-entry form. See "— Book Entry Registration."

### Definitive Certificates

Definitive Certificates are to be issued only under the circumstances described in the last paragraph of the next section. If any Definitive Certificates are issued, they shall be issued in fully registered, certificated form directly to the Holder or a nominee thereof. Distributions of principal of, and interest on, the Definitive Certificates will be made in accordance with the procedures set forth in the Series Agreement, directly to holders of Definitive Certificates in whose names the Definitive Certificates were registered at the close of business on the applicable Record Date. See "— Payments of Principal and Interest."

Definitive Certificates will be transferable and exchangeable at the offices of the Trustee or of a registrar named in a notice delivered to Holders of Definitive Certificates. No service charge will be payable with respect to any transfer of Certificates, but the Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any such transfer.

### Book-Entry Registration

The Certificates will be issued in book-entry form and will be represented by one or more Global Certificates registered in the name of The Depository Trust Company ("DTC") or its nominee. The Trustee has been informed by DTC that DTC's nominee will be Cede & Co. Accordingly, Cede & Co. is expected to be the holder of record of the Global Certificates.

With respect to Certificates in book-entry form, all references herein to actions by Holders refer to actions taken by DTC upon instructions from its participating organizations (the "Participants") and all references herein to distributions, notices, reports, and statements to Holders refer to distributions, notices, reports, and statements to DTC or its nominee, as the registered holder of the Certificates, for distribution to Holders in accordance with DTC's procedures.

DTC is a limited purpose trust company organized under the laws of the State of New York, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York UCC and a "clearing agency" registered pursuant to Section 17A of the Exchange Act. DTC was created to hold securities for its Participants and to facilitate the clearance and settlement of securities transactions between Participants through electronic book-entries, thereby eliminating the need for physical movement of certificates. Participants include securities brokers and dealers, banks, trust companies and clearing corporations. Indirect access to the DTC system is also available to others such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Participant, either directly or indirectly (the "Indirect Participants").

Holders that are not Participants or Indirect Participants but desire to purchase, sell or otherwise transfer ownership of, or other interests in, Certificates that are Global Certificates may do so only through Participants and Indirect Participants. In addition, Holders will receive all distributions of principal and interest through DTC Participants. Under a book-entry format, Holders may experience some delay in their receipt of payments, since such payments will be forwarded by the Trustee to Cede & Co., as nominee for DTC. DTC will forward such payments to its Participants, which thereafter will forward them to Indirect Participants or Holders.

Under the rules, regulations and procedures creating and affecting DTC and its operations (the "Rules"), DTC is required to make book-entry transfers of Certificates among Participants on whose behalf DTC acts with respect to the Certificates and to receive and transmit distributions of principal of, and interest on, Certificates. Participants and Indirect Participants with which Holders have accounts with respect to the Certificates similarly are required to make book-entry transfers and receive and transmit such payments on behalf of their respective Holders. Accordingly, although Holders will not possess Certificates, the Rules provide a mechanism by which Participants will receive payments and will be able to transfer their Certificates.

Because DTC can only act on behalf of Participants, who in turn act on behalf of Indirect Participants and certain banks, the ability of a Holder to pledge Certificates to persons or entities that do not participate in the DTC system, or to otherwise act with respect to such Certificates, may be limited due to the lack of a physical certificate for such Certificates.

Except as required by law, the Trustee will not have any liability for any aspect of the records relating to or payments made on account of beneficial ownership interest of the Certificates held by DTC or its nominee, or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

Global Certificates registered in the name of DTC or its nominee will be exchangeable for Definitive Certificates only if DTC is no longer willing or able to act as a depository and the Trustee is unable to locate a qualified successor within 90 days. Upon the occurrence of such event, the Trustee shall promptly notify all Holders and DTC of such occurrence and of the exchange of Global Certificates for Definitive Certificates. Upon surrender to the Trustee of the Global Certificates by DTC, accompanied by registration instructions, the Trustee on behalf of the Series

shall execute and the Trustee shall authenticate the Definitive Certificates in accordance with the instructions of DTC. Neither the Series nor the Trustee shall be liable for any delay in delivery of such instructions, and the Series and the Trustee may conclusively rely on, and shall be protected in relying on, such instructions. Upon the issuance of Definitive Certificates, the Trustee shall recognize the Holders of the Definitive Certificates as Holders under the Series Agreement.

## Payments of Principal and Interest

Distributions on the Certificates will depend upon timely receipt of payments due on the CLNs and from the Counterparty under the Basis Swap. Payment of interest and principal on the Certificates will be less any applicable withholding taxes and other governmental charges.

All payments in respect of Certificates held in book-entry form through Global Certificates will be made to DTC. All payments in respect of any Definitive Certificates will be made in U.S. dollars by check mailed on or before the applicable Coupon Distribution Date for such payment to the Holder entitled thereto, or, if the Holder so elects by giving prior written notice to the Trustee, by wire transfer to an account maintained by the Holder with a bank located in the United States. The final payment on any Definitive Certificate, however, will be made only upon presentation and surrender of such Definitive Certificate at the office or agency specified in the notice of final distribution to such Holder.

## Postponement of Final Distribution

The distribution of principal of the Certificates on the Scheduled Final Distribution Date will be funded from the proceeds received by the Series from the redemption of the CLNs (the "CLNs Redemption Proceeds"). The Scheduled Final Distribution Date of the Certificates is the same as the scheduled maturity date of the CLNs. The terms of the CLNs permit the payment of some or all of the CLNs Redemption Proceeds to be delayed beyond the scheduled maturity date of the CLNs in certain circumstances as described in the Prospectus for the CLNs. In such a scenario, the Holders will not receive a USD amount equal to the Certificate Principal Balance on the Scheduled Final Distribution Date but will receive a lesser amount which will represent each Holder's pro rata share of the CLNs Redemption Proceeds. On the Final Distribution Date each Holder will receive their pro rata share of the sum of:

(1) the Interest Amount in respect of the last Coupon Accrual Period;

(2) any redemption monies received in respect of the CLNs in the period from and excluding the Scheduled Final Distribution Date to and including the Final Distribution Date that have not been previously distributed to Holders; and

(3) an amount equal to the aggregate of all daily interest amounts in respect of each day during the period from and including the Scheduled Distribution Date to but excluding the Final Distribution Date. Each such daily interest amount shall be equal to the product of:

(i) the Interest Deferral Rate (which term shall have the same meaning as in the Prospectus for the CLNs);

(ii) the sum of the Notional Principal Amount on the Final Distribution Date and the Interest Amount relating to the final Coupon Accrual Period; and

(iii) the Deferral Rate Day Count Fraction (which term shall have the same meaning as in the Prospectus for the CLNs).

## Certificate Exchange Right

The Counterparty and any of its affiliates may redeem any Certificates held for the account of the Counterparty or any such affiliate, including any Certificates purchased by the Counterparty or

its affiliates in the open market. Upon such a redemption by the Counterparty or its affiliate (i) the notional amount of the Basis Swap relating to such Certificates will be reduced proportionally based on the aggregate amount of Certificates being exchanged and (ii) the portion of the CLNs relating to the Certificates that are being redeemed will be distributed in-kind to the Counterparty or its affiliate, as applicable.

## Transfer Restrictions

The Certificates have not been and will not be registered under the Securities Act of 1933, as amended (the "Securities Act") or any state blue sky law. Purchases of Certificates may be made only in minimum denominations of U.S. $100,000 (and in integral multiples of U.S. $50,000 in excess thereof) and can be made only by Qualified Institutional Buyers that are also Qualified Purchasers.

An Existing Holder may only sell, transfer or otherwise dispose of its Certificates pursuant to a Sell Order in accordance with the Auction Procedures or to or through a Broker-Dealer. In the case of all transfers other than pursuant to Auctions, such Existing Holder's Broker-Dealer must advise the Auction Agent of such transfer. The Auction Agent is not required to give effect to any such notice for purposes of the Bidding Rights Record unless it is received by the Auction Agent by the deadline set forth in the Auction Procedures.

The purchase of Certificates by ERISA plan investors is subject to further restriction and under certain circumstances may be prohibited. Investors will be required to make certain representations regarding their status as ERISA Plans. See "Certain ERISA Considerations."

Each purchaser of Certificates (whether as an initial purchaser or transferee) will be deemed by its acceptance of its Certificates to have made certain representations and agreements regarding their Certificates as set forth herein under "Notice to Purchasers and Transferees". The Trustee shall have no duty to determine whether any purported transfer violates any federal or state securities laws or of ERISA.

Any purported transfer of an interest in a Certificate that is not made in accordance with the transfer restrictions described herein and specified in the Series Agreement shall not be binding on the Series. If at any time the Trustee determines or is notified by the Broker-Dealer that a purchaser was, at the time of its purchase of its Certificates, in breach of the deemed representations and agreements set forth in the Notice to Purchasers and Transferees, the Trustee may consider the acquisition of the Certificates by such purchaser null and void and rescinded or may require that the Certificates purchased by such purchaser be transferred to a person designated by the Trustee or the Broker-Dealer at a price determined by the Broker-Dealer based upon its estimation of the prevailing price of the Certificates and each Holder and purported Holder, by its acceptance of its Certificate authorizes the Trustee and the Broker-Dealer to take such action if warranted and understands that neither the Trustee nor the Broker-Dealer will be responsible for any losses that may be incurred as a result of any such transfer.

So long as any of the Certificates are "restricted securities" within the meaning of Rule 144(a)(3), the Series Agent, on behalf of the Series, shall furnish, upon request of a Holder, to such Holder or any prospective investor designated as such by the Holder, information, as available, that is required to be provided pursuant to Rule 144A(d)(4) under the Securities Act. To the extent the Series Agent provides such information to Holders, the Series Agent will include with such information a reminder that (1) each Holder is required to be both a Qualified Institutional Buyer and a Qualified Purchaser, (2) the Certificates may only be transferred to a Person who is both a Qualified Institutional Buyer and a Qualified Purchaser and (3) the Series has the right to compel any Holder that does not meet the transfer restrictions to transfer its Certificates to a Person designated by the Initial Purchaser, the Broker-Dealer or the Trustee.

Purchasers are advised to consult legal counsel prior to making any purchase, resale, pledge or other transfer of any of the Certificates.

## AUCTION PROCEDURES

### Interest Rate Set by Auction Procedures

The rate at which interest will accrue on the Certificates (the "Applicable Rate") for each Coupon Accrual Period will be established pursuant to the Auction Procedures described herein, except that for the first Coupon Accrual Period, the Applicable Rate will be specified in the Series Pricing Supplement. However, if an Auction is not held in respect of the Certificates for any Coupon Accrual Period, the rate at which interest will accrue on Certificates for that Coupon Accrual Period will be equal to the Maximum Applicable Rate.

### Applicable Rate

The Applicable Rate for the Certificates for any Coupon Accrual Period other than the first Coupon Accrual Period will be either the Winning Bid for such Coupon Accrual Period that the Auction Agent advises results from the implementation of the Auction Procedures, the Minimum Applicable Rate, or the Maximum Applicable Rate, as applicable. Each periodic operation of such procedures is referred to herein as an "Auction" and such procedures are collectively referred to as the "Auction Procedures."

### Auction Agent

The initial Auction Agent will be The Bank of New York (in such capacity, the "Auction Agent"). The Auction Agent and the Series will enter into an auction agency agreement dated the Issue Date (the "Auction Agency Agreement") providing, among other things, that the Auction Agent will follow the Auction Procedures for the purposes of determining the Applicable Rate for each Coupon Accrual Period. Unless otherwise terminated by the Series or the Auction Agent as described below, the Auction Agency Agreement will remain in effect for so long as there remain any outstanding Certificates.

The Auction Agent has undertaken to perform only such duties as are specifically set forth in the Auction Agency Agreement. The Auction Agency Agreement provides that, in the absence of bad faith, wilful misconduct or negligence on its part, the Auction Agent will not be liable for any action taken, suffered or omitted or for any error of judgment made by it in the performance of its duties under the Auction Agency Agreement and that the Auction Agent will not be liable for any error of judgment made in good faith unless the Auction Agent shall have been negligent in ascertaining the pertinent facts.

In addition, the Auction Agency Agreement provides that (a) the Auction Agent may conclusively rely on and will be protected in acting or refraining from acting upon any communication authorized by the Auction Agency Agreement and upon any written instruction, notice, request, direction, consent, report, certificate or other instrument, paper or document reasonably believed by it in good faith to be genuine, (b) the Auction Agent may consult with counsel, and the advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it under the Auction Agency Agreement in good faith and in reliance thereon, and (c) the Auction Agent will not be required to advance, expend or risk its own funds or otherwise incur or become exposed to financial liability in the performance of its duties under the Auction Agency Agreement, except as may be required as a result of its own negligence or bad faith.

The Series has agreed to reimburse the Auction Agent upon its request for all reasonable out-of-pocket expenses, disbursements and advances reasonably incurred or made by the Auction Agent in accordance with any provision of the Auction Agency Agreement or the Broker-Dealer Agreements (including the reasonable compensation, expenses and disbursements of its agents

and counsel), except any expense or disbursement attributable to its negligence, bad faith or wilful misconduct, up to certain agreed per annum dollar limits upon receipt of the same under the Basis Swap. In addition, the Counterparty has agreed to indemnify the Auction Agent against, and hold it harmless from, any loss, liabilities or expense incurred without negligence, bad faith or wilful misconduct on its part arising out of or in connection with the exercise or performance of any of its duties under the Auction Agency Agreement or under any Broker-Dealer Agreement, including the reasonable costs and expenses of defending itself against any claim or liability in connection with its exercise or performance of any of its duties under the Auction Agency Agreement or any Broker-Dealer Agreement and for which it is entitled to indemnification under the Auction Agent Extraordinary Expense and Indemnification Agreement between the Auction Agent and the Counterparty.

The Auction Agency Agreement will remain in effect for as long as there remain any outstanding Certificates, except that either the Series, at the direction of the Counterparty, or the Auction Agent may terminate the Auction Agency Agreement by so notifying the other party and the Counterparty, provided such termination will not be effective until the Series has entered into an agreement with a successor Auction Agent appointed by the Counterparty, containing substantially the same terms and conditions as the Auction Agency Agreement, subject to any changes with respect to which the Rating Agency Condition has been satisfied. A successor Auction Agent shall be (i) a bank, national banking association or trust company duly organized under the laws of the United States of America or any state or territory thereof having its principal place of business in the Borough of Manhattan, New York, or another location approved by the Series in writing and having a combined capital stock or surplus of at least U.S. $50,000,000, or (ii) a member of the National Association of Securities Dealers, Inc. having a capitalization of at least U.S. $50,000,000, and, in either case, authorized by law to perform all the duties imposed upon it under the Auction Agency Agreement and the Broker-Dealer Agreements. Upon the redemption of all of the Certificates, the Auction Agency Agreement will be terminated automatically without the appointment of a successor Auction Agent by the Series.

### Broker-Dealers

Existing Holders and Potential Holders of certificates must submit orders through a Broker-Dealer in order to participate in an Auction. Broker-Dealers may communicate among themselves in order to encourage bidding and to determine the level of interest in the market. Broker-Dealers may submit Orders and purchase certificates for their own account, either in an Auction or otherwise. The Counterparty may prohibit all Broker-Dealers from submitting Bids in Auctions for their own accounts.

### Trustee not Responsible for Auction Agent and Broker-Dealers

The Trustee shall not be liable or responsible for the actions of or failure to act by the Auction Agent or any Broker-Dealer under the Auction Agency Agreement or any Broker-Dealer Agreement. The Trustee may conclusively rely upon any information required to be furnished by the Auction Agent or any Broker-Dealer without undertaking any independent review or investigation of the truth or accuracy of such information.

For the purpose of allowing the Auction Agent to accurately maintain its records (the "Bidding Rights Records") of the allocable portion of the bidding rights for the Certificates held by each Broker-Dealer, each Broker-Dealer shall deliver to the Auction Agent a written notice of any transfer of the Certificates made through such Broker-Dealer by an Existing Holder to another person other than pursuant to an Auction. The Auction Agent is not required to give effect to any such notice of change of Existing Holder for purposes of the Bidding Rights Record prior to an Auction unless such notice is received by the Auction Agent by 3:00 p.m. on the Business Day immediately preceding the related Auction Date, and the Auction Agent is not permitted to accept

any such notice for purposes of the Bidding Rights Record received by the Auction Agent after 4:00 p.m. on the Business Day preceding the related Auction Date.

## Auction Dates

An Auction with respect to the Certificates will be held on the first Business Day immediately preceding each Scheduled Coupon Accrual Date following the first Scheduled Coupon Accrual Date to, but excluding, the Scheduled Final Distribution Date (each, an "Auction Date") to determine the Applicable Rate for the subsequent Coupon Accrual Period.

## Submission of Orders

The communication to a Broker-Dealer of the information described below is referred to herein as an "Order." An Existing Holder or a Potential Holder placing an Order is referred to herein as a "Bidder." The Auction Agent is entitled to rely upon the terms of any Order submitted to it by a Broker-Dealer.

Prior to the Submission Deadline for each Auction, Broker-Dealers will contact their customers by telephone or otherwise to determine whether such customers desire to submit Orders. Orders must be submitted only in applicable Authorized Denominations, notwithstanding that the Certificate Principal Balance may be less than the aggregate Authorized Denominations of the Certificates. If a notice of a Counterparty Call has been given by the Series, no Auctions will be held commencing on or after the Coupon Distribution Date such Counterparty Call is effective.

(i)    Prior to 1:00 p.m., New York City time, on each Auction Date or such other time on the Auction Date specified by the Auction Agent (the "Submission Deadline"), each Broker-Dealer will submit to the Auction Agent in writing all Orders obtained by it for the Auction to be conducted on such Auction Date.

(ii)    The Auction Agent will, if necessary, round any rate specified in any Bid (expressed as a percentage) that contains more than three figures to the right of the decimal point up to the next highest one-thousandth of one per cent (.001%).

Prior to the Submission Deadline for each Auction for the Certificates, Broker-Dealers will contact Existing Holders of Certificates, by telephone or otherwise, to determine whether such Existing Holders desire to place Orders. Each Existing Holder, with respect to the Certificates that it then holds, may submit to a Broker-Dealer by telephone or otherwise:

(i)    a "Hold Order": indicating the aggregate principal amount of Certificates that such Existing Holder desires to continue to hold without regard to the Applicable Rate for the next Coupon Accrual Period;

(ii)    a "Bid": indicating the aggregate principal amount of Certificates that such Existing Holder desires to continue to hold, provided that the Applicable Rate for the next Coupon Accrual Period is not less than the per annum interest rate specified in such Bid; or

(iii)    a "Sell Order": indicating the aggregate principal amount of Certificates that such Existing Holder desires to sell without regard to the Applicable Rate for the next Coupon Accrual Period.

## Treatment of Orders

(i)    A Sell Order submitted by an Existing Holder will constitute an irrevocable offer to sell the aggregate principal amount of Certificates subject to that Order, and a Bid submitted by an Existing Holder will constitute an irrevocable offer to sell the Certificates subject to that Bid if the rate specified in such Bid is higher than the Applicable Rate determined in the Auction,

Any Bid submitted by an Existing Holder specifying an interest rate higher than the Maximum Applicable Rate will be deemed to be a Sell Order.

(ii) If Orders covering all of the Certificates held by an Existing Holder are not submitted to the Auction Agent (through the Existing Holder's Broker-Dealer) prior to the Submission Deadline, whether because a Broker-Dealer failed to contact such Existing Holder or because the Broker-Dealer failed to submit the Existing Holder's Orders by the Submission Deadline, or for any other reason, the Auction Agent will deem a Hold Order to have been submitted by that Existing Holder covering the aggregate principal amount of Certificates held by that Existing Holder and not subject to any Order submitted to the Auction Agent.

(iii) An Existing Holder may submit different types of Orders in an Auction with respect to the Certificates then held by that Existing Holder.

(iv) Any Order which specifies the Certificates to be held, purchased or sold in a principal amount which is not U.S. $100,000 or an integral multiple of U.S. $50,000 in excess thereof will be rounded down to the nearest Authorized Denomination and the Auction Agent will conduct the Auction Procedures as if such Order had been submitted in such lower amount.

**Allocation of Orders**

If one or more Orders covering in the aggregate more than the total principal amount of Certificates held by Existing Holders are submitted to the Auction Agent by an Existing Holder (through the Existing Holder's Broker-Dealer), those Orders will be considered valid as follows and in the following order of priority:

(i) any Hold Order submitted on behalf of that Existing Holder will be considered valid up to and including the aggregate principal amount of Certificates held by that Existing Holder, except that if more than one Hold Order is submitted on behalf of that Existing Holder and the aggregate principal amount of Certificates subject to those Hold Orders exceeds the aggregate principal amount of Certificates held by that Existing Holder, the aggregate principal amount of Certificates subject to each such Hold Order will be reduced pro rata so that those Hold Orders will cover exactly the aggregate principal amount of Certificates held by that Existing Holder;

(ii)

(a) any Bid submitted on behalf of that Existing Holder will be considered valid up to and including the excess of the principal amount of Certificates held by that Existing Holder over the aggregate principal amount of Certificates subject to any Hold Order referred to in clause (i) above;

(b) subject to sub clause (a), if more than one Bid with the same interest rate is submitted on behalf of that Existing Holder and the aggregate principal amount of Certificates subject to those Bids is greater than such excess, the aggregate principal amount of Certificates subject to each such Bid will be reduced pro rata so that those Bids will cover exactly the aggregate principal amount of Certificates equal to such excess;

(c) subject to sub clause (a), if more than one Bid with different interest rates is submitted on behalf of that Existing Holder, those Bids will be considered valid in the ascending order of their respective interest rates up to and including the amount of such excess; and

(d) in any such event, the number, if any, of such Certificates subject to Bids not valid under sub clause (a), (b) or (c) of this clause (ii) (i.e., Bids in excess of the Certificates held by the Existing Holder) will be treated as the subject of a Bid by a Potential Holder; and

(iii) any Sell Order submitted on behalf of that Existing Holder will be considered valid up to and including the excess of the principal amount of Certificates held by that Existing Holder over the principal amount of Certificates subject to valid Hold Orders by that Existing Holder

referred to in clause (i) and valid Bids by such Existing Holder referred to in clause (ii), except that if more than one Sell Order is submitted on behalf of any Existing Holder and the principal amount of Certificates subject to those Sell Orders is greater than such excess, the principal amount of Certificates subject to those Sell Orders will be reduced pro rata so that those Sell Orders will cover exactly the aggregate principal amount of Certificates equal to such excess.

**Existing Holders**

An "Existing Holder" of Certificates means with respect to any Auction, any Person that participates in the Auction by submitting Orders through a Broker-Dealer, to the extent such Orders relate to Certificates of which such Person is the beneficial owner.

**Potential Holders**

A "Potential Holder" means, with respect to any Auction, any Person that participates in the Auction by submitting Orders through a Broker-Dealer, to the extent such Orders are Bids that do not relate to Certificates of which such Person is the beneficial owner. When used with respect to a Potential Holder, "Bid" means an Order indicating the aggregate principal amount of Certificates that the Potential Holder offers to purchase if the Applicable Rate for the next Coupon Accrual Period is not less than the per annum interest rate specified in such Bid. A Bid submitted by a Potential Holder will constitute an irrevocable offer to purchase the aggregate principal amount of Certificates subject to that Bid if the rate specified in the Bid is less than or equal to the Applicable Rate determined in the Auction. An Existing Holder who submits a Bid for Certificates in excess of the aggregate principal amount of Certificates then held by that Existing Holder will be treated as a Potential Holder to the extent of such excess. Any Bid submitted by a Potential Holder specifying an interest rate higher than the Maximum Applicable Rate will be rejected. If more than one Bid is submitted on behalf of any Potential Holder, each Bid submitted will be deemed a separate Bid with the rate for the aggregate principal amount of Certificates specified therein.

**Sufficient Clearing Bids**

Not earlier than the Submission Deadline on each Auction Date, the Auction Agent will assemble all Orders submitted or deemed submitted to it by the Broker-Dealers (each Hold Order, Bid or Sell Order as submitted or deemed submitted by a Broker-Dealer being referred to herein as a "Submitted Hold Order," a "Submitted Bid" or a "Submitted Sell Order," as the case may be, or as a "Submitted Order") and will determine the excess, if any, of the aggregate principal amount of Certificates over the aggregate principal amount of Certificates subject to Submitted Hold Orders (such excess called the "Available Certificates").

(i)   If all of the Certificates are subject to Submitted Hold Orders, there will be no Available Certificates, and the Applicable Rate for the next Coupon Accrual Period for the Certificates will be the Minimum Applicable Rate.

(ii)  If there are Available Certificates, the Auction Agent will determine whether Sufficient Clearing Bids exist in the Auction. "Sufficient Clearing Bids" exist if the aggregate principal amount of Certificates that are the subject of Submitted Bids by Potential Holders (including Existing Holders who have submitted Bids to purchase additional Certificates) specifying interest rates not higher than the Maximum Applicable Rate equals or exceeds the aggregate principal amount of Certificates that are the subject of Submitted Sell Orders (including the aggregate principal amount of Certificates subject to Submitted Bids by Existing Holders specifying per annum interest rates higher than the Maximum Applicable Rate).

(iii) If Sufficient Clearing Bids exist, the Auction Agent will determine the lowest interest rate specified in the Submitted Bids of Existing Holders and Potential Holders (the "Winning Bid") that would result in Existing Holders' continuing to hold (pursuant to Submitted Bids) and

Potential Holders' (including Existing Holders who have placed Bids to purchase additional Certificates) purchasing an aggregate principal amount of Certificates bearing interest at the Winning Bid at least equal to the aggregate principal amount of Available Certificates. If Sufficient Clearing Bids exist, the Applicable Rate for the next succeeding Coupon Accrual Period for all Certificates then outstanding will be the Winning Bid.

(iv)  If Sufficient Clearing Bids have not been made in an Auction, the Applicable Rate for the next succeeding Coupon Accrual Period will be equal to the Maximum Applicable Rate on the date of such Auction. In that event, Existing Holders that have placed Sell Orders for Certificates will not be able to sell all, and may not be able to sell any, Certificates in the Auction.

(v)  The "Maximum Applicable Rate" with respect to the Certificates for any Coupon Accrual Period will be specified in the Series Pricing Supplement.

(vi)  The "Minimum Applicable Rate" with respect to the Certificates for a Coupon Accrual Period will be specified in the Series Pricing Supplement.

### Acceptance or Rejection of Bids and Orders

Based on the determinations made as described above, Submitted Bids and Submitted Sell Orders will be accepted or rejected by the Auction Agent with the result that Existing Holders and Potential Holders of Certificates will sell, continue to hold and/or purchase Certificates as described below and in such order of priority, Existing Holders that placed or were deemed to have placed Hold Orders will continue to hold Certificates subject to such Hold Orders. If Sufficient Clearing Bids exist, Submitted Orders will be accepted or rejected as follows in the following order of priority:

(i)  each Existing Holder that placed a Submitted Bid specifying a per annum interest rate higher than the Winning Bid or a Submitted Sell Order will sell the aggregate principal amount of Certificates subject to such Submitted Bid or Submitted Sell Order;

(ii)  each Existing Holder that placed a Submitted Bid specifying an interest rate lower than the Winning Bid will continue to hold the aggregate principal amount of Certificates subject to such Submitted Bid;

(iii)  each Potential Holder that placed a Submitted Bid specifying an interest rate lower than the Winning Bid will purchase the aggregate principal amount of Certificates subject to such Submitted Bid;

(iv)  each Existing Holder that placed a Submitted Bid specifying an interest rate equal to the Winning Bid will continue to hold the aggregate principal amount of Certificates subject to such Submitted Bid, unless the aggregate principal amount of Available Certificates not previously accounted for in clauses (ii) and (iii) above is less than the aggregate amount of Certificates subject to such Submitted Bids, in which event each Existing Holder with such a Submitted Bid will sell a portion of the Certificates held by such Holder, in an amount to be determined on a pro rata basis based on the aggregate principal amount of Certificates subject to all such Submitted Bids by such Existing Holders;

(v)  each Potential Holder that placed a Submitted Bid specifying an interest rate equal to the Winning Bid will purchase any Available Certificates not accounted for in clause (ii), (iii) or (iv) above on a pro rata basis based on the aggregate principal amount of Certificates subject to all such Submitted Bids by such Potential Holders; and

(vi)  the Submitted Bid of each Potential Holder specifying any rate that is higher than the Winning Bid will be rejected.

In the event that Sufficient Clearing Bids have not been made, Submitted Orders will be accepted or rejected as follows in the following order of priority:

(i)   each Existing Holder that placed a Submitted Bid specifying an interest rate equal to or lower than the Maximum Applicable Rate will continue to hold the aggregate principal amount of Certificates subject to such Submitted Bid;

(ii)  each Potential Holder that placed a Submitted Bid specifying an interest rate equal to or lower than the Maximum Applicable Rate will purchase the aggregate principal amount of Certificates subject to each Submitted Bid;

(iii) each Existing Holder that placed a Submitted Sell Order (including a Submitted Bid specifying a rate in excess of the Maximum Applicable Rate) will sell a portion of Certificates held by such holder, in an amount to be determined on a pro rata basis based on the aggregate principal amount of Certificates as are needed to be purchased as described in clause (ii) above; and

(iv)  the Submitted Bid of each Potential Holder specifying any rate that is higher than the Maximum Applicable Rate will be rejected.

Certificates will be purchased and sold for a price equal to a pro rata portion of the Certificate Principal Balance on the Auction Date notwithstanding the fact that Orders were submitted based upon Authorized Denominations.

If, as a result of the procedures described above, any Existing Holder or Potential Holder would be required to purchase or sell an amount of the Certificates which is not an Authorized Denomination on any Auction Date, the Auction Agent will by lot, in such manner as it will determine in its sole discretion, round up or down the principal amount of the Certificates to be purchased or sold by any Existing Holder or Potential Holder on such Auction Date so that the amount of the Certificates purchased or sold by each Existing Holder or Potential Holder on such Auction Date will be an Authorized Denomination, even if such allocation results in one or more of such Existing Holders or Potential Holders not purchasing or selling any Certificates on such Auction Date.

**Fees to the Auction Agent and Broker-Dealer(s)**

The Auction Agent will be paid the Auction Agent Fee by the Series following receipt of the same under the Basis Swap.

The Broker-Dealer will be paid the Broker-Dealer Fee by the Series following receipt of the same under the Basis Swap.

**Auction Schedule**

Prior to the Final Distribution Date, the Auction Agent will conduct an Auction on each Auction Date in accordance with the schedule set forth below. If an Auction is not held as required under the Auction Procedures for any reason, the Applicable Rate for the immediately following Coupon Accrual Period will be the Maximum Applicable Rate.

The Auction Agent will conduct Auctions in accordance with the schedule set forth below. Changes that have no material adverse effect on beneficial owners, such judgment to be made by the Counterparty in its sole and absolute discretion, may be made to such schedule by the Auction Agent or any Broker-Dealer with the prior consent of the Trustee, each other Broker-Dealer, the Series Agent and the Counterparty, which consent shall not be unreasonably withheld or delayed and which consent shall promptly be confirmed in writing. Any Broker-Dealer requesting any such change will give written notice to any such change to the Auction Agent, and the Auction Agent will give written notice of any such change to each Broker-Dealer prior to the close of business on the Business Day immediately preceding the first Auction Date on which any such change shall be effective.

| Time | Event |
|------|-------|
| Between 9:30 a.m. and 1:00 p.m. | The Auction Agent will assemble information on each Submitted Order communicated to it by Broker-Dealers. The Submission Deadline will be 1:00 p.m. unless otherwise specified by the Auction Agent as provided above. |
| Not earlier than 1:00 p.m. | The Auction Agent will determine the aggregate principal amount of Available Certificates. If there are Available Certificates, the Auction Agent will then determine whether Sufficient Clearing Bids exist and then Submitted Orders will be accepted and rejected and the Certificates will be allocated pursuant to the Auction Procedures. Without limiting the generality of the foregoing, the Auction Agent will follow the Auction Procedures to ensure that the Certificates are only held in Authorized Denominations. |
| Not later than 4:00 p.m. | The Auction Agent will advise the Broker-Dealer, the Trustee and the Counterparty of the results of the Auction as determined pursuant to the Auction Procedures. |

In the event that the Auction Date for any Auction will be changed, the Auction Agent, by such means as the Auction Agent deems practicable, will give notice of such change to the Trustee, the Series Agent and each Broker-Dealer not later than the earlier of 9:15 a.m. on the new Auction Date and 9:15 a.m. on the old Auction Date. Thereafter, each Broker-Dealer will promptly notify its customers of such change in the Auction Date.

The Auction Agent will follow The Bond Market Association's Market Practice U.S. Holiday Recommendations for shortened trading days for bond markets (the "BMA Recommendation") unless the Auction Agent is instructed otherwise by the Trustee. In the event of a BMA Recommendation on an Auction Date, the Submission Deadline will be 11:30 a.m. instead of 1:00 p.m. and as a result the notice of Auction results will occur at an earlier time.

**Settlement Procedures**

On each Auction Date not later than 4:00 p.m., the Auction Agent shall notify the Broker-Dealers, the Trustee and the Counterparty of:

(i)     the Applicable Rate fixed for the next succeeding Coupon Accrual Period (which, if such Applicable Rate is the Minimum Applicable Rate shall constitute notice to such persons that all of the Certificates were subject to Submitted Hold Orders);

(ii)    whether Sufficient Clearing Bids existed for the determination of the Winning Bid, if any, in respect of such Applicable Rate;

(iii)   the scheduled Auction Date of the next succeeding Auction;

(iv)   the Broker-Dealer Fees for each Broker-Dealer for the next succeeding Coupon Accrual Period;

(v)    the Auction Agent Fees for the next succeeding Coupon Accrual Period; and

(vi)   the Trustee Fees for the next succeeding Coupon Accrual Period.

In the event that the Auction Agent fails to calculate or, for any reason fails to provide the Applicable Rate for any Coupon Accrual Period, the Applicable Rate for the Coupon Accrual

Period will be the same as the Applicable Rate for the preceding Coupon Accrual Period unless no Auction has been held, in which case the Applicable Rate will be the Maximum Applicable Rate.

On each Auction Date not later than 4:00 p.m., the Auction Agent shall also notify the Broker-Dealers that participated in the Auction held on such Auction Date in respect of such Certificates and submitted an Order on behalf of any Existing Holder or Potential Holder of the following information in respect of such Certificates:

(i)     if such Broker-Dealer submitted a Bid or a Sell Order on behalf of an Existing Holder, whether such Bid or Sell Order was accepted or rejected, in whole or in part, and the principal amount of the Certificates, if any, to be sold by such Existing Holder;

(ii)    if such Broker-Dealer submitted a Bid on behalf of a Potential Holder, whether such Bid was accepted or rejected, in whole or in part, and the principal amount of the Certificates, if any, to be purchased by such Potential Holder; and

(iii)   if the aggregate principal amount of the Certificates to be sold by all Existing Holders on whose behalf such Broker-Dealer submitted Bids or Sell Orders is different from the aggregate principal amount of the Certificates to be purchased by all Potential Holders on whose behalf such Broker-Dealer submitted a Bid, the name or names of one or more other Broker-Dealers (and the member of, or participant in, DTC, if any, of each such other Broker-Dealer) and the principal amount of the Certificates to be (x) purchased from one or more Existing Holders on whose behalf such other Broker-Dealers submitted Bids or Sell Orders, or (y) sold to one or more Potential Holders on whose behalf such other Broker-Dealers submitted bids.

On each Auction Date, each Broker-Dealer that submitted an Order on behalf of any Existing Holder or Potential Holder shall:

(i)     advise each Existing Holder and Potential Holder on whose behalf such Broker-Dealer submitted a Bid or Sell Order whether such Bid or Sell Order was accepted or rejected, in whole or in part;

(ii)    advise each Existing Holder on whose behalf such Broker-Dealer submitted an Order and each Potential Holder on whose behalf such Broker-Dealer submitted a Bid of the Applicable Rate for the next Coupon Accrual Period;

(iii)   advise each Existing Holder on whose behalf such Broker-Dealer submitted an Order of the scheduled Auction Date of the next succeeding Auction; and

(iv)    advise each Potential Holder on whose behalf such Broker-Dealer submitted a Bid that was accepted, in whole or in part, of the scheduled Auction Date of the next succeeding Auction.

In accordance with DTC's normal procedures, on the Business Day after the Auction Date, the transactions described above will be executed through DTC, so long as DTC is the depository, and the accounts of the respective Participants at DTC will be debited and credited and the Certificates delivered as necessary to effect the purchases and sales of the Certificates as determined in the Auction. Purchasers are required to make payment through their Participants in same-day funds to DTC against delivery through their Participants. DTC will make payment in accordance with its normal procedures, which now provide for payment against delivery by its Participants in immediately available funds. If any Existing Holder selling Certificates in an Auction fails to deliver such Certificates, the Broker-Dealer may deliver to any person that was to have purchased Certificates in such Auction a principal amount of Certificates that is less than the principal amount of Certificates that otherwise was to be purchased by such person but in any event in an applicable permitted denomination or any integral multiple thereof as specified herein. In such event, the principal amount of Certificates to be delivered will be determined by the Broker-Dealer. Delivery of such lesser principal amount of Certificates will constitute good delivery. Neither the Trustee nor the Auction Agent will have any responsibility or liability with respect to the failure of a Potential

Holder, Existing Holder or the Broker-Dealer or Participant to deliver the principal amount of Certificates or to pay for the Certificates purchased or sold pursuant to an Auction or otherwise. Any delivery or non-delivery of Certificates that represents any departure from the results of an Auction, as determined by the Auction Agent, shall be of no effect for purposes of the Bidding Rights Records unless and until the Auction Agent shall have been notified of such delivery or non-delivery.

## THE TRUST

The Trust was established under the laws of the State of Delaware pursuant to the terms of the Declaration of Trust.

The Trust was established for the primary purpose of creating separate Series. Each Series will be administered by the Trustee pursuant to the terms of a Series Agreement. Each Series will issue a separate series of Certificates, acquire the CLNs and enter into a Basis Swap. Each Series will not purchase or otherwise acquire any additional securities after the Issue Date and will not dispose of or create any lien on the CLNs, except as described herein.

No Holder shall be entitled to revoke or seek revocation of the Trust or the Series.

## THE SERIES AGREEMENT

Pursuant to the terms of the Series Agreement for each series of Certificates, The Bank of New York, as Trustee, will administer the Series and hold the Series Property for each Series in a segregated account. The Series will hold an ownership interest in the CLNs on behalf of the Holders.

The Trustee's fees and ordinary expenses (up to certain agreed per annum dollar limits) will be paid by the Series using monies received from the Counterparty under the Basis Swap.

An extraordinary expense and indemnity agreement (the "Trustee Extraordinary Expense and Indemnity Agreement") between the Trustee and the Counterparty, provides for indemnification of the Trustee by the Counterparty, and exculpates the Trustee for acts or omissions in respect of each Series except for the Trustee's own bad faith, wilful misconduct or negligence. The Trustee will not be obligated to take or pursue any action on behalf of the Series unless the Trustee is satisfied that it has adequate indemnification for such action and any related expenses. The Trustee may from time to time delegate certain of its responsibilities to third parties in good faith and in accordance with the terms of the Series Agreement. The Trustee will also maintain the register for the Certificates issued by the Series. The Trustee will be reimbursed for Extraordinary Expenses by the Counterparty subject to the terms of a fee schedule which will be appended to the Trustee Extraordinary Expense and Indemnity Agreement.

The Trustee's liability in connection with the issuance and sale of Certificates is limited solely to the express obligations of the Trustee as set forth in the Series Agreement. The source of payments on the Certificates will be payments by the Counterparty under the Basis Swap. Neither the Certificates nor the CLNs will represent an interest in or obligation of, or be guaranteed or insured by, the Trustee in its individual capacity. There will be no recourse to the Trustee in its individual capacity or any other entity if the proceeds of, or payments received in respect of, the CLNs and payments by the Counterparty are insufficient or otherwise unavailable to make all payments provided for under the Certificates issued by the Series.

The Trustee shall have no responsibility for the accuracy of any information provided to the Holders or any other person that has been obtained from, or provided to the Trustee by, the Counterparty or any of its Affiliates in any capacity.

The Bank of New York (Delaware), a Delaware banking corporation, will act as Delaware Trustee (the "Delaware Trustee") and will assume certain responsibilities for executing and delivering documents necessary for the maintenance of the Trust and each Series in Delaware. The Delaware Trustee will be entitled to all the benefits and protection to which the Trustee is entitled.

### The Series Agent

The Series will enter into an agreement (the "Series Agency Agreement") with Deutsche Bank Securities Inc., which will serve as an agent of the Series (the "Series Agent"), and, in that capacity will, among other things, on behalf of the Series, sell the CLNs in accordance with the Sale Procedures if and when required. The Series Agent will determine any tax or governmental charges that may be due in connection with any transfer or exchange of Certificates. The Series Agent may be removed by the Trustee upon 30 days' prior written notice and may resign upon 60 days' prior written notice to the Trustee. If the Series Agent provides notice of resignation or the Trustee provides notice of termination of the Series Agency Agreement, the Series Agent will continue to perform its services under the Series Agency Agreement until a replacement Series Agent has been appointed by the Counterparty.

### The Broker-Dealer

The Auction Agent will enter into broker-dealer agreements with persons acting as Broker-Dealers. The initial Broker-Dealer will be Deutsche Bank Securities Inc., although the Counterparty may appoint additional Broker-Dealers by instructing the Auction Agent to enter into a broker-dealer agreement with each such Broker-Dealer. The Broker-Dealer will submit Orders on behalf of Existing Holders and Potential Holders. The broker-dealer will notify the Auction Agent of any transfer of the Certificates made through such Broker-Dealer by an Existing Holder to another person other than pursuant to an Auction. The Series will pay to the Broker-Dealer the fees owed to the Broker-Dealer from monies received by the Series from the Counterparty under the Basis Swap.

Each of the Auction Agent (if directed by the Counterparty) and the relevant Broker-Dealer may terminate a Broker-Dealer Agreement at any time on five Business Days' notice to the other party. Each Broker-Dealer Agreement will terminate upon the termination of the Auction Agency Agreement (provided that the Series is not entering into a replacement Auction Agency Agreement).

### No Temporary Investment of Funds

The dates on which a Series is scheduled to make payments will coincide with the dates of expected receipt of the amounts that are to be applied to make such payments and accordingly there generally will not be any amounts in a Series to invest. If, however, a Series receives any amounts in advance of the date on which such amounts are to be distributed by the Trustee, such amounts will be held uninvested.

### Expenses

The Counterparty will be obligated under the Basis Swap to make payments equal in amount to the costs of establishing the Trust and each Series and to the fees and the ordinary and customary expenses of the Trustee and the Auction Agent, up to certain agreed per annum dollar limits (the "Trustee Ordinary Expenses" and "Auction Agent Ordinary Expenses" respectively) and

the fees of the Broker-Dealers. All other liabilities and expenses of the Series that may at any time be incurred by the Series will be paid out of Series Property prior to any distributions to the Holders. Under the Series Agreement the Trustee has agreed that it will use reasonable efforts not to take any action that, in the Trustee's opinion, would cause the Trust, the Series or the Trustee to incur costs, expenses or liabilities that are not Trustee Ordinary Expenses (any such "Extraordinary Expenses") and that it will promptly notify the Counterparty, each Rating Agency and the Holders if it anticipates that the Series will be required to incur any such Extraordinary Expenses. Unless within five Business Days of receipt of any such notice from the Trustee (or such longer period of time as agreed to by the Majority Holders or the Counterparty), the Trustee receives assurances from all Holders, satisfactory to the Trustee, that all Holders will reimburse the Trustee for any such Extraordinary Expenses or unless the Counterparty, in its sole discretion, has agreed to pay such Extraordinary Expenses on behalf of the Series, the Trustee shall cause the liquidation of the Series (such event, an "Expense Liquidation Event"). The Holders will be automatically liable, to the extent of their proportionate interests in the Series Property, for any Extraordinary Expenses incurred by the Series prior to or in connection with such liquidation except for any amounts for which the Counterparty or a Holder has agreed to be liable. Payment of any Extraordinary Expenses will reduce amounts available for distribution to the Holders. The Series Agreement provides that the Trustee shall not be liable for its failure to anticipate incurring Extraordinary Expenses as long as the Trustee acts in good faith based upon the facts reasonably available to it at the time of its determination.

## Liquidation of a Series

A Series will be liquidated (i) upon a determination by the Trustee that it has received all amounts due to the Series in respect of the Series Property and has distributed the proceeds of the Series Property in accordance with the terms of the Series Agreement; (ii) if the Certificate Principal Balance is reduced to zero; (iii) upon the occurrence of a CLNs Event; (iv) upon the occurrence of an Expense Liquidation Event; (v) at the direction of the Counterparty or Holders whose Certificates represent at least two-thirds of the principal amount of the Certificates, upon a determination by the Trustee that there is a material risk that (A) the Trust or the Series is subject to regulation as an "investment company" under the 1940 Act, (B) the Trust or the Series is, or will be, subject to any material tax on its income, (C) the purchase or holding of any Certificates constitutes a prohibited transaction within the meaning of ERISA for which no exemption from the prohibited transaction provisions of ERISA is available, (D) payments due to the Series in respect of the CLNs are or will be subject to withholding tax or (E) on any Coupon Distribution Date the Series is required to withhold tax on any distribution on the Certificates (except that the occurrences in clauses (D) and (E) above shall only cause the liquidation of the Series if the Trustee, the Counterparty or other appropriate Person has received any forms, documents or certificates that are required to avoid withholding on payments in respect of the CLNs or Basis Swap or on distributions on the Certificates) (the occurrence of an event specified in this clause (v), a "Series Regulatory/Tax Liquidation Event"); (vi) upon the early redemption of the CLNs in whole but not in part, or (vii) upon the termination of the Basis Swap other than as a result of an event described in (i) through (vi) above. Items (i) through (vii) above being, in each case, a "Series Liquidation Event."

"CLNs Event" means, any event or circumstance that constitutes an "Event of Default" pursuant to the Prospectus for the CLNs and which has not been cured or waived to the satisfaction of the trustee of the CLNs.

In connection with a liquidation of the Series, the Trustee will first pay any amounts due to the Counterparty (including in respect of any Termination Payment, unless the Basis Swap has been terminated because of a Default by the Counterparty) and will pay or make provision for the payment of any Extraordinary Expenses incurred by the Series. The Trustee will then distribute to the Holders the proceeds of the remaining Series Property. Notwithstanding the foregoing, if the Series is liquidated in connection with a Default by the Counterparty, any Termination Payments

and other amounts due to the Counterparty will be paid after payment (in the following order) of (i) all Extraordinary Expenses of the Series, (ii) any payments due to the Counterparty under the Basis Swap (other than any Termination Payment) and (iii) all amounts due on the Certificates to the Holders.

If upon payment in full by the Series of all obligations and liabilities of the Series and the remaining Certificate Principal Balance and accrued interest thereon, any Series Property remains in the Series, then all such remaining property shall be liquidated and its proceeds distributed to the Holders.

### Resignation and Replacement of the Trustee

The Series Agreement provides that Holders of a Series may not remove the Trustee. The Trustee may resign its duties with respect to a Series upon 90 days' written notice to the Series Agent and the Counterparty, and the Counterparty may relieve the Trustee of its duties with respect to the Series at any time and appoint a successor Trustee to act on behalf of the Series. Such resignation or removal will not take effect until a successor trustee is appointed by the Counterparty and has assumed the duties of trustee with respect to the Series as set forth in the Series Agreement. Any successor Trustee must be a bank or trust company having combined capital and surplus of at least U.S. $100,000,000 and must be approved by Fitch and S&P.

A resigning Trustee will continue, following appointment of any successor, to have the benefit of all indemnities, power and privileges and rights of recourse against the property of the Series conferred upon such Trustee with respect to the Series pursuant to the Series Agreement or applicable law in respect of the period during which such Trustee acted as Trustee with respect to the Series.

### Amendment of the Series Agreement

Without the approval of the Holders, the Trustee may amend the Declaration of Trust and any Series Agreement in such manner and to such extent as each may consider expedient (i) to cure any ambiguity or correct or supplement any provision of the Declaration of Trust and any Series Agreement that may be defective or inconsistent with any other provision thereof; (ii) to modify the restrictions on and procedures for resales and other transfers of the Certificates to reflect any change in applicable law or regulation (or the interpretation thereof) or in practices relating to the resale or transfer of restricted securities generally or to enable a Series to rely upon any exemption from registration under the Securities Act that may become available (and to remove existing restrictions to the extent not required under such exemption); (iii) to modify, eliminate or add to any of its provisions to such extent as shall be necessary or helpful to avoid or minimize the risk of the imposition of any tax on a Series that would be a claim against the Series Property; or (iv) to add, change or eliminate any other provision of the Series Agreement provided either (A) that such addition, change or elimination does not, as confirmed by an opinion of counsel to each affected Series of the Trust, adversely affect in any material respect the interests of the Holders or (B) Holders whose Certificates represent at least two-thirds in principal amount of the Certificates of a Series consent to such addition, change or elimination with respect to such Series. No amendment of the Declaration of Trust or any Series Agreement will be effective without the consent of all Holders unless the Rating Agency Condition has been satisfied. The Rating Agency Condition is a condition that is satisfied if each of Fitch and S&P has confirmed in writing that such amendment will not cause a downgrade or withdrawal of its rating of the Certificates of any Series. The Trustee shall not be obligated to consent to any amendment that would adversely affect its rights, duties, liabilities or immunities (the "Rating Agency Condition").

The Series Agreement will provide that unless the Counterparty is in Default under the Basis Swap or the Basis Swap has been terminated, no amendment shall become effective unless the Counterparty consents to the amendment. The Basis Swap provides that the Counterparty will so

31

consent unless, in its sole discretion, it concludes that the amendment would adversely affect its rights under the Basis Swap.

## Amendment of Other Documents

The Trustee and the Delaware Trustee shall, at the request of the Counterparty, consent to any amendment, waiver or substitution of the Basis Swap or any other agreement entered into in connection with the issuance of the Certificates with respect to which the Trustee and/or the Delaware Trustee has the right of such consent, unless such amendment, waiver or substitution will adversely affect in a material respect the interests of the Holders. The Trustee may conclusively presume that such amendment, waiver or substitution will not adversely affect in any material respect the interests of the Holders if the Trustee receives an opinion of counsel to that effect, or if Holders whose Certificates represent at least two-thirds in principal amount of each affected Series of the Certificates consent to such amendment. Notwithstanding the foregoing, no such amendment, waiver or substitution will be permitted without the consent of all Holders unless the Rating Agency Condition has been satisfied.

## Rights of Holders

The terms and conditions of the Declaration of Trust and each Series Agreement shall inure to the benefit of, and be binding on, all Holders as if each Holder had been a party to and had executed the Declaration of Trust and such Series Agreement, and as if each Holder had covenanted to observe and be bound by all the provisions of the Declaration of Trust and such Series Agreement and had thereby authorized the Trustee on behalf of the Series to do all such acts and things as the Series Agreement may or shall require the Trustee on behalf of the Series to do or that the Trustee on behalf of the Series shall do in accordance with the provisions thereof.

No Holder will have the contractual right to act directly with respect to the CLNs or the Basis Swap or to proceed directly against the CLNs Obligor or the Counterparty. Such rights are reserved to the Trustee. The Trustee, as holder of the CLNs, has the right to vote and give consent and waivers in respect of the CLNs, except as limited herein or in the Series Pricing Supplement. In the event that the Trustee receives a request from the trustee of the CLNs for its consent to any amendment, modification or waiver of the CLNs, their documentation or any other document relating thereto, or receives any other solicitation for any action with respect to the CLNs, the Trustee shall notify each Holder of record on such date of such proposed amendment, modification, waiver or solicitation to each Holder of record on such date. The Trustee shall request instructions from the Holders as to whether or not to consent to or to vote to accept such amendment, modification, waiver or solicitation. The Trustee shall consent or vote, or refrain from consenting or voting, in the same proportion as each Holder actually voted as of a date determined by the Trustee prior to the date on which such consent or vote is required. Notwithstanding anything to the contrary, the Trustee shall at no time vote or consent to any matter (i) unless such vote or consent would not (based on the opinion of counsel) alter the tax status of the Series or (ii) that would alter the timing or amount of any payment on the CLNs. The Trustee shall have no liability for any failure to act as a result of a Holder's late return of directions, or failure to return directions, requested by the Trustee from the Holders.

All notices received by the Trustee as holder of the CLNs that relate to the occurrence of a credit event under the Default Swap will be promptly sent to the Holders or record on such date.

No Holder will have any right to bring an action in the name of a Series except in accordance with applicable law and unless the Majority Holders of such Series join in bringing such action.

**Non-Petition**

Under the Declaration of Trust and each Series Agreement each of the Trustee, the Delaware Trustee, and each Holder, under the Basis Swap, the Counterparty, under each Broker-Dealer Agreement, each Broker-Dealer, under the Series Agency Agreement, the Series Agent and under the Auction Agency Agreement, the Auction Agent, will agree that prior to one year and one day after the termination of the related Series Agreement, it will not commence or sustain an action against the Trustee or the Series under any federal or state bankruptcy, insolvency or similar law, or appoint a receiver or other similar official of the Series, make an assignment for the benefit of creditors, or order the winding up or liquidation of the Series.

**Governing Law**

The Certificates, the Declaration of Trust and each Series Agreement will be governed by the laws of the State of Delaware. The remaining transaction documents will be governed by the laws of the State of New York.

## THE BASIS SWAP

### General

The following summary, as well as other information included herein and in the Series Pricing Supplement, describes the material terms of the Basis Swap but does not purport to be complete and is subject to, and is qualified in its entirety by reference to, all of the provisions of the Basis Swap, copies of which are available from the Broker-Dealer or the Trustee. The Holders will not be parties to and will have no right to enforce the Basis Swap.

The Basis Swap will be subject to the 1992 ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Master Agreement") published by the International Swaps and Derivatives Association, Inc. ("ISDA") and will incorporate any relevant standard definitions published by ISDA (collectively, the "ISDA Definitions"), except as otherwise expressly set forth therein.

### The Counterparty

The Counterparty will be Deutsche Bank AG, acting through its London branch ("Deutsche Bank AG London"). The Counterparty is an affiliate of Deutsche Bank Securities Inc.

Deutsche Bank Aktiengesellschaft ("Deutsche Bank") originated from the reunification of Norddeutsche Bank Aktiengesellschaft, Hamburg, Rheinisch-Westfälische Bank Aktiengesellschaft, Duesseldorf and Süddeutsche Bank Aktiengesellschaft, Munich; pursuant to the Law on the Regional Scope of Credit Institutions, these had been disincorporated in 1952 from Deutsche Bank which was founded in 1870. The merger and the name were entered in the Commercial Register of the District Court Frankfurt am Main on May 2 1957. Deutsche Bank is a banking institution and a stock corporation incorporated under the laws of Germany under registration number HRB 30 000. Deutsche Bank has its registered office in Frankfurt am Main, Germany. It maintains its head office at Taunusanlage 12, 60325 Frankfurt am Main and branch offices in Germany and abroad including in London, New York, Sydney, Tokyo and an Asia-Pacific Head Office in Singapore which serve as hubs for its operations in the respective regions.

Deutsche Bank is the parent company of a group consisting of banks, capital market companies, fund management companies, a real estate finance company, instalment financing companies, research and consultancy companies and other domestic and foreign companies (the "Deutsche Bank Group").

Deutsche Bank AG London is the London branch of Deutsche Bank AG. On January 12 1973, Deutsche Bank AG filed in the United Kingdom the documents required pursuant to Section 407 of the Companies Act 1948 to establish a place of business within Great Britain. On January 14 1993, Deutsche Bank registered under Schedule 21A to the Companies Act 1985 as having established a branch (Registration No. BR000005) in England and Wales. Deutsche Bank AG London is an authorized person for the purposes of Section 19 of the Financial Services and Markets Act 2000. In the United Kingdom, it conducts wholesale banking business and through its Private Wealth Management division, it provides holistic wealth management advice and integrated financial solutions for wealthy individuals, their families and selected institutions.

As of March 31 2006, Deutsche Bank's issued share capital amounted to Euro 1,325,118,960.64 consisting of 517,624,594 ordinary shares of no par value. The shares are fully paid up and in registered form. The shares are listed for trading and official quotation on all the German Stock Exchanges. They are also listed on the Stock Exchanges in Amsterdam, Brussels, London, Luxembourg, New York, Paris, Tokyo, Vienna and Zurich. The Management Board has decided to pursue delisting on certain stock exchanges other than Germany and New York in order to benefit from the integration of financial markets.

As of March 31 2006, Deutsche Bank Group had total assets of EUR 1,034,520 million, total liabilities of EUR 1,003,759 million and total shareholders' equity of EUR 30,761 million on the basis of United States Generally Accepted Accounting Principles ("U.S. GAAP").

Deutsche Bank's long-term senior debt has been assigned a rating of AA- (outlook stable) by Standard & Poor's, Aa3 (outlook stable) by Moody's Investors Services and AA- (outlook stable) by Fitch Ratings.

You can find additional information regarding Deutsche Bank at its website: www.db.com.

Deutsche Bank will provide without charge to each person to whom this Private Placement Memorandum is delivered, upon the written or oral request of such person, a copy of the most recent Annual Report of Deutsche Bank that contains the consolidated statements of Deutsche Bank, and the most recent Interim Report of Deutsche Bank showing unaudited figures. The Interim Reports of Deutsche Bank that are made available are for purposes of information only. Written requests should be directed to: Deutsche Bank AG New York Branch, 60 Wall Street, New York, NY 10005, Attention: Management.

## Transfer of the Basis Swap

The Basis Swap will permit the Counterparty to transfer all its rights and obligations thereunder to any of its direct or indirect subsidiaries or affiliates or to any branch of the Counterparty, provided that (i) such transfer does not result in a downgrade or withdrawal of the then current rating of the Certificates by Fitch or S&P, and (ii) such transferee satisfies any ratings criteria specified in the Basis Swap or has its payment obligations under the Basis Swap guaranteed by the Counterparty or an affiliate of the Counterparty that satisfies such ratings criteria.

## Payments under the Basis Swap

Payments made by the Series and the Counterparty under the Basis Swap will be based on an exchange of: (i) cash flows received by the Series on the CLNs in respect of interest, for (ii) amounts equal to the sum of (a) the Interest Amount payable on each Coupon Distribution Date, (b) the fees of the Broker-Dealers, Auction Agent and Trustee, (c) the Trustee Ordinary Expenses and the Auction Agent Ordinary Expenses up to agreed per annum dollar limits and (d) any interest payable on the Final Distribution Date. The cash flows to be received by the Series under the Basis Swap are designed to be sufficient to make scheduled distributions of interest in respect of the Certificates.

Payments by the Series and by the Counterparty made on the same date and in the same currency will be netted.

Neither the Series nor the Counterparty will be obligated, under the Basis Swap, to gross-up payments to be made by it to the other if withholding taxes are imposed on such payments, but the Basis Swap will be terminable in such event. See "---Early Termination" below.

## Early Termination

The Basis Swap may be terminated early upon the occurrence of any of the "Events of Default" or "Termination Events" specified therein which are summarized below. The Series will be liquidated upon the early termination of the Basis Swap. See "The Series Agreement---Liquidation of a Series."

*Events of Default*. The "Events of Default" under the Basis Swap are limited to: (i) the failure of the Series or the Counterparty to make when due any payment or delivery required to be made thereunder after giving effect to the applicable grace period, if any; and (ii) the occurrence of

certain events of insolvency or bankruptcy of the Series or the Counterparty as described in Sections 5(a)(i) and 5(a)(vii), respectively, of the ISDA Master Agreement.

*Termination Events*: The "Termination Events" under the Basis Swap consist of the following: (i) the termination events under the ISDA Master Agreement of "Illegality," "Tax Event," and "Tax Event Upon Merger," as described in Sections 5(b)(i), 5(b)(ii), and 5(b)(iii), respectively, of the ISDA Master Agreement, (ii) an Additional Termination Event if the Counterparty fails to take any of the actions described under "Counterparty Rating Downgrade" below (a "Counterparty Downgrade Default"), and (iii) "Automatic Additional Termination Events" consisting of the liquidation of the Series as a result of the occurrence of any event described in items (i) – (vi) of the definition of Series Liquidation Event. Upon the termination of the Basis Swap upon the occurrence of a Counterparty Downgrade Default, the Counterparty will pay to the Series on the Early Termination Date a sum equal to the aggregate of (i), any Unpaid Amounts (as defined in the Basis Swap) owed to the Series and (ii) without duplication, an amount calculated on the same basis as the Interest Amount but in respect of the period from and including the immediately preceding Coupon Accrual Date to but excluding the Early Termination Date; and the Series shall pay to the Counterparty any Unpaid Amounts owed to the Counterparty. No Termination Payment will be owed by either party. Upon the occurrence of an Automatic Additional Termination Event, the Basis Swap shall terminate without the need for any further action by either party and the date of liquidation of the Series shall be automatically designated as the Early Termination Date for the Basis Swap. For the avoidance of doubt, upon the occurrence of an Automatic Additional Termination Event as a result of any event described in items (iii) – (vi) of the definition of Liquidation Event, a Termination Payment may be payable by the Series or the Counterparty, as the case may be.

*Designation of Early Termination Date*: Upon the occurrence of any Event of Default under the Basis Swap, the non-defaulting party will have the right to designate an "Early Termination Date" (as defined in the Basis Swap). With respect to Termination Events (other than an Automatic Additional Termination Event"), an Early Termination Date may be designated by one of the parties (as specified in each case in the Basis Swap) and will occur only upon notice and, in certain cases, after any Affected Party (as defined in the Basis Swap) has used reasonable efforts to transfer its rights and obligations under the Basis Swap to a related entity within a limited period after notice has been given of the Termination Event, all as set forth in the Basis Swap.

Upon the occurrence of (i) an Event of Default in respect of which the Counterparty is the Defaulting Party, or (ii) the occurrence of a Termination Event (other than an Automatic Additional Early Termination Event, "Illegality" or "Tax Event") with respect to which the Counterparty is the sole "Affected Party" (together a "Default") the Holders of a majority in the aggregate in principal amount of the Certificates of the Series (the "Majority Holders") which term, for the avoidance of doubt, shall exclude the Counterparty or any of its affiliates, may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee under the Basis Swap, including, if so directed by the Majority Holders, terminating the Basis Swap. Holders will have no right directly to enforce any rights of the Series in the Basis Swap or directly to receive any payments thereunder. The Trustee is not obligated to pursue any action on behalf of the Series or the Holders unless the Trustee is satisfied that it has received adequate indemnification for such action and the expenses related thereto.

*Termination Payments*: A termination payment ("Termination Payment") may be payable by either the Counterparty or the Series if the Basis Swap terminates early because of an Event of Default or Termination Event thereunder. If the Basis Swap is terminated early the Termination Payment will be based on "Loss" as defined in the ISDA Master Agreement. *If the Series is obligated to make a Termination Payment to the Counterparty upon a termination of the Basis Swap, the loss to the Holders resulting from such payment could be substantial.*

*Sale of CLNs*: If as described herein, the Series is required to sell all or portion of the CLNs in connection with a termination of the Basis Swap or the Series Agreement, the Series Agent will sell

the CLNs in accordance with the Sale Procedures specified in the Series Agreement. The "Sale Procedures" generally require that the Series Agent solicit quotations from at least five bidders, one of which may be, at the Series Agent's option, the Series Agent. The Series Agent, in its sole judgment, may evaluate such bids on the basis of quotations for all or a portion of the CLNs being sold (or on any other basis selected in good faith by the Series Agent) on that day (the "Liquidation Date"). If on the Liquidation Date the Series Agent is unable to obtain any such quotation, it will seek to obtain such quotations on the next succeeding Business Day, and on each succeeding Business Day thereafter, if necessary, to obtain such quotations, until the date which is the 10th Business Day following the Liquidation Date, when the bid, if any, of the Series Agent shall be used. For the avoidance of doubt, if the Series Agent does not bid the CLNs will be worth zero. The proceeds from any sale of the CLNs will be distributed to Holders, decreased by the amount of any Termination Payment or other amount owed by the Series to the Counterparty and any Extraordinary Expenses owed by the Series, and increased by any Termination Payment or other amount owed and paid by the Counterparty to the Series.

## Counterparty Ratings Downgrade

If on any date on which there are Certificates outstanding the short term credit rating by Fitch of the Counterparty falls below "F1" or its long term credit rating by Fitch falls below "A+" or its short term credit rating by S&P falls below "A-1+" (each a "Counterparty Ratings Downgrade") then no later than 30 calendar days after the occurrence of such Counterparty Rating Downgrade, the Counterparty shall take such actions as are more fully described in the Basis Swap and which include:

(i)  obtaining a guarantee for its obligations to the Series under the Basis Swap; or

(ii)  novating, at the expense of the Counterparty, all (and not some only) of its obligations under the Basis Swap; or

(iii)  providing collateral for its obligations to the Series under the Basis Swap; or

(iv)  taking such actions as it may agree with Fitch or S&P, the effect of which is to maintain the ratings of the Certificates as if the Counterparty Ratings Downgrade had not occurred.

If the short term credit rating of the Counterparty falls below "F2" by Fitch or the long term credit rating of the Counterparty falls below "BBB+" by Fitch, the Counterparty shall take the actions as are more fully described in the Basis Swap and which include (i), (ii) or (iv) above.

## Counterparty Security Interest

The Series will grant to the Counterparty a security interest in all of the right, title and interest of the Series in all of its property (except its rights under the Basis Swap), whether owned on the Issue Date or thereafter acquired, including the CLNs. Such security interest will secure all payments, including any Termination Payments, owed by the Series to the Counterparty (net of all payments (if any) owed by the Counterparty to the Series) under the Basis Swap. The Bank of New York, acting in its commercial banking capacity, will act as agent of the Counterparty for purposes of perfecting such security interest. The Series will be obligated to take such actions as may be necessary or reasonably requested by the Counterparty to ensure that such security interest is a perfected security interest under the UCC during the term of the Basis Swap. Such security interest will be perfected by the filing of UCC financing statements in the appropriate jurisdictions. Notwithstanding such security interest, the rights of the Counterparty to receive payments from the Series pursuant to the Basis Swap will be subject to the provisions thereof and to the payment priorities under the Series Agreement. See "The Series Agreement."

## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS PRIVATE PLACEMENT MEMORANDUM IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS INCLUDED HEREIN ON BEHALF OF EACH SERIES IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE SERIES OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

The following is a summary of certain material U.S. federal income tax consequences of the acquisition, ownership and disposition of the Certificates by a U.S. Corporate Holder (as defined below). The summary is based on the tax laws of the United States, including the provisions of the Internal Revenue Code of 1986, as amended (the "Code"), its legislative history, existing and proposed regulations thereunder, published rulings by the Internal Revenue Service ("IRS") and court decisions, all as currently in effect and all subject to change at any time, possibly with retroactive effect. This summary deals only with U.S. Corporate Holders that will hold the Certificates as capital assets. This discussion does not cover all aspects of the U.S. federal income taxation that may be relevant to, or the actual tax effect that any of the matters described herein will have on, the acquisition, ownership or disposition of the Certificates by particular investors, and does not address state, local, foreign or other tax laws. In particular, this summary does not discuss all of the tax considerations that may be relevant to certain types of Holders subject to special treatment under the U.S. federal income tax laws (such as financial institutions, insurance companies, partnerships, investors liable for the alternative minimum tax, individual retirement accounts and other tax-deferred accounts, tax-exempt organizations, dealers in securities or currencies, investors that will hold the Certificates as part of straddles, hedging transactions or conversion transactions for U.S. federal income tax purposes or investors whose functional currency is not the U.S. dollar).

As used herein, the term "U.S. Corporate Holder" means a beneficial owner of Certificates that is, for U.S. federal income tax purposes, a corporation created or organized under the laws of the United States or any State thereof. References to "the Series" refer to each Series whose Certificates are offered by this Private Placement Memorandum and a related Series Pricing Supplement.

THE SUMMARY OF U.S. FEDERAL INCOME TAX CONSEQUENCES SET OUT BELOW IS FOR GENERAL INFORMATION ONLY. ALL PROSPECTIVE PURCHASERS SHOULD CONSULT THEIR TAX ADVISERS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF OWNING THE CERTIFICATES, INCLUDING THE APPLICABILITY AND EFFECT OF STATE, LOCAL, FOREIGN AND OTHER TAX LAWS AND POSSIBLE CHANGES IN TAX LAW.

Investors should note that no rulings have been or will be sought from the IRS with respect to any of the federal income tax consequences discussed below. Unlike a tax ruling, the opinions of counsel are not binding on the IRS and no assurance can be given that the IRS will not challenge the conclusion or propriety of counsel's opinion.

### Classification and Taxation of the Series

The Series should be classified as a grantor trust for U.S. federal income tax purposes and will not be subject to U.S. federal income taxation. The Trustee will report income, gain, loss and deductions to the IRS accordingly.

The Trustee will furnish or make available, within a reasonable time after the end of each calendar year, to each U.S. Corporate Holder, such information as the Trustee deems necessary or desirable to assist U.S. Corporate Holders in preparing their U.S. federal income tax returns, or to enable U.S. Corporate Holders to make this information available to owners or other financial intermediaries of U.S. Corporate Holders that hold such Certificates as nominees.

Subject to the Integration Regulations discussed below, under the U.S. federal income tax rules applicable to grantor trusts, a U.S. Corporate Holder will be treated as the owner of an undivided interest in the income and assets of the Series, including the CLNs, and as having entered into the Basis Swap, both to the extent of the Holder's proportionate interest in the Series. Similarly, the sale of Certificates will be considered a sale of a U.S. Corporate Holder's interest in the assets and income of the Series, and a termination of the Basis Swap with respect to that U.S. Corporate Holder. A U.S. Corporate Holder thus will be required to take into account its pro rata share of the income from the CLNs and the Basis Swap, as determined under the separate U.S. federal income tax rules applicable to those assets and to the Basis Swap. In addition, a U.S. Corporate Holder may deduct its pro rata share of the fees and other deductible expenses paid by the Series, at the same time and to the same extent as such items would be deducted by the U.S. Corporate Holder if the U.S. Corporate Holder paid directly a pro rata portion of the amounts paid by the Series.

## CLNs

Linklaters LLP, special tax counsel to the Series, will deliver its opinion to the Series that the CLNs should constitute debt instruments for U.S. federal income tax purposes. It is assumed for purposes of the following discussion that each series of the CLNs will constitute debt instruments for U.S. federal income tax purposes. The Series Pricing Supplement will describe the relevant tax consequences in the event this assumption is inapplicable.

## Integration Regulations

Treasury Regulations under Section 1275 of the Code (the "Integration Regulations") permit holders of certain debt instruments and certain financial instruments to elect to treat the combined cash flows on such assets as a single "synthetic debt instrument." **A taxpayer that elects to integrate a debt instrument with a financial instrument would generally not account for each asset separately, but would instead be treated as owning a single synthetic debt instrument having payment terms identical to the net cash flows under the integrated debt instrument and swap.**

A U.S. Corporate Holder could elect to integrate the CLNs and the Basis Swap into a single instrument (a "Synthetic Debt Instrument"), if, as the Series believes, they qualify under the Integration Regulations. These regulations in general require, among other conditions, that: (1) the U.S. Corporate Holder satisfies certain identification requirements provided in Treasury Regulations 1.1275-6(e); (2) the Synthetic Debt Instrument qualifies as a variable rate debt instrument and pays interest at a qualified floating rate or rates as defined in Treasury Regulations; and (3) the CLNs are not tax-exempt obligations, certain interests in or mortgages held by a REMIC, certain other debt instruments subject to acceleration, and certain contingent payment debt instruments. The CLNs will not be treated as a contingent payment debt instrument that fails to satisfy the requirement in (3) if, as the Series believes, the contingencies are remote or incidental. In order to meet the identification requirements, a U.S. Corporate Holder must, on or before the date the U.S. Corporate Holder is treated as having entered into the Basis Swap, enter and retain as part of its books and records: the date the U.S. Corporate Holder is treated as having acquired the CLNs and the date the U.S. Corporate Holder is treated as having entered into the Basis Swap, a description of the CLNs and the Basis Swap, and a summary of the cash flows and accruals on the Synthetic Debt Instrument resulting from integration.

39

Failure to elect to integrate, or failure of the CLNs and the Basis Swap to qualify for integration, would result in accounting for the CLNs and the Basis Swap separately, which could affect the character and timing of income, deductions, gains, or losses, which would include, without limitation, certain timing or character mismatching. No assurance can be given that the CLNs or the Basis Swap will qualify as an integrated transaction under the Integration Regulations.

**Each U.S. Corporate Holder should consult with its own tax advisors to determine whether making such an election under the Integration Regulations is permitted or advisable, the consequences of a failure to elect integration, and the identification and information requirements necessary for making such an election.**

The following discussion assumes that each U.S. Corporate Holder will be entitled to and will elect to treat the CLNs and the Basis Swap as an integrated transaction under the Integration Regulations.

### Payments of Interest

A U.S. Corporate Holder will be required to include the interest on a Synthetic Debt Instrument in gross income as ordinary income at the time it is received or accrued, depending on the Holder's method of accounting for tax purposes. Interest paid on a Synthetic Debt Instrument constitutes income from sources outside the United States.

*Original Issue Discount.* The Series intends to take the position, and this summary assumes, that the CLNs and the Synthetic Debt Instrument will not be issued with original issue discount ("OID").

*Market Discount.* The Series anticipates that the purchase of a Certificate by a U.S. Corporate Holder at an Auction will generally not result in market discount or premium, and that therefore the discussion under "Market Discount" and "Notes Purchased at a Premium" will generally not be applicable. However, these rules could be applicable to purchases that occur outside of an Auction, or in the event that, contrary to expectations, market discount or premium arises at an Auction.

A Synthetic Debt Instrument generally will be treated as purchased at a market discount (a "Market Discount Note") if the "revised issue price" of a Synthetic Debt Instrument exceeds the amount for which the U.S. Corporate Holder is treated as having purchased the Synthetic Debt Instrument by at least 0.25 per cent of the revised issue price of the Synthetic Debt Instrument multiplied by the number of complete years from the date the U.S. Corporate Holder is treated as having acquired the Synthetic Debt Instrument to the maturity of the Synthetic Debt Instrument. If this excess is not sufficient to cause the Synthetic Debt Instrument to be a Market Discount Note, then the excess constitutes "*de minimis* market discount." For this purpose, the "revised issue price" of a Synthetic Debt Instrument generally equals its issue price. Generally, the issue price of a Synthetic Debt Instrument will be the first price at which a substantial amount of Synthetic Debt Instruments included in the issue of which the Synthetic Debt Instrument is a part is sold to persons other than bond houses, brokers, or similar persons or organizations acting in the capacity of underwriters, placement agents, or wholesalers. Under current law, any gain recognized on the maturity or disposition of a Market Discount Note will be treated as ordinary income to the extent that the gain does not exceed the accrued market discount on the Synthetic Debt Instrument. Alternatively, a U.S. Corporate Holder of a Market Discount Note may elect to include market discount in income currently over the life of the Synthetic Debt Instrument. This election applies to all debt instruments with market discount acquired by the electing U.S. Corporate Holder on or after the first day of the first taxable year for which the election is made. This election may not be revoked without the consent of the IRS. A U.S. Corporate Holder that does not elect to include market discount in income currently generally will be required to defer deductions for interest on borrowings incurred to purchase or carry a Market Discount Note that is in excess of the interest on the Synthetic Debt Instrument includible in the U.S. Corporate Holder's income, to the extent

that this excess interest expense does not exceed the portion of the market discount allocable to the days on which the Synthetic Debt Instrument was held by the U.S. Corporate Holder.

Under current law, market discount on a Market Discount Note will accrue on a straight-line basis unless the U.S. Corporate Holder elects to accrue the market discount on a constant-yield method. This election applies only to the Synthetic Debt Instrument with respect to which it is made and is irrevocable.

*Election to Treat All Interest as Original Issue Discount.* A U.S. Corporate Holder may elect to include in gross income all interest that accrues on a Synthetic Debt Instrument (including interest, market discount and *de minimis* market discount) using the constant-yield method normally used for OID and described below, with certain modifications. This election generally applies only to the Synthetic Debt Instrument with respect to which it is made and may not be revoked without the consent of the IRS. If the election to apply the constant yield method to all interest on a Note is made with respect to a Market Discount Note, the electing U.S. Corporate Holder will be treated as having made the election described above under "Market Discount" to include market discount in income currently over the life of all debt instruments held or thereafter acquired by the U.S. Corporate Holder. U.S. Corporate Holders should consult their tax advisors concerning the propriety and consequences of making this election.

If a U.S. Corporate Holder makes the election described above, then the Holder must include interest in income calculated on a constant-yield method before the receipt of cash attributable to the income, and generally will have to include in income increasingly greater amounts of interest over the life of the Synthetic Debt Instrument. The amount of interest includible in income by a U.S. Corporate Holder is the sum of the daily portions of interest with respect to the Synthetic Debt Instrument for each day during the taxable year or portion of the taxable year on which the U.S. Corporate Holder holds the Synthetic Debt Instrument ("accrued interest"). The daily portion is determined by allocating to each day in any "accrual period" a pro rata portion of the interest allocable to that accrual period. Accrual periods with respect to a Synthetic Debt Instrument may be of any length selected by the U.S. Corporate Holder and may vary in length over the term of the Synthetic Debt Instrument as long as (i) no accrual period is longer than one year; and (ii) each scheduled payment of interest or principal on the Synthetic Debt Instrument occurs on either the final or first day of an accrual period. The amount of interest allocable to an accrual period equals the excess of (a) the product of the issue price of the Synthetic Debt Instrument at the beginning of the accrual period and the yield to maturity of the Synthetic Debt Instrument (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period) over (b) the sum of the payments of interest on the Synthetic Debt Instrument allocable to the accrual period. The "adjusted issue price" of a Synthetic Debt Instrument at the beginning of any accrual period is the issue price of the Synthetic Debt Instrument increased by the amount of accrued interest for each prior accrual period.

*Notes Purchased at a Premium.* As already noted above under "Payments of Interest—Market Discount," this discussion will generally not be applicable, unless the purchase occurred outside of an Auction, or in the event that, contrary to expectations, market discount or premium arises at an Auction.

A U.S. Corporate Holder that purchases a Synthetic Debt Instrument for an amount in excess of its stated redemption price at maturity may elect to treat the excess as "amortizable bond premium," in which case the amount required to be included in the U.S. Corporate Holder's income each year with respect to interest on the Synthetic Debt Instrument will be reduced by the amount of amortizable bond premium allocable (based on the yield to maturity of the Synthetic Debt Instrument) to that year. Any election to amortize bond premium applies to all bonds (other than bonds the interest on which is excludible from gross income for U.S. federal income tax purposes) held by the U.S. Corporate Holder at the beginning of the first taxable year to which the election applies or thereafter acquired by the U.S. Corporate Holder, and is irrevocable without the consent

of the IRS. See also "Original Issue Discount—Election to Treat All Interest as Original Issue Discount" above.

**Sale or Retirement**

A U.S. Corporate Holder will generally recognize gain or loss on the sale, retirement or other taxable disposition of a Synthetic Debt Instrument equal to the difference between the amount realized on the sale or retirement and the tax basis of the Synthetic Debt Instrument. The amount realized does not include the amount attributable to accrued but unpaid interest, which will be taxable as interest income to the extent not previously included in income. Except to the extent described under "Market Discount" above, gain or less recognized by a U.S. Corporate Holder on the sale or a retirement of a Synthetic Debt Instrument will be capital gain or loss and will be long-term capital gain or loss if the Synthetic Debt Instrument was held by the U.S. Corporate Holder for more than one year.

## CERTAIN ERISA CONSIDERATIONS

The U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA") imposes fiduciary standards and certain other requirements on employee benefit plans subject thereto, including collective investment funds, separate accounts, and other entities or accounts whose underlying assets are treated as assets of such plans pursuant to the U.S. Department of Labor "plan assets" regulation, 29 CFR Section 2510.3-101 as modified by Section 3(42) of ERISA (collectively, "ERISA Plans"), and on those persons who are fiduciaries with respect to ERISA Plans.

Section 406 of ERISA and Section 4975 of the Code prohibit certain transactions involving the assets of an ERISA Plan (as well as those plans that are not subject to ERISA but which are subject to Section 4975 of the Code (together with ERISA Plans, "Plans")) and certain persons (referred to as "parties in interest" or "disqualified persons") having certain relationships to such Plans, unless a statutory or administrative exemption applies to the transaction. In particular, a sale or exchange of property or an extension of credit between a Plan and a "party in interest" or "disqualified person" may constitute a prohibited transaction. A party in interest or disqualified person who engages in a prohibited transaction may be subject to excise taxes or other liabilities under ERISA and the Code.

The Series or the Counterparty, directly or through affiliates, may be considered a party in interest or disqualified person with respect to many Plans. Prohibited transactions within the meaning of Section 406 of ERISA or Section 4975 of the Code may arise if the Certificates are acquired by a Plan with respect to which the Series or the Counterparty or an affiliate is a party in interest or a disqualified person, unless the Certificates are acquired pursuant to and in accordance with an applicable exemption. Certain exemptions from the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code may apply depending in part on the type of Plan fiduciary making the decision to acquire a Certificate and the circumstances under which that decision is made.

Under a "look-through rule," if a Plan invests in an "equity interest" of an entity and no other exception applies, the Plan's assets include both the equity interest and an undivided interest in each of the entity's underlying assets.  This rule will only apply where 25 per cent. or more of the value of any class of equity interest in the entity is held by "benefit plan investors." The term "benefit plan investor" includes (a) an employee benefit plan (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, (b) a plan to which Section 4975 of the Code applies, or (c) any entity whose underlying assets include "plan assets" by reason of any such plan's investment in the entity.

The Certificates will be regarded for ERISA purposes as equity interests in the Series whose assets are the CLNs and the Basis Swap. The Series will not monitor the Holders' possible status as benefit plan investors. Accordingly, the Certificates should not be acquired by any benefit plan investor.

BY ITS PURCHASE AND HOLDING OF A CERTIFICATE, EACH PURCHASER AND EACH TRANSFEREE WILL BE DEEMED TO HAVE REPRESENTED AND WARRANTED THAT (1) IT IS NOT AN EMPLOYEE BENEFIT PLAN AS DESCRIBED IN SECTION 3(3) OF ERISA THAT IS SUBJECT TO TITLE I OF ERISA, OR A PLAN TO WHICH SECTION 4975 OF THE CODE APPLIES, OR AN ENTITY WHOSE ASSETS ARE TREATED AS ASSETS OF ANY SUCH PLAN AND (2) IT WILL NOT SELL OR OTHERWISE TRANSFER ANY SUCH CERTIFICATE TO ANY PERSON WITHOUT FIRST OBTAINING THESE SAME FOREGOING REPRESENTATIONS, WARRANTIES AND COVENANTS FROM THAT PERSON.

## OFFERING AND SALE

The Certificates will be offered initially to prospective investors at a price of 100%.

Each prospective purchaser is hereby offered the opportunity to ask questions of, and receive answers from, the Trustee, the Initial Purchaser and the Broker-Dealer concerning the terms and conditions of this offering and the Series and to obtain additional information that the Trustee possesses or can acquire without unreasonable effort or expense that is necessary to verify the accuracy of the information furnished in this Private Placement Memorandum and the Series Pricing Supplement. See "General Information—Further Information." Inquiries concerning such additional information should be directed to The Bank of New York, 101 Barclay Street, 8th Floor East, New York, New York, 10286 Attention: Corporate Trust Dealing and Trading Group, telephone (212) 815-2898, fax (646) 835-4321; or to Deutsche Bank Securities Inc. - New York, 60 Wall Street, New York, New York 10005, Attention: Yury Gruzglin, telephone (212) 250-8206 or Ernest Goodrich, telephone (212) 250-7636.

Deutsche Bank Securities, Inc. will be the initial purchaser (the "Initial Purchaser") of the Series for the private placement of Certificates. In order to facilitate the offering of Certificates by the Initial Purchaser, the Initial Purchaser may temporarily acquire and hold the Certificates as principal for resale at prices determined by the Initial Purchaser to reflect the current market for the related CLNs and the rights and obligations under the Basis Swap as well as selling concessions and costs and expenses associated with the establishment of the Series. Certificates are being offered by the Initial Purchaser, subject to prior sale, when as and if issued and subject to acceptance by the Trustee, and approval of certain legal matters by counsel for the Trustee and the Initial Purchaser and certain other conditions.

The Series Agreement will prohibit the sale or transfer of Certificates to any investors other than investors who are Qualified Institutional Buyers that are also Qualified Purchasers. The Series Agreement will only allow sales or transfers of Certificates in minimum denominations of U.S. $100,000 (and in integral multiples of U.S. $50,000 in excess thereof).

No sale or transfer of Certificates shall be permitted that would require registration of the Certificates under the Securities Act or result in a violation of any federal or state securities law or regulation. See "Description of the Certificates—Transfer Restrictions." The Certificates will be subject to significant restrictions on transfer, and purchasers are advised to consult legal counsel prior to making any purchase, resale, pledge or other transfer of any Certificate. Inquiries concerning transfers of Certificates shall be made to: Deutsche Bank Securities Inc. - New York, 60 Wall Street, New York, New York 10005, Attention: Yury Gruzglin, telephone (212) 250-8206.

By acquiring a Certificate, each Holder appoints the Trustee to act on its behalf pursuant to the terms of the Series Agreement and agrees to be bound by the terms and conditions of the Series Agreement to the same extent as if such Holder were a signatory thereto.

## GENERAL INFORMATION

### Financial Information

Within 90 days of the liquidation of the Series, the Trustee will distribute unaudited financial statements of the Series to all Holders. The Trustee will require an audit to be performed at the end of one or more of the Series' fiscal years only if and to the extent the Holder or Holders have agreed to reimburse the Series for any expenses incurred in connection with the audit in a manner satisfactory to the Trustee.

### Further Information

Further information concerning the Certificates, the Basis Swap, the Counterparty, the CLNs, the Series Agent and the operations of the Series is available from the Trustee or Deutsche Bank Securities Inc. upon request.

## LEGAL MATTERS

Certain legal matters will be passed upon for Deutsche Bank Securities Inc. and the Counterparty by Linklaters LLP, New York and The Bayard Firm.

## INDEX OF DEFINED TERMS

1940 Act .......................................... iii
Accrued Interest Amount ............................ 3
Additional Interest Amount .......................... 3
Affected Party ................................... 36
Applicable Rate ............................... 4, 19
Auction ........................................ 19
Auction Agency Agreement ....................... 19
Auction Agent .............................. 1, 19
Auction Agent Ordinary Expenses ................ 29
Auction Date .................................. 21
Auction Procedures ............................. 19
Authorized Denominations ................... 2, 15
Available Certificates .......................... 23
Basis Swap .................................. ii, 7
Basis Swap Early Termination Unwind ........ 5
Bid ....................................... 21, 23
Bidder ......................................... 21
Bidding Rights Records ......................... 20
BMA Recommendation ........................... 26
Broker-Dealer .................................... 1
Business Day Convention ......................... 2
Business Days .................................... 2
Certificate Exchange ............................. 4
Certificate Principal Balance ...................... 1
Certificates .................................. ii, 1
CLNs .......................................... ii
CLNs Event ................................. 5, 30
CLNs Obligor .................................... v
CLNs Redemption Proceeds ...................... 17
Code .......................................... 38
Counterparty ................................ ii, 1
Counterparty Call ................................ 4
Counterparty Downgrade Default .............. 36

Counterparty Ratings Downgrade .............. 37
Coupon Accrual Dates ............................ 2
Coupon Accrual Period ........................... 2
Coupon Distribution Dates ........................ 2
Currency ........................................ 2
Current Factor .................................. 1
Declaration of Trust ..................... ii, 1, 15
Default ........................................ 36
Default Swap .................................... 7
Delaware Trustee ............................ 1, 29
DTC ........................................... 16
ERISA ....................................... v, 42
ERISA Plans ................................... 42
Event of Default ............................... 30
Existing Holder ................................ 23
Expense Liquidation Event ...................... 30
Extraordinary Expenses ......................... 30
Final Distribution Date .......................... 3
Fitch .......................................... iii
Hold Order ..................................... 21
Holders ........................................ ii
Illegality ...................................... 36
Indirect Participants ........................... 16
Initial Certificate Principal Balance ............... 1
Initial Purchaser ............................ 1, 43
Integration Regulations ......................... 39
Interest Amount ................................. 3
Interest Rate ................................... 4
IRS ........................................... 38
ISDA .......................................... 34
ISDA Definitions .............................. 34
ISDA Master Agreement ......................... 34
Issue Date ...................................... 2

Issue Price.................................................... 2

Liquidation Date........................................ 37

Majority Holders....................................... 36

Market Discount Note .............................. 40

Maximum Applicable Rate ...................... 24

Minimum Applicable Rate ....................... 24

OID ............................................................. 40

Order ......................................................... 21

Original Principal Amount ......................... 1

Participants .............................................. 16

Plans.......................................................... 42

Potential Holder ....................................... 23

Priority of Payments.................................. 5

Qualified Institutional Buyer ......................v

Rating Agency .......................................... 6

Rating Agency Condition ........................ 31

Record Date............................................... 2

Reference Entities ................................... 10

Rule 144A...................................................v

Rules ......................................................... 16

S&P ............................................................iii

Sale Procedures ...................................... 37

Scheduled Coupon Accrual Dates............. 2

Scheduled Final Distribution Date............. 3

Securities Act...............................ii, v, 18

Sell Order ................................................. 21

Series .................................................ii, 1, 15

Series Agency Agreement........................ 29

Series Agent......................................7, 29

Series Agreement........................ii, 1, 15

Series Liquidation Event......................5, 30

Series Pricing Supplement ....................... ii

Series Property...........................................7

Series Regulatory/Tax Liquidation Event....30

Submission Deadline................................ 21

Submitted Bid............................................ 23

Submitted Hold Order............................... 23

Submitted Order ....................................... 23

Submitted Sell Order ............................... 23

Sufficient Clearing Bids ........................... 23

Synthetic Debt Instrument ....................... 39

Tax Event .................................................. 36

Termination Payment ............................... 36

Trust ....................................................ii, 1, 15

Trustee ....................................................... 1

Trustee Extraordinary Expense and
Indemnity Agreement ............................... 28

Trustee Ordinary Expenses...................... 29

U.S. Corporate Holder .............................. 38

U.S. GAAP ................................................ 35

Unpaid Amounts...................................5, 36

Weighted Average Certificate  Principal
Balance ...................................................... 2

Winning Bid ............................................... 23

Attached please find an electronic copy of the private placement memorandum (the "Private Placement Memorandum"), dated August 14, 2006, relating to the AR CLNs Certificates offered by Camber Master Trust.

The Private Placement Memorandum is highly confidential and does not constitute an offer to any person other than the recipient or to the public generally to subscribe for or otherwise acquire the certificates described therein. The Private Placement Memorandum is not an offer to sell the certificates and is not a solicitation of an offer to buy such certificates in any jurisdiction where the offer or sale is not permitted.

DISTRIBUTION OF THE PRIVATE PLACEMENT MEMORANDUM TO ANY PERSONS OTHER THAN THE PERSON RECEIVING THIS ELECTRONIC COPY FROM THE INITIAL PURCHASER AND ANY PERSONS RETAINED TO ADVISE THE PERSON RECEIVING THIS ELECTRONIC TRANSMISSION FROM THE INITIAL PURCHASER WITH RESPECT THERETO IS UNAUTHORIZED. ANY PHOTOCOPYING, DISCLOSURE OR ALTERATION OF THE CONTENTS OF THE PRIVATE PLACEMENT MEMORANDUM, AND ANY FORWARDING OF A COPY OF THE PRIVATE PLACEMENT MEMORANDUM BY ANY MEANS TO ANY PERSON OTHER THAN THE PERSON RECEIVING THIS COPY FROM THE INITIAL PURCHASER IS PROHIBITED. BY ACCEPTING DELIVERY OF THE PRIVATE PLACEMENT MEMORANDUM, THE RECIPIENT AGREES TO THE FOREGOING.

PRIVATE PLACEMENT MEMORANDUM

# CAMBER MASTER TRUST
# AR CLNs CERTIFICATES

*(Issuable in Series)*

## Deutsche Bank Securities Inc.

*as Initial Purchaser and Broker-Dealer*

## The Bank of New York

*as Auction Agent*

*and*

## Deutsche Bank AG,
## acting through its London branch

*as Counterparty*

Each series of certificates offered hereby (the "Certificates") will be issued by Camber Master Trust, a limited purpose Delaware statutory trust (the "Trust") acting for a series of the Trust (the Trust acting for a series is referred to hereinafter as a "Series"). The Trust was formed pursuant to a Declaration of Trust and Trust Agreement (the "Declaration of Trust"), dated as of August 2, 2006, under which The Bank of New York will act as trustee for the benefit of the registered holders (the "Holders") of the Certificates and The Bank of New York (Delaware) will act as Delaware Trustee. Each Series will be created on the date of issuance of the Certificates of such Series by the Counterparty (as defined below), the Trustee and the Delaware Trustee entering into a series agreement creating a series of the Trust (the "Series Agreement").

The Certificates will be sold from time to time in amounts and on terms determined at the time of sale, which terms will be disclosed in a series pricing supplement (with respect to any Series of Certificates, the "Series Pricing Supplement") to this Private Placement Memorandum. Each Certificate will represent an undivided interest in (i) the credit-linked notes described in the Series Pricing Supplement (the "CLNs"), (ii) the rights of the Series under the ISDA Master Agreement, schedule and confirmation (the "Basis Swap"), dated as of the Issue Date, between Deutsche Bank AG, acting through its London branch (the "Counterparty") and the Series, and (iii) all proceeds of the foregoing. The Certificates will be the sole class of securities issued by the Series. The Series will be subject to early liquidation upon the occurrence of certain events specified under the caption "The Series Agreement—Liquidation of a Series" in this Private Placement Memorandum.

Distributions in respect of the Certificates will be subject to receipt by the Series of payments under the CLNs and of amounts due from the Counterparty pursuant to the Basis Swap. The Prospectus for the CLNs will be attached as an Appendix to the Series Pricing Supplement. See such Prospectus and "The Basis Swap" below. *There can be no assurance that upon early liquidation of the Series the Holders will have received distributions equal to the original purchase price of their Certificates.*

THE CERTIFICATES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND

NEITHER THE TRUST NOR THE SERIES HAS BEEN REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "1940 ACT"). AS A RESULT, THE CERTIFICATES ARE SUBJECT TO RESTRICTIONS ON TRANSFER. THE CERTIFICATES ARE BEING OFFERED AND SOLD EXCLUSIVELY TO "QUALIFIED INSTITUTIONAL BUYERS" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT. EACH PURCHASER OF CERTIFICATES WILL BE DEEMED, BY ITS ACCEPTANCE OF SUCH CERTIFICATES, TO HAVE MADE CERTAIN REPRESENTATIONS AND AGREEMENTS INTENDED TO RESTRICT TRANSFER OF THE CERTIFICATES, AS SET FORTH IN THIS PRIVATE PLACEMENT MEMORANDUM UNDER "NOTICE TO PURCHASERS AND TRANSFEREES."

It is a condition to issuance of the Certificates of any Series that they shall have been rated "AAA" by Fitch Ratings ("Fitch") and "AAA" by Standard and Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P").

THIS PRIVATE PLACEMENT MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITY IF NOT ACCOMPANIED BY A SERIES PRICING SUPPLEMENT.

## Deutsche Bank Securities Inc.

Dated August 14, 2006.

## NOTICE TO PURCHASERS AND TRANSFEREES

A Series Pricing Supplement disclosing the pricing terms of each series of Certificates offered hereby and attaching the Prospectus for the related CLNs will be provided to prospective investors in connection with the offering and sale of such Series. The Series will make available to each prospective purchaser, prior to such purchaser's purchase of Certificates, the opportunity to ask questions of, and receive answers from, the Trustee, the Initial Purchaser and the Broker-Dealer concerning the terms and conditions of this offering and the Series.

No person is authorized to give any information or to make any representation concerning the offering of the Certificates not contained in this Private Placement Memorandum and the related Series Pricing Supplement, and any such information or representation not contained or incorporated by reference herein or therein should not be relied upon as having been authorized by or on behalf of the Broker-Dealer, the Trustee, the Delaware Trustee or the Counterparty. Neither the delivery of this Private Placement Memorandum and the related Series Pricing Supplement, nor any sale made hereunder or thereunder should, at any time, imply that the information contained herein or therein is correct as of any date subsequent to their respective dates.

This Private Placement Memorandum and the Series Pricing Supplement do not constitute an offer to sell or a solicitation of any offer to buy any security other than the Certificates offered hereby and thereby nor do they constitute an offer to sell or a solicitation of an offer to buy any of the Certificates to any person in any jurisdiction in which it is unlawful to make such an offer or solicitation to such person.

Each purchaser of Certificates (whether as initial purchaser or transferee) will be deemed by its acceptance of its Certificates to have made certain representations and agreements as set forth in this section.

See "Special Considerations" in this Private Placement Memorandum for a description of certain factors that should be considered in connection with an investment in the Certificates.

This Private Placement Memorandum has been prepared solely for use in connection with the offering of the Certificates. Except as set forth below, distribution of this Private Placement Memorandum and the Series Pricing Supplement to any person other than the offeree and those persons, if any, retained to advise such offeree with respect thereto is unauthorized, and any disclosure of any of their contents without the prior written consent of the Broker-Dealer is prohibited. Except as set forth below, each prospective purchaser, by accepting delivery of this Private Placement Memorandum, agrees to the foregoing and to make no photocopies of this Private Placement Memorandum, the Series Pricing Supplement or any documents attached hereto and, if the offeree does not purchase the Certificates or the offering is terminated, to return this Private Placement Memorandum, the Series Pricing Supplement and all documents attached hereto to: Deutsche Bank Securities Inc. – New York, 60 Wall Street, New York, New York 10005, Attention: Yury Gruzglin, telephone (212) 250-8206 or Ernest Goodrich, telephone (212) 250-7636.

Neither the Initial Purchaser, the Broker-Dealer or any of their affiliates nor the Series assumes any obligation to update or correct any inaccuracies that may become apparent in this Private Placement Memorandum or the Series Pricing Supplement or any other information made available in connection with the Certificates.

In making an investment decision, investors must rely on their own examination of the terms of the Certificates and the CLNs, including the merits and risks involved. The contents of this Private Placement Memorandum and the Series Pricing Supplement hereto and any accompanying information should not be construed as legal, business or tax advice. Each prospective investor should consult its own legal, business and tax advisors as to legal, business and tax advice.

NOTICE TO NEW HAMPSHIRE RESIDENTS: NEITHER THE FACT THAT NO REGISTRATION STATEMENT OR APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

Each purchaser of Certificates, whether as initial purchaser or as transferee, by its acceptance thereof (directly or through a nominee), will be deemed to have represented and agreed as follows:

(i)     it understands that the Certificates are being offered only in a transaction not involving any public offering within the meaning of, and have not been and will not be registered under, the Securities Act of 1933, as amended (the "Securities Act"), or any securities law of any state of the United States or any other jurisdiction;

(ii)    it is acquiring the Certificates for its own account or an account or accounts with respect to which it exercises sole investment discretion and it or each such account is a "Qualified Institutional Buyer" (each a "QIB") as defined in Rule 144A under the Securities Act ("Rule 144A");

(iii)   (1) it is not an employee benefit plan as described in Section 3(3) of the Employment Retirement Income Security Act of 1974, as amended, or a plan as described in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended, or an entity whose assets are treated as assets of any such plan, and (2) it will not sell or otherwise transfer any Certificate to any person without first obtaining these same foregoing representations, warranties and covenants from that person;

(iv)    it and each account for which it is purchasing the Certificates has all necessary power and authority to acquire the Certificates and such acquisition will not contravene any law, rule or regulation binding on it or such account or any investment guideline or restriction applicable to it or such account;

(v)     it will comply with all applicable laws and regulations in effect in any jurisdiction in which it purchases or sells Certificates and obtain any consent, approval or permission required by it for such purchase or sale under the laws and regulations of any jurisdiction to which it is subject or in which it makes such purchases or sales, and none of the Trustee, the Initial Purchaser, the Series, Series Agent, the Counterparty, the Broker-Dealer, the Auction Agent or any of their affiliates shall have any responsibility therefor;

(vi)    in deciding whether or not to purchase the Certificates, (a) it has carefully read and fully understands this Private Placement Memorandum and the Series Pricing Supplement; (b) it has made its own independent evaluation, based upon such investigation and analysis as it deems appropriate, of the business prospects and creditworthiness of the Series, the issuer of the CLNs (the "CLNs Obligor") and the Counterparty, and of the terms and provisions of the Certificates and other instruments and agreements that are described or referred to in this Private Placement Memorandum and in the Series Pricing Supplement; (c) it is not relying on any communication (written or oral) from the Series, the CLNs Obligor, the Initial Purchaser, the Broker-Dealer or the Counterparty as investment advice or as a recommendation to purchase the Certificates, it being

understood that information and explanations related to the terms and conditions of the Certificates and the agreements that are described in this Private Placement Memorandum and in the Series Pricing Supplement shall not be considered investment advice or a recommendation to purchase the Certificates; (d) it has been afforded the opportunity to ask questions of, and receive answers from, the Trustee, the Initial Purchaser and the Broker-Dealer concerning the terms of the Certificates, the offering contemplated by this Private Placement Memorandum and the Series Pricing Supplement, the Series and related matters; and (e) it has the knowledge, expertise and experience in financial matters to evaluate the risks involved in purchasing the Certificates;

(vii)    it acknowledges and agrees that none of the Counterparty, the Initial Purchaser, the Broker-Dealer, the Series, Series Agent, the Auction Agent, the Trustee or the Delaware Trustee has made any representation to it regarding the legality of its investment in the Certificates under applicable legal investment or similar laws or regulations and that the appropriate characterization of the Certificates under various legal investment restrictions may be subject to significant interpretative uncertainties;

(viii)   it understands that the Certificates will bear a restrictive legend stating that the Certificates have not been registered under the Securities Act and setting forth the restrictions on transfer of the Certificates described herein and stating that each purchaser of any Certificate will be deemed, by its acceptance thereof, to have made the representations and agreements set forth in this "Notice to Purchasers and Transferees";

(ix)     it will notify any proposed purchaser of Certificates from it of the resale restrictions referred to herein and prior to its sale of the Certificates, deliver a copy of this Notice to Purchasers and Transferees to such proposed purchaser; and

(x)      it understands that if at any time the Trustee determines, or is notified by the Initial Purchaser or the Broker-Dealer, that (A) a Holder was, at the time of acquisition of its Certificates, in breach of the deemed representations and agreements set forth in this "Notice to Purchasers and Transferees" or (B) at any time since such acquisition, such Certificates are being held by a Holder (based on reputable independent legal advice) in violation of the applicable deemed representations and agreements set forth in this "Notice to Purchasers and Transferees," the Trustee may (in the case of clause (A) or clause (B)) consider the acquisition of the Certificates by such Holder null and void and rescinded or may require that the Certificates purchased by such Holder be transferred to a person designated by the Trustee, the Initial Purchaser or the Broker-Dealer at a price determined by the Broker-Dealer or the Initial Purchaser as the case may be, based upon its estimation of the prevailing price of the Certificates and, by its acceptance of its Certificate, it authorizes the Trustee, the Initial Purchaser and the Broker-Dealer to take such action if warranted and understands that neither the Trustee, the Initial Purchaser, nor the Broker-Dealer will be responsible for any losses that may be incurred as a result of any such transfer.

The foregoing restrictions are subject to amendment under certain circumstances by the Trustee with the consent of the Counterparty. By its acceptance of a Certificate, each purchaser shall be deemed to have agreed to any such amendment, provided that no such amendment shall have a material adverse effect on the holders of Certificates then outstanding.

This Private Placement Memorandum and the Series Pricing Supplement do not constitute an offer to sell or a solicitation of any offer to buy any security other than the Certificates offered hereby, nor do they constitute an offer to sell or a solicitation of an offer to buy any of the Certificates to any person in any jurisdiction in which it is unlawful to make such an offer or solicitation to such person.

NOTICE TO FLORIDA INVESTORS: The Certificates have not been registered under the Florida Securities Act. If sales are made to five or more investors in Florida, any Florida investor may, at his or her option, void any purchase hereunder within a period of three days after he or she first tenders or pays to the Initial Purchaser or the Broker-Dealer, an agent of the Initial Purchaser or the Broker-Dealer, or an escrow agent the consideration required for purchase of a Certificate, whichever occurs later. To accomplish this, it is sufficient for a Florida investor to send a letter or telegram to the Broker-Dealer within a three day period, stating that it is voiding and rescinding the purchase. If an investor sends a letter, it is prudent to do so by certified mail, return receipt requested, to ensure that it is received and to evidence the time of mailing.

The Trustee has not participated in the preparation of this Private Placement Memorandum or the Series Pricing Supplement and assumes no responsibility for their contents.

## TABLE OF CONTENTS

NOTICE TO PURCHASERS AND TRANSFEREES ......................................................................... iv

SUMMARY OF PRINCIPAL TERMS ........................................................................................... 1

SPECIAL CONSIDERATIONS ...................................................................................................... 9

USE OF PROCEEDS ..................................................................................................................... 15

DESCRIPTION OF THE CERTIFICATES .................................................................................... 15

AUCTION PROCEDURES ............................................................................................................ 19

THE TRUST .................................................................................................................................. 26

THE SERIES AGREEMENT ......................................................................................................... 26

THE BASIS SWAP ....................................................................................................................... 34

CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS .................................................. 38

GENERAL INFORMATION ......................................................................................................... 44

LEGAL MATTERS ....................................................................................................................... 44

## SUMMARY OF PRINCIPAL TERMS

The following summary is qualified in its entirety by reference to the detailed information appearing elsewhere herein and by reference to the information contained in the Series Pricing Supplement delivered in connection with the offering and sale of a particular series of Certificates. Each series of Certificates offered hereby will be issued by Camber Master Trust, a limited purpose Delaware statutory trust (the "Trust"), on behalf of a series of the Trust (the Trust acting for such series, the "Series"). The Trust was formed pursuant to a Declaration of Trust and Trust Agreement (the "Declaration of Trust") among the Counterparty, the Trustee and the Delaware Trustee, dated as of August 2, 2006. It was established for the primary purpose of creating separate Series of the Trust. Each Series will be created to (i) issue separate series of Certificates representing undivided interests in a Series and the related Series Property (as described below), (ii) acquire the CLNs described in the Series Pricing Supplement and (iii) enter into a Basis Swap with the Counterparty. The Certificates of a Series will be issued pursuant to a Series Agreement (the "Series Agreement") among the Counterparty, the Trustee and the Delaware Trustee, creating the Series that issues those Certificates. Each Series Agreement will incorporate by reference a Terms Schedule attached thereto as Appendix 1, Auction Procedures attached thereto as Appendix 2, and Standard Terms of Series attached thereto as Appendix 3. The date of the Series Agreement and of the issuance of such Certificates is referred to herein as the "Issue Date." No securities other than Certificates will be issued by any Series.

*Certain capitalized terms used and not defined in this Summary are defined elsewhere in this Private Placement Memorandum. See "Index of Defined Terms."*

| | |
|---|---|
| The Certificates: | Each Series will issue a single issue of Certificates pursuant to its Series Agreement. A Series will not issue any securities other than the Certificates. The terms of the Certificates of a Series will be as set forth herein and in the Series Pricing Supplement. |
| Broker-Dealer: | Deutsche Bank Securities Inc. or, with respect to each Series, any other entity appointed by the Counterparty to act as a Broker-Dealer that is a party to a Broker-Dealer Agreement. |
| Initial Purchaser: | Deutsche Bank Securities Inc. |
| Auction Agent: | The Bank of New York. |
| Trustee: | The Bank of New York. |
| Delaware Trustee: | The Bank of New York (Delaware). |
| Counterparty: | Deutsche Bank AG, an affiliate of Deutsche Bank Securities Inc., acting through its London branch. |
| Initial Certificate Principal Balance: | As specified in the Series Pricing Supplement. |
| Certificate Principal Balance: | On any date, an amount equal to: |
| | the Initial Certificate Principal Balance multiplied by the Current Factor where: |
| | the "Current Factor" is a fraction equal to A/B, and |
| | "A" is the Notional Principal Amount of the CLNs on such date, as such term is defined in the Prospectus for the CLNs; and |

1

"B" is the Original Principal Amount of the CLNs. The "Original Principal Amount" is the Principal Amount of the CLNs, as such term is defined in the Prospectus for the CLNs.

Weighted Average Certificate Principal Balance:

For any Coupon Accrual Period, an amount equal to (i) the sum of the Certificate Principal Balance on each day of such period divided by (ii) the number of days in such period.

Issue Date: As specified in the Series Pricing Supplement.

Issue Price: 100%.

Authorized Denominations: U.S. $100,000 and integral multiples of U.S. $50,000 in excess thereof.

Currency: U.S. $

Record Date: The Business Day immediately preceding each Coupon Distribution Date.

Business Days: Any day other than a Saturday, Sunday, a day on which the Trustee is authorized or obligated by law to be closed or a day on which the New York Stock Exchange is closed.

Business Day Convention: Following Business Day Convention.

Scheduled Coupon Accrual Dates: As specified in the Series Pricing Supplement.

Coupon Accrual Dates: Each Scheduled Coupon Accrual Date subject to adjustment in accordance with the Following Business Day Convention.

Coupon Accrual Period: Each period from, and including, one Coupon Accrual Date to, but excluding, the immediately following Coupon Accrual Date.

The Interest Amount payable on a Coupon Distribution Date will be the Interest Amount calculated with reference to the Coupon Accrual Period ending on, but excluding, the Coupon Accrual Date that is (or is closest in time to) that Coupon Distribution Date or, in the case of the final Coupon Accrual Period, ending on, and excluding the Scheduled Final Distribution Date.

Coupon Distribution Dates: Each Coupon Accrual Date except that if the Final Distribution Date falls after the Scheduled Final Distribution Date, the Scheduled Final Distribution Date shall not be a Coupon Distribution Date and the Final Distribution Date shall be the final Coupon Distribution Date.

Distribution on the Scheduled Final Distribution Date: Unless the Certificates have been previously subject to a Certificate Exchange, a Counterparty Call or Series Liquidation Event, the final distribution of principal on the Certificates will be made on the Scheduled Final Distribution Date in an amount in U.S. $ equal to the Certificate Principal Balance, subject to "Postponement of Final Distribution" below. See also "Certificate Exchange Right," "Liquidation of the Series; Basis Swap Early Termination Unwind," and "Counterparty Call Right" below in this Summary.

| | |
|---|---|
| Scheduled Final Distribution Date: | The date specified as such in the Series Pricing Supplement. |
| Final Distribution Date: | The Scheduled Final Distribution Date, unless the Maturity Date (as such term is defined in the Prospectus for the CLNs) of the CLNs falls after the Scheduled Final Distribution Date in which case "Final Distribution Date" shall mean the date which is two Business Days after the Maturity Date of the CLNs. |
| Postponement of Final Distribution: | The distribution of principal of the Certificates on the Scheduled Final Distribution Date will be funded from the proceeds received by the Series on the redemption of the CLNs. The Scheduled Final Distribution Date of the Certificates is the same as the scheduled maturity date of the CLNs. The terms of the CLNs permit the payment of some or all of the redemption monies due on the CLNs to be delayed beyond the scheduled maturity date of the CLNs in certain circumstances described in the Prospectus for the CLNs. In such a scenario, the Holders will not receive a USD amount equal to the Certificate Principal Distribution Balance on the Scheduled Final Distribution Date but will receive a lesser amount. See "Description of the Certificates—Postponement of Final Distribution" below. |
| Interest Amount: | Each Certificate's pro rata share (rounded down to the nearest cent) of the aggregate of: |
| | (a) the product of: |
| | (i)   the Weighted Average Certificate Principal Balance in respect of such Coupon Accrual Period; and |
| | (ii)  a per annum rate equal to the Applicable Rate (calculated on the basis of the actual number of calendar days in such Coupon Accrual Period divided by 360); and |
| | (b) the sum of the Additional Interest Amounts and the related Accrued Interest Amounts if such Coupon Distribution Date follows a date on which the CLNs have paid the amounts referred to under those names in the Prospectus for the CLNs. |
| | "Additional Interest Amount" in respect of any Coupon Distribution Date, shall be calculated by the Counterparty in its discretion based on the calculation of such amount in the Prospectus for the CLNs except that references to "Interest Payment  Dates" and "Additional Interest Payment Dates" shall be read as "Coupon Distribution Dates", references to "Interest Accrual Date" as "Coupon Accrual Date" and "Interest Period" as "Coupon Accrual Period," that interest shall be deemed to accrue at the Applicable Rate rather than the "Coupon Rate" and that the "Adjustment Period" means the period from the respective Event Determination Date (as such term is defined in the Prospectus for the CLNs) to but excluding the Coupon Distribution Date on which such Additional Interest Amount is to be paid. |
| | "Accrued Interest Amount" means in respect of any Coupon Distribution Date, the amount calculated by the Counterparty in its |

discretion based on the calculation of such amount in the Prospectus for the CLNs except that references to "Additional Interest Payment Date" shall be read as "Coupon Distribution Dates" and references to "Relevant Coupon Accrual Date" shall be read as the "Event Determination Date" (as such term is defined in the Prospectus for the CLNs).

| | |
|---|---|
| Interest Rate: | The rate at which interest will accrue on the Weighted Average Certificate Principal Balance for each Coupon Accrual Period following the first Coupon Accrual Period (the "Applicable Rate") will be established pursuant to the Auction Procedures as specified under "Auction Procedures" herein. The Applicable Rate for the first Coupon Accrual Period will be specified in the Series Pricing Supplement. For all other Coupon Accrual Periods, the Applicable Rate will be either: (a) if there are Sufficient Clearing Bids, the Winning Bid; (b) if all the Certificates are subject to Submitted Hold Orders, the Minimum Applicable Rate; or (c) if Sufficient Clearing Bids do not exist, the Maximum Applicable Rate. |
| Payments of Principal and Interest: | Accrued interest on the Certificates prior to the Final Distribution Date will be distributed in arrear on each Coupon Distribution Date (including the Final Distribution Date). The rights of Holders of Certificates to receive distributions thereon out of amounts available to the Series upon any early liquidation of the Series will be subject to the priorities of payment specified herein. See "The Series Agreement—Liquidation of a Series." |
| Certificate Exchange Right: | The Counterparty and any of its affiliates may exchange any Certificates held for its own account, including any Certificates purchased by the Counterparty or any affiliate in the open market (a "Certificate Exchange"). Upon such exchange by the Counterparty or any affiliate, the portion of the CLNs relating to the Certificates being exchanged will be distributed in-kind to the Counterparty or its affiliate, as applicable. In such event, the notional amount of the Basis Swap relating to such Certificates will be proportionally reduced, based on the amount of Certificates being exchanged, without the payment of any Termination Payment. See "Description of the Certificates—Certificate Exchange Right." |
| Reduction of Certificate Principal Balance: | On any date on or prior to the Final Distribution Date, if the Notional Principal Amount of the CLNs is reduced in accordance with the terms thereof, then as of such date the Certificate Principal Balance will be reduced in an equal amount. See "Special Considerations— CLNs." For an explanation of the circumstances in which the Notional Principal Amount of the CLNs can be reduced, see the Prospectus for the CLNs, which will be attached as an Appendix to the Series Pricing Supplement. |
| | *If the Certificate Principal Balance is reduced to zero prior to the Final Distribution Date, then the Series will be liquidated.* |
| Counterparty Call Right: | The Certificates will be callable (in whole but not in part) on any Coupon Distribution Date at the option of the Counterparty. The amount payable in connection with a Counterparty Call (the |

"Counterparty Call") of the Certificates will be the Certificate Principal Balance plus any accrued interest thereon. Amounts payable in respect of a Counterparty Call will be made in cash.

**Liquidation of the Series; Basis Swap Early Termination Unwind:**

The Series will be liquidated (i) if the Certificate Principal Balance is reduced to zero, (ii) upon the Trustee's receipt and distribution of all amounts owed to the Series in respect of the Series Property, (iii) upon the occurrence of an event of default on the CLNs which has not been cured or waived to the satisfaction of the trustee of the CLNs (a "CLNs Event"), (iv) upon the occurrence of an Expense Liquidation Event, (v) at the direction of the Counterparty or Holders whose Certificates represent at least two-thirds of the principal amount of the Certificates, upon the occurrence of a Series Regulatory/Tax Liquidation Event, (vi) upon the early redemption of the CLNs in whole but not in part, or (vii) upon the termination of the Basis Swap other than as a result of an event described in items (i) through (vi) above (items (i) through (vii) above being referred to herein, in each case, as a "Series Liquidation Event"). Upon the liquidation of the Series on the occurrence of any of the events described in (iii) to (vii) above (each a "Basis Swap Early Termination Unwind"), each Holder will be entitled, subject to the priority of payments described herein, to a pro rata share of the CLNs or the redemption proceeds thereof in the case of the early redemption of the CLNs in whole but not in part, plus the Termination Payment if one is owed from the Counterparty to the Series, and minus the Termination Payment if one is owed by the Series to the Counterparty. See "Special Considerations—Basis Swap; Termination Payments; Counterparty Priority". Notwithstanding the foregoing, if the Basis Swap Early Termination Unwind is a result of a Counterparty Downgrade Default, each Holder will be entitled, subject to the priority of payments described herein, to a pro rata share of the CLNs plus a sum equal to the aggregate of (i) any Unpaid Amounts (as defined in the Basis Swap) owed to the Series and (ii) without duplication, an amount calculated on the same basis as the Interest Amount but in respect of the period from and including the immediately preceding Coupon Accrual Date to but excluding the Early Termination Date; minus any Unpaid Amounts owed to the Counterparty by the Series. No Termination Payment will be payable upon the termination of the Basis Swap as a result of a Counterparty Downgrade Default.

**Priority of Payments:**

In connection with any early liquidation of the Series, the Trustee will distribute amounts to the extent of available funds, and will distribute the CLNs in kind to the Holders, in the following order of priority (the "Priority of Payments"):

(a) *first*, to the Trustee, any Extraordinary Expenses incurred by the Series and any other expenses of the Trust not paid by a third party;

(b) *second*, to the Counterparty, (i) any amounts due to the Counterparty (other than any Termination Payment) and,

(ii) unless the Series is liquidated in connection with a termination of the Basis Swap following a Default by the Counterparty, any Termination Payment due to the Counterparty from the Series;

(c) *third*, to the Holders; and

(d) *fourth*, if the Basis Swap is terminated early because of a Default by the Counterparty, any Termination Payment due to the Counterparty from the Series.

If practicable, the Trustee will attempt to satisfy the amounts due to Holders on the early liquidation of the Series by delivering CLNs pro rata to the Holders. If this is not possible due to the denominations of the CLNs, Holders will receive a combination of cash and CLNs in satisfaction of amounts then due in respect of the Certificates in such proportions as shall be determined by the Trustee in its sole discretion. The Trustee will only sell CLNs to the extent they are required to be sold to fund any amounts due to the Counterparty or the Trustee or if the denominations of the CLNs require their sale in order to make a pro rata distribution to the Holders.

If the Series is liquidated early, Holders may not receive property equivalent in value to full payment of accrued interest on and full repayment of the principal of their Certificates. In connection with any such liquidation of the Series, a Termination Payment may be payable by the Series to the Counterparty or by the Counterparty to the Series. The amount of such Termination Payment will, if such amount is owed to the Counterparty, unless the Basis Swap is terminated because of a Default by the Counterparty, be paid prior to any payments or distributions being made out of the Series Property to the Holders. If a Termination Payment is due to the Counterparty, the Trustee will be required to sell an amount of the CLNs sufficient to fund such payment. If Termination Payment is payable to the Counterparty upon an early termination of the Basis Swap, such payment will reduce the amount available to make payments to the Holders and could result in a loss to Holders.

If, upon the payment in full by the Series of all obligations and liabilities of the Series and the remaining Certificate Principal Balance and accrued interest thereon, any Series Property remains in the Series, then all such remaining property shall be distributed to the Holders.

| | |
|---|---|
| Rating Agency: | Fitch and S&P. |
| Rating: | As of the Issue Date, "AAA" by Fitch and "AAA" by S&P. |
| Listing: | The Certificates will not be listed on any established securities market. |
| Form: | The Certificates will be issued in book-entry form and will be represented by one or more Global Certificates registered in the name of Cede & Co., as nominee for DTC. See "Description of the Certificates — Book-Entry Registration" in this Private Placement |

|  | Memorandum. |
|---|---|
| Series Property: | The Series Property will consist of (i) the CLNs, (ii) the rights of the Series under the Basis Swap, and (iii) the proceeds of the foregoing. |
| The CLNs: | The CLNs will be identified in the Series Pricing Supplement. A Prospectus for the CLNs will be attached as an Appendix to the Series Pricing Supplement. |
| The Basis Swap: | Payments made by the Series and the Counterparty under the Basis Swap will be based on an exchange of: (i) cash flows received by the Series on the CLNs in respect of interest, for (ii) amounts equal to the sum of (a) the Interest Amount payable on each Coupon Distribution Date, (b) the fees of the Broker-Dealers, Auction Agent and Trustee, (c) the Trustee Ordinary Expenses and the Auction Agent Ordinary Expenses up to agreed per annum dollar limits and (d) any interest payable on the Final Distribution Date. The cash flows to be received by the Series under the Basis Swap are designed to be sufficient to make scheduled distributions of interest in respect of the Certificates. See "The Basis Swap" below. |
| Series Agent: | Deutsche Bank Securities Inc. (or an affiliate thereof) will act as agent for the Series (the "Series Agent") and in that capacity, amongst other things, will sell the CLNs on behalf of the Series in accordance with the Sale Procedures, if and when required. |
| Private Placement; Transfer Restrictions: | The Certificates have not been and will not be registered under the Securities Act. Certificates will be offered only to QIBs in minimum amounts for any single beneficial owner as set forth herein and in the Series Pricing Supplement. See "Description of the Certificates—Transfer Restrictions." |
| Tax Considerations: | The Series will be treated as a grantor trust for U.S. federal income tax purposes and will not be subject to U.S. federal income taxation. Subject to the Integration Regulations discussed herein, each Holder will be treated as the owner of its proportionate share of the assets of the Series for U.S. federal income tax purposes. See "Certain U.S. Federal Income Tax Considerations." |
| ERISA Considerations: | Certificates are not a suitable investment for employee benefit plans. Investors will be deemed to represent that they are not employee benefit plans. See "Certain ERISA Considerations." |
| Trustee as the holder of the CLNs: | The Trustee as holder of the CLNs has the right to vote and give consent and waivers in respect of the CLNs, except as limited herein or in the Series Pricing Supplement. In the event that the Trustee receives a request from the trustee of the CLNs for its consent to any amendment, modification or waiver of the CLNs, their documentation or any other document relating thereto, or receives any other solicitation for any action with respect to the CLNs, the Trustee shall notify each Holder of record on such date such proposed amendment, modification, waiver or solicitation to each Holder of record on such date. The Trustee shall request instructions from the Holders as to whether or not to consent to or to vote to accept such amendment, modification, waiver or solicitation. |

The Trustee shall consent or vote, or refrain from consenting or voting, in the same proportion as each Holder actually voted as of a date determined by the Trustee prior to the date on which such consent or vote is required. Notwithstanding anything to the contrary, the Trustee shall at no time vote or consent to any matter unless (i) such vote or consent would not (based on the opinion of counsel) alter the tax status of the Series, and (ii) such vote or consent would not alter the timing or amount of any payment on the CLNs. The Trustee shall have no liability for any failure to act as a result of a Holder's late return of directions, or failure to return directions requested by the Trustee from the Holders.

All notices received by the Trustee as holder of the CLNs that relate to the occurrence of a credit event under the portfolio credit default swap entered into between the CLNs Obligor and the Counterparty in connection with the issuance of the CLNs (the "Default Swap") will be promptly sent to the Holders of record on such date.

## SPECIAL CONSIDERATIONS

*The purchase of the Certificates involves certain risks, including without limitation, the risks described below. This Private Placement Memorandum does not purport to describe all risks of an investment in Certificates, either as such risks exist at the date hereof or as such risks may change in the future.*

### Ability to Sell Certificates at an Auction or to Receive a Market Rate at an Auction

Holders of the Certificates may not be able to sell some or all of their Certificates at an Auction if the Auction fails; that is, if there are more Certificates offered for sale than there are buyers for those Certificates. Also, if a Holder places a Bid (an order to retain its Certificates) at an Auction only at a specified rate, and that specified rate exceeds the Applicable Rate set at the Auction, the Holder will not retain its Certificates. If a Holder submits a Hold Order for its Certificates the Auction may set an Applicable Rate which may be different from the rate the Holder was expecting to receive.

As noted above, if there are more Certificates offered for sale than there are buyers for those Certificates in any Auction, the Auction will fail and the Holder may not be able to sell some or all of its Certificates at that time.

### CLNs

The only investments to be made by the Series are the CLNs and the Basis Swap. The amount of principal that Holders are entitled to be paid on the Scheduled Final Distribution Date, the Final Distribution Date, upon a Counterparty Call, or the monies that the Holders will receive upon a Series Liquidation Event and the amount of interest that Holders are entitled to receive, is dependent upon the Certificate Principal Balance which tracks the Notional Principal Amount of the CLNs. Reductions to the Notional Principal Amount of the CLNs due to losses incurred by the CLNs Obligor under the Default Swap will therefore directly affect the interest and principal payable on the Certificates. The occurrence of a CLNs Event will cause a liquidation of the Series and could result in a Termination Payment being owed to the Counterparty.

If the Notional Principal Amount of the CLNs is reduced to zero, the Certificate Principal Balance will be reduced to zero and the Series will be liquidated. In these circumstances the Holders will receive no redemption monies or interest.

A Prospectus for the CLNs is attached to the Series Pricing Supplement. Prospective purchasers of the Certificates are urged to read such Prospectus as carefully as if they were making a direct investment in the CLNs.

### Risks Associated with the CLNs

The Holders are exposed to the credit of the CLNs. If losses are allocated to the CLNs in accordance with their terms, reducing their principal amount, or the CLNs Obligor fails to pay any principal payment on the CLNs, whether in whole or in part, then the principal repaid to the Holder could be less than the Holder's original investment. Any failure by the CLNs Obligor to make required principal payments on the CLNs will reduce payments on the Certificates and will result in losses thereon.

Failure by the CLNs Obligor to pay any interest or principal payment on the CLNs could result in the occurrence of a CLNs Event. Such occurrence may adversely affect the Holders because a CLNs Event constitutes a termination event under the Basis Swap and the Series may be required to make a Termination Payment to the Counterparty as described below.

A Prospectus for the CLNs is attached to the Series Pricing Supplement. Prospective purchasers of the Certificates are urged to read such Prospectus as carefully as if they were making a direct investment in the CLNs.

### Risks of Reference Entities and CLNs Obligor

The likelihood of a Holder being paid interest on and the principal of the Certificates will be highly dependent on the financial status of the reference entities to which the CLNs are credit linked (the "Reference Entities"). The creditworthiness of each Reference Entity may be affected by a variety of factors that are inherently difficult to predict, such as business, financial, market and legal uncertainties, and domestic or international economic and political developments (including terrorist attacks, wars and other hostilities).

### CLNs Event

Any event of default in relation to the CLNs which has not been cured or waived to the satisfaction of the trustee of the CLNs will cause the liquidation of the Series and result in the Holders receiving a pro rata share of the CLNs, plus the Termination Payment if one is owed from the Counterparty to the Series or minus the Termination Payment if one is owed by the Series to the Counterparty. The events of default that are applicable to the CLNs are more fully described in the Prospectus for the CLNs and include the failure by the CLNs Obligor to make, when due, any payment on the CLNs or any asset swap pertaining thereto or under the Default Swap and an event of default on the Collateral (as such term is defined in the Prospectus for the CLNs).

### Payment-in-kind on the Liquidation of the Series

Upon the liquidation of the Series upon the occurrence of any of the events described in (iii) to (vii) of the definition of "Series Liquidation Event," the Holders are entitled to a pro rata share of the CLNs, plus the Termination Payment if one is owed from the Counterparty to the Series or minus the Termination Payment if one is owed by the Series to the Counterparty. If practicable, the Trustee will attempt to satisfy the amounts due to a Holder on a liquidation of the Series by delivering CLNs with an outstanding principal balance equal to such Holder's claim. If this is not possible due to the denominations of the CLNs, Holders will receive a combination of cash and CLNs in satisfaction of amounts then due in respect of the Certificates in such proportions as shall be determined by the Trustee in its sole discretion. The Trustee will only sell CLNs to the extent they are required to be sold to fund a Termination Payment to the Counterparty or if the denomination of the CLNs requires their sale in order to pay amounts then due to the Holders. There may be no market or only a very limited market in the CLNs. Consequently the market value of the CLNs, especially in the case where the liquidation of the Series has been triggered by a CLNs Event, may well be substantially below their outstanding principal amount. While the Auction process is intended to create liquidity for Holders, it is possible that no market may develop for the CLNs and consequently, Holders must be prepared to hold such CLNs potentially until their maturity date.

### Limited Recourse

The Certificates will evidence undivided interests in the Series Property subject to the Basis Swap, and will not be obligations or responsibilities of, and will not be guaranteed by, the Trustee, the Delaware Trustee, the Counterparty, the Initial Purchaser, the Auction Agent, the Broker-Dealer or any company in the same group of companies as, or any affiliate of, any of the foregoing. Distributions on the Certificates will be made solely from the Series Property, and not from the property of any other series of the Trust. Each Holder, by its holding of its Certificate, will be deemed to agree that distributions on the Certificates of a Series will be payable solely from the Series Property. If the Series is not able to meet its payment obligations in respect of the

Certificates, then the obligations of the Series in respect of the Certificates will be limited to proceeds of the Series Property. Any shortfall will be borne by the Holders in accordance with the priority of payments specified herein.

### Secondary Market

The Broker-Dealer may assist in resales of the Certificates, but it is not required to do so. A secondary market for the Certificates may not develop. If a secondary market does develop, it might not continue or it might not be sufficiently liquid to allow resale of any of the Certificates.

Furthermore, the auction procedures and transfer requirements described herein may limit the liquidity and marketability of the Certificates and therefore may not yield an owner the best price for the Certificates.

### Buying Certificates at Auction

Bids in the Auction by Existing Holders or Potential Holders constitute irrevocable offers to buy the Certificates if certain parameters are met. If a bid is not revoked prior to the Submission Deadline and the required parameters are met, an Existing Holder will be bound to continue to hold its Certificates and a Potential Holder will be bound to purchase the Certificates notwithstanding that the Certificate Principal Balance at the time of settlement may be lower than it was when the Bid was submitted or on the Submission Deadline, as the case may be.

### Broker-Dealer Bidding in Auctions

The Broker-Dealer may submit Orders in auctions for its own account. In the Broker-Dealer Agreement, each Broker-Dealer will agree to handle customers' orders in accordance with its duties under applicable securities laws and rules. If the Broker-Dealer submits an Order for its own account in any Auction, it could have an advantage over other Potential or Existing Holders in that it would have knowledge of other Orders placed through it in that Auction. A Broker-Dealer would not, however, have specific knowledge of Orders submitted by other non-affiliated Broker-Dealers, if any. The Counterparty may prohibit all Broker-Dealers from submitting Bids in Auctions for their own accounts.

### Dependence on Counterparty

An investment in the Certificates will entail reliance upon the Counterparty to make payments in accordance with the Default Swap relating to the CLNs and the Basis Swap. Any delay or cessation in the making of such payments by the Counterparty under either swap may be expected to result in delays or reductions in payments to Holders and could in some circumstances lead to a liquidation of the Series and a loss to Holders. Thus, Holders are exposed to the credit of the Counterparty.

### Basis Swap; Termination Payments; Counterparty Priority

The Basis Swap is subject to termination under certain circumstances, in which case a Termination Payment may be payable by or to the Series. The Termination Payment will be calculated by the Counterparty based on Loss (as defined in the Basis Swap). In determining such Termination Payment, the Counterparty will take into account the losses and costs (or gains, in which case expressed as a negative number) in connection with the termination of the Basis Swap including any loss of bargain, cost of funding or, at the election of the Counterparty but, without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). If a Termination Payment is payable by the Series to the Counterparty, unless the Basis Swap has

11

been terminated because of a Default by the Counterparty, the Counterparty's right to receive such payment will be senior in right of payment to the Holders. If the Basis Swap is terminated early because of a Default by the Counterparty, any Termination Payment due to the Counterparty will be subordinated in right of payment to the Holders. In either case, if a Termination Payment is payable by the Series to the Counterparty, such payment could be substantial and, if it does not result from a Default by the Counterparty, will reduce the amount available for payment to the Holders. Payment of a Termination Payment to the Counterparty may result in a return to Holders of less than the full amount of their principal investment. However, in certain circumstances, a Termination Payment may be owing to the Series under the terms of the Basis Swap and in such event the amounts available for payment to the Holders may be increased.

## Limited Right to Enforce Series Property

The CLNs generally will be registered in the name of the Trustee on behalf of the Series, and the Basis Swap will be executed by the Counterparty and the Trustee on behalf of the Series. No Holder will have the contractual right to act directly with respect to the CLNs or the Basis Swap or to proceed directly against the CLNs Obligor or the Counterparty. Such rights are reserved to the Trustee on behalf of the Series. The Trustee will, however, pass through the voting rights on the CLNs to Holders.

No Holder will have any right to bring an action in the name of the Series except in accordance with applicable law and unless the Majority Holders of such Series join in bringing such action. See "The Series Agreement — Rights of Holders."

## Variable Interest Rate

After the initial Coupon Accrual Period, the rate at which interest will accrue on the Certificates will be reset on a periodic basis in accordance with the Auction Procedures described herein. Those Auction Procedures provide that the Applicable Rate will be reset in accordance with bids submitted through Broker-Dealers to an Auction Agent. As a result, the Applicable Rate at which interest will accrue on the Certificates will reflect the willingness of investors and potential investors in the Certificates to hold those Certificates for successive Coupon Accrual Periods. There is no assurance that the Applicable Rate will reflect yields earned by other investors on fixed income securities comparable to the Certificates.

## Failure of Auction; Maximum Applicable Rate; Minimum Applicable Rate

If no Auction is held with respect to a Coupon Accrual Period, then the Applicable Rate for such Coupon Accrual Period will be the Maximum Applicable Rate. In addition, if the aggregate principal amount of the Certificates that are the subject of Submitted Sell Orders by Existing Holders (including Submitted Bids at rates in excess of the Maximum Applicable Rate) exceeds the aggregate principal amount of Certificates that are the subject of Submitted Bids (so that there are not Sufficient Clearing Bids), then the Applicable Rate for the next succeeding Coupon Accrual Period will be equal to the Maximum Applicable Rate on the date of such Auction. In either such event, Existing Holders that have placed Sell Orders for Certificates will not be able to sell all, and may not be able to sell any, Certificates in the Auction.

If all of the Certificates with respect to any Auction are subject to Submitted Hold Orders, there will be no Available Certificates, and the Applicable Rate for the next Coupon Accrual Period will be the Minimum Applicable Rate.

**Legal Investment**

The appropriate characterization of the Certificates under various legal investment restrictions, and thus the ability of investors subject to those restrictions to purchase the Certificates, may be subject to significant interpretative uncertainties. No representation is made as to the proper characterization of the Certificates for legal investment purposes, or for risk-weighting, securities valuation, regulatory accounting or other financial institution regulatory regimes of the National Association of Insurance Commissioners, any state insurance commissioner, any federal or state banking authority or any other regulatory body. Investors should consult with their own legal advisors in determining whether, and to what extent, the Certificates will constitute legal investments for them and the consequences of such an investment.

**Counterparty as Secured Party**

The CLNs and the other property of the Series (other than the interest of the Series in the Basis Swap) will be pledged to the Counterparty as security for the obligations of the Series to the Counterparty under the Basis Swap. Although the Counterparty's rights to receive payments will be subject to the terms of the Basis Swap and the Series Agreement as described herein, such pledge will afford the Counterparty secured party status with respect to the property of the Series.

**Tax Considerations**

Prospective investors in Certificates should carefully consider the U.S. federal income tax treatment of the Certificates as described herein and are urged to consult their tax advisors regarding the U.S. federal income tax consequences of the purchase, ownership and disposition of Certificates, particularly with respect to the timing and character of income, loss or deduction associated with holding an interest in the CLNs and the Basis Swap, as described herein. See "Certain U.S. Federal Income Tax Considerations."

**Rating of the Certificates**

The Certificates will be rated by Fitch and by S&P at the request of the Series and will have such ratings as are specified in the Series Pricing Supplement. Ratings are subject to reconsideration at the rating agencies' sole discretion and may be subject to suspension, downgrade or withdrawal at any time by the relevant rating agency. Any rating issued with respect to the Certificates is not a recommendation to purchase, sell or hold a security and does not address the suitability of an investment for any particular investor. There can be no assurance that any rating will remain in effect for any given period of time.

**Limited Information**

Neither the Private Placement Memorandum nor the Series Pricing Supplement provide nor are they intended to provide any significant amount of information concerning the Reference Obligations (as defined in the Prospectus for the CLNs) and Reference Entities to which the CLNs are credit-linked, or concerning the CLNs Obligor. Each of the Initial Purchaser, the Broker-Dealer, the Auction Agent, the Counterparty and their respective affiliates may, whether by virtue of the types of relationships described above or otherwise, at the date hereof or at any time hereafter, be in possession of information in relation to the Reference Entities referenced by the Default Swap that is or may be material in the context of the Certificates and that is or may not be known to the general public. None of the Initial Purchaser, the Broker-Dealer, the Auction Agent, the Counterparty or their affiliates has any contractual obligation, and the offering of the Certificates does not create any contractual obligation on the part of any of the Initial Purchaser, the Broker-Dealer, the Auction Agent, the Counterparty or their affiliates, to disclose to the Holders any such relationship or information (whether or not confidential).

None of the Initial Purchaser, the Broker-Dealer, the Counterparty or any of their respective affiliates has any contractual obligation, and the offering of the Certificates does not create any contractual obligation on the part of any of the Initial Purchaser, the Broker-Dealer, the Counterparty or any of their affiliates, to disclose to any Holder any such relationship or information (whether or not confidential). Accordingly, each prospective purchaser of the Certificates is urged to conduct its own independent investigation of the Reference Obligations and Reference Entities to which the CLNs are credit linked, and of the CLNs Obligor and to not rely upon the Series, the Broker-Dealer, the Initial Purchaser, the Auction Agent, the Counterparty or any affiliate thereof as a source of information concerning the Reference Obligations, the Reference Entities or the CLNs Obligor.

## USE OF PROCEEDS

The Series will use the proceeds of the sale of the Certificates to acquire the CLNs.

## DESCRIPTION OF THE CERTIFICATES

*The following is a general summary of the terms and conditions of the Certificates. The summary is qualified in its entirety by reference to the Series Pricing Supplement and to the Series Agreement, copies of which are available upon request from the Broker-Dealer or the Trustee. Capitalized terms used herein and not otherwise defined in the Private Placement Memorandum have the meanings ascribed to such term in the Series Agreement unless the context otherwise requires.*

### General

Each series of Certificates offered hereby will be issued by a series of a Delaware statutory trust (the "Trust", and the Trust acting for such series, the "Series"). The Trust was formed pursuant to a Declaration of Trust and Trust Agreement (the "Declaration of Trust") among the Counterparty, the Trustee and the Delaware Trustee, dated as of August 2, 2006. It was established for the primary purpose of issuing separate series of Certificates representing undivided interests in a Series and the related Series Property (as described below), acquiring the CLNs described in the Series Pricing Supplement and entering into a Basis Swap with the Counterparty. The Certificates of a Series will be issued pursuant to a Series Agreement (the "Series Agreement") among the Counterparty, the Trustee and the Delaware Trustee, dated as of the Issue Date creating the Series that issues those Certificates. No securities other than Certificates will be issued by any Series.

The Certificates will represent undivided interests in the Series and the Series Property and will be available for purchase only in minimum denominations of U.S. $100,000 and integral multiples of U.S. $50,000 in excess thereof (collectively, the "Authorized Denominations"). Each Certificate of the same denomination will be entitled to an identical undivided interest in the Series Property. The Series Property will consist of (i) the CLNs, (ii) the rights of the Series under the Basis Swap, and (iii) any proceeds of the foregoing. Holders will not have any right in or claim to any specific part of the Series Property. No further Certificates will be issued by the Series after the Issue Date. The Certificates will be issued in book-entry form. See "— Book Entry Registration."

### Definitive Certificates

Definitive Certificates are to be issued only under the circumstances described in the last paragraph of the next section. If any Definitive Certificates are issued, they shall be issued in fully registered, certificated form directly to the Holder or a nominee thereof. Distributions of principal of, and interest on, the Definitive Certificates will be made in accordance with the procedures set forth in the Series Agreement, directly to holders of Definitive Certificates in whose names the Definitive Certificates were registered at the close of business on the applicable Record Date. See "— Payments of Principal and Interest."

Definitive Certificates will be transferable and exchangeable at the offices of the Trustee or at a registrar named in a notice delivered to Holders of Definitive Certificates. No service charge will be payable with respect to any transfer of Certificates, but the Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any such transfer.

### Book-Entry Registration

The Certificates will be issued in book-entry form and will be represented by one or more Global Certificates registered in the name of The Depository Trust Company ("DTC") or its nominee. The Trustee has been informed by DTC that DTC's nominee will be Cede & Co. Accordingly, Cede & Co. is expected to be the holder of record of the Global Certificates.

With respect to Certificates in book-entry form, all references herein to actions by Holders refer to actions taken by DTC upon instructions from its participating organizations (the "Participants") and all references herein to distributions, notices, reports, and statements to Holders refer to distributions, notices, reports, and statements to DTC or its nominee, as the registered holder of the Certificates, for distribution to Holders in accordance with DTC's procedures.

DTC is a limited purpose trust company organized under the laws of the State of New York, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York UCC and a "clearing agency" registered pursuant to Section 17A of the Exchange Act. DTC was created to hold securities for its Participants and to facilitate the clearance and settlement of securities transactions between Participants through electronic book-entries, thereby eliminating the need for physical movement of certificates. Participants include securities brokers and dealers, banks, trust companies and clearing corporations. Indirect access to the DTC system is also available to others such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Participant, either directly or indirectly (the "Indirect Participants").

Holders that are not Participants or Indirect Participants but desire to purchase, sell or otherwise transfer ownership of, or other interests in, Certificates that are Global Certificates may do so only through Participants and Indirect Participants. In addition, Holders will receive all distributions of principal and interest through DTC Participants. Under a book-entry format, Holders may experience some delay in their receipt of payments, since such payments will be forwarded by the Trustee to Cede & Co., as nominee for DTC. DTC will forward such payments to its Participants, which thereafter will forward them to Indirect Participants or Holders.

Under the rules, regulations and procedures creating and affecting DTC and its operations (the "Rules"), DTC is required to make book-entry transfers of Certificates among Participants on whose behalf DTC acts with respect to the Certificates and to receive and transmit distributions of principal of, and interest on, Certificates. Participants and Indirect Participants with which Holders have accounts with respect to the Certificates similarly are required to make book-entry transfers and receive and transmit such payments on behalf of their respective Holders. Accordingly, although Holders will not possess Certificates, the Rules provide a mechanism by which Participants will receive payments and will be able to transfer their Certificates.

Because DTC can only act on behalf of Participants, who in turn act on behalf of Indirect Participants and certain banks, the ability of a Holder to pledge Certificates to persons or entities that do not participate in the DTC system, or to otherwise act with respect to such Certificates, may be limited due to the lack of a physical certificate for such Certificates.

Except as required by law, the Trustee will not have any liability for any aspect of the records relating to or payments made on account of beneficial ownership interest of the Certificates held by DTC or its nominee, or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

Global Certificates registered in the name of DTC or its nominee will be exchangeable for Definitive Certificates only if DTC is no longer willing or able to act as a depository and the Trustee is unable to locate a qualified successor within 90 days. Upon the occurrence of such event, the Trustee shall promptly notify all Holders and DTC of such occurrence and of the exchange of Global Certificates for Definitive Certificates. Upon surrender to the Trustee of the Global Certificates by DTC, accompanied by registration instructions, the Trustee on behalf of the Series

16

shall execute and the Trustee shall authenticate the Definitive Certificates in accordance with the instructions of DTC. Neither the Series nor the Trustee shall be liable for any delay in delivery of such instructions, and the Series and the Trustee may conclusively rely on, and shall be protected in relying on, such instructions. Upon the issuance of Definitive Certificates, the Trustee shall recognize the Holders of the Definitive Certificates as Holders under the Series Agreement.

### Payments of Principal and Interest

Distributions on the Certificates will depend upon timely receipt of payments due on the CLNs and from the Counterparty under the Basis Swap. Payment of interest and principal on the Certificates will be less any applicable withholding taxes and other governmental charges.

All payments in respect of Certificates held in book-entry form through Global Certificates will be made to DTC. All payments in respect of any Definitive Certificates will be made in U.S. dollars by check mailed on or before the applicable Coupon Distribution Date for such payment to the Holder entitled thereto, or, if the Holder so elects by giving prior written notice to the Trustee, by wire transfer to an account maintained by the Holder with a bank located in the United States. The final payment on any Definitive Certificate, however, will be made only upon presentation and surrender of such Definitive Certificate at the office or agency specified in the notice of final distribution to such Holder.

### Postponement of Final Distribution

The distribution of principal of the Certificates on the Scheduled Final Distribution Date will be funded from the proceeds received by the Series from the redemption of the CLNs (the "CLNs Redemption Proceeds"). The Scheduled Final Distribution Date of the Certificates is the same as the scheduled maturity date of the CLNs. The terms of the CLNs permit the payment of some or all of the CLNs Redemption Proceeds to be delayed beyond the scheduled maturity date of the CLNs in certain circumstances as described in the Prospectus for the CLNs. In such a scenario, the Holders will not receive a USD amount equal to the Certificate Principal Balance on the Scheduled Final Distribution Date but will receive a lesser amount which will represent each Holder's pro rata share of the CLNs Redemption Proceeds. On the Final Distribution Date each Holder will receive their pro rata share of the sum of:

(1) the Interest Amount in respect of the last Coupon Accrual Period;

(2) any redemption monies received in respect of the CLNs in the period from and excluding the Scheduled Final Distribution Date to and including the Final Distribution Date that have not been previously distributed to Holders; and

(3) an amount equal to the aggregate of all daily interest amounts in respect of each day during the period from and including the Scheduled Distribution Date to but excluding the Final Distribution Date. Each such daily interest amount shall be equal to the product of:

(i) the Interest Deferral Rate (which term shall have the same meaning as in the Prospectus for the CLNs);

(ii) the sum of the Notional Principal Amount on the Final Distribution Date and the Interest Amount relating to the final Coupon Accrual Period; and

(iii) the Deferral Rate Day Count Fraction (which term shall have the same meaning as in the Prospectus for the CLNs).

### Certificate Exchange Right

The Counterparty and any of its affiliates may redeem any Certificates held for the account of the Counterparty or any such affiliate, including any Certificates purchased by the Counterparty or

its affiliates in the open market. Upon such a redemption by the Counterparty or its affiliate (i) the notional amount of the Basis Swap relating to such Certificates will be reduced proportionately based on the aggregate amount of Certificates being exchanged and (ii) the portion of the CLNs relating to the Certificates that are being redeemed will be distributed in-kind to the Counterparty or its affiliate, as applicable.

## Transfer Restrictions

The Certificates have not been and will not be registered under the Securities Act of 1933, as amended (the "Securities Act") or any state blue sky law. Purchases of Certificates may be made only in minimum denominations of U.S. $100,000 (and in integral multiples of U.S. $50,000 in excess thereof) and can be made only by Qualified Institutional Buyers.

An Existing Holder may only sell, transfer or otherwise dispose of its Certificates pursuant to a Sell Order in accordance with the Auction Procedures or to or through a Broker-Dealer. In the case of all transfers other than pursuant to Auctions, such Existing Holder's Broker-Dealer must advise the Auction Agent of such transfer. The Auction Agent is not required to give effect to any such notice for purposes of the Bidding Rights Record unless it is received by the Auction Agent by the deadline set forth in the Auction Procedures.

The purchase of Certificates by ERISA plan investors is subject to further restriction and under certain circumstances may be prohibited. Investors will be required to make certain representations regarding their status as ERISA Plans. See "Certain ERISA Considerations."

Each purchaser of Certificates (whether as an initial purchaser or transferee) will be deemed by its acceptance of its Certificates to have made certain representations and agreements regarding their Certificates as set forth herein under "Notice to Purchasers and Transferees". The Trustee shall have no duty to determine whether any purported transfer violates any federal or state securities laws or of ERISA.

Any purported transfer of an interest in a Certificate that is not made in accordance with the transfer restrictions described herein and specified in the Series Agreement shall not be binding on the Series. If at any time the Trustee determines or is notified by the Broker-Dealer that a purchaser was, at the time of its purchase of its Certificates, in breach of the deemed representations and agreements set forth in the Notice to Purchasers and Transferees, the Trustee may consider the acquisition of the Certificates by such purchaser null and void and rescinded or may require that the Certificates purchased by such purchaser be transferred to a person designated by the Trustee or the Broker-Dealer at a price determined by the Broker-Dealer based upon its estimation of the prevailing price of the Certificates and each Holder and purported Holder, by its acceptance of its Certificate authorizes the Trustee and the Broker-Dealer to take such action if warranted and understands that neither the Trustee nor the Broker-Dealer will be responsible for any losses that may be incurred as a result of any such transfer.

So long as any of the Certificates are "restricted securities" within the meaning of Rule 144(a)(3), the Series Agent, on behalf of the Series, shall furnish, upon request of a Holder, to such Holder or any prospective investor designated as such by the Holder, information, as available, that is required to be provided pursuant to Rule 144A(d)(4) under the Securities Act. To the extent the Series Agent provides such information to Holders, the Series Agent will include with such information a reminder that (1) each Holder is required to be a Qualified Institutional Buyer, (2) the Certificates may only be transferred to a Person who is a Qualified Institutional Buyer and (3) the Series has the right to compel any Holder that does not meet the transfer restrictions to transfer its Certificates to a Person designated by the Initial Purchaser, the Broker-Dealer or the Trustee.

Purchasers are advised to consult legal counsel prior to making any purchase, resale, pledge or other transfer of any of the Certificates.

## AUCTION PROCEDURES

### Interest Rate Set by Auction Procedures

The rate at which interest will accrue on the Certificates (the "Applicable Rate") for each Coupon Accrual Period will be established pursuant to the Auction Procedures described herein, except that for the first Coupon Accrual Period, the Applicable Rate will be specified in the Series Pricing Supplement. However, if an Auction is not held in respect of the Certificates for any Coupon Accrual Period, the rate at which interest will accrue on Certificates for that Coupon Accrual Period will be equal to the Maximum Applicable Rate.

### Applicable Rate

The Applicable Rate for the Certificates for any Coupon Accrual Period other than the first Coupon Accrual Period will be either the Winning Bid for such Coupon Accrual Period that the Auction Agent advises results from the implementation of the Auction Procedures, the Minimum Applicable Rate, or the Maximum Applicable Rate, as applicable. Each periodic operation of such procedures is referred to herein as an "Auction" and such procedures are collectively referred to as the "Auction Procedures."

### Auction Agent

The initial Auction Agent will be The Bank of New York (in such capacity, the "Auction Agent"). The Auction Agent and the Series will enter into an auction agency agreement dated the Issue Date (the "Auction Agency Agreement") providing, among other things, that the Auction Agent will follow the Auction Procedures for the purposes of determining the Applicable Rate for each Coupon Accrual Period. Unless otherwise terminated by the Series or the Auction Agent as described below, the Auction Agency Agreement will remain in effect for so long as there remain any outstanding Certificates.

The Auction Agent has undertaken to perform only such duties as are specifically set forth in the Auction Agency Agreement. The Auction Agency Agreement provides that, in the absence of bad faith, wilful misconduct or negligence on its part, the Auction Agent will not be liable for any action taken, suffered or omitted or for any error of judgment made by it in the performance of its duties under the Auction Agency Agreement and that the Auction Agent will not be liable for any error of judgment made in good faith unless the Auction Agent shall have been negligent in ascertaining the pertinent facts.

In addition, the Auction Agency Agreement provides that (a) the Auction Agent may conclusively rely on and will be protected in acting or refraining from acting upon any communication authorized by the Auction Agency Agreement and upon any written instruction, notice, request, direction, consent, report, certificate or other instrument, paper or document reasonably believed by it in good faith to be genuine, (b) the Auction Agent may consult with counsel, and the advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it under the Auction Agency Agreement in good faith and in reliance thereon, and (c) the Auction Agent will not be required to advance, expend or risk its own funds or otherwise incur or become exposed to financial liability in the performance of its duties under the Auction Agency Agreement, except as may be required as a result of its own negligence or bad faith.

The Series has agreed to reimburse the Auction Agent upon its request for all reasonable out-of-pocket expenses, disbursements and advances reasonably incurred or made by the Auction Agent in accordance with any provision of the Auction Agency Agreement or the Broker-Dealer Agreements (including the reasonable compensation, expenses and disbursements of its agents

and counsel), except any expense or disbursement attributable to its negligence, bad faith or wilful misconduct, up to certain agreed per annum dollar limits upon receipt of the same under the Basis Swap. In addition, the Counterparty has agreed to indemnify the Auction Agent against, and hold it harmless from, any loss, liabilities or expense incurred without negligence, bad faith or wilful misconduct on its part arising out of or in connection with the exercise or performance of any of its duties under the Auction Agency Agreement or under any Broker-Dealer Agreement, including the reasonable costs and expenses of defending itself against any claim or liability in connection with its exercise or performance of any of its duties under the Auction Agency Agreement or any Broker-Dealer Agreement and for which it is entitled to indemnification under the Auction Agent Extraordinary Expense and Indemnification Agreement between the Auction Agent and the Counterparty.

The Auction Agency Agreement will remain in effect for as long as there remain any outstanding Certificates, except that either the Series, at the direction of the Counterparty, or the Auction Agent may terminate the Auction Agency Agreement by so notifying the other party and the Counterparty, provided such termination will not be effective until the Series has entered into an agreement with a successor Auction Agent appointed by the Counterparty, containing substantially the same terms and conditions as the Auction Agency Agreement, subject to any changes with respect to which the Rating Agency Condition has been satisfied. A successor Auction Agent shall be (i) a bank, national banking association or trust company duly organized under the laws of the United States of America or any state or territory thereof having its principal place of business in the Borough of Manhattan, New York, or another location approved by the Series in writing and having a combined capital stock or surplus of at least U.S. $50,000,000, or (ii) a member of the National Association of Securities Dealers, Inc. having a capitalization of at least U.S. $50,000,000, and, in either case, authorized by law to perform all the duties imposed upon it under the Auction Agency Agreement and the Broker-Dealer Agreements. Upon the redemption of all of the Certificates, the Auction Agency Agreement will be terminated automatically without the appointment of a successor Auction Agent by the Series.

## Broker-Dealers

Existing Holders and Potential Holders of certificates must submit orders through a Broker-Dealer in order to participate in an Auction. Broker-Dealers may communicate among themselves in order to encourage bidding and to determine the level of interest in the market. Broker-Dealers may submit Orders and purchase certificates for their own account, either in an Auction or otherwise. The Counterparty may prohibit all Broker-Dealers from submitting Bids in Auctions for their own accounts.

## Trustee not Responsible for Auction Agent and Broker-Dealers

The Trustee shall not be liable or responsible for the actions of or failure to act by the Auction Agent or any Broker-Dealer under the Auction Agency Agreement or any Broker-Dealer Agreement. The Trustee may conclusively rely upon any information required to be furnished by the Auction Agent or any Broker-Dealer without undertaking any independent review or investigation of the truth or accuracy of such information.

For the purpose of allowing the Auction Agent to accurately maintain its records (the "Bidding Rights Records") of the allocable portion of the bidding rights for the Certificates held by each Broker-Dealer, each Broker-Dealer shall deliver to the Auction Agent a written notice of any transfer of the Certificates made through such Broker-Dealer by an Existing Holder to another person other than pursuant to an Auction. The Auction Agent is not required to give effect to any such notice of change of Existing Holder for purposes of the Bidding Rights Record prior to an Auction unless such notice is received by the Auction Agent by 3:00 p.m. on the Business Day immediately preceding the related Auction Date, and the Auction Agent is not permitted to accept

any such notice for purposes of the Bidding Rights Record received by the Auction Agent after 4:00 p.m. on the Business Day preceding the related Auction Date.

## Auction Dates

An Auction with respect to the Certificates will be held on the first Business Day immediately preceding each Scheduled Coupon Accrual Date following the first Scheduled Coupon Accrual Date to, but excluding, the Scheduled Final Distribution Date (each, an "Auction Date") to determine the Applicable Rate for the subsequent Coupon Accrual Period.

## Submission of Orders

The communication to a Broker-Dealer of the information described below is referred to herein as an "Order." An Existing Holder or a Potential Holder placing an Order is referred to herein as a "Bidder." The Auction Agent is entitled to rely upon the terms of any Order submitted to it by a Broker-Dealer.

Prior to the Submission Deadline for each Auction, Broker-Dealers will contact their customers by telephone or otherwise to determine whether such customers desire to submit Orders. Orders must be submitted only in applicable Authorized Denominations, notwithstanding that the Certificate Principal Balance may be less than the aggregate Authorized Denominations of the Certificates. If a notice of a Counterparty Call has been given by the Series, no Auctions will be held commencing on or after the Coupon Distribution Date such Counterparty Call is effective.

(i) Prior to 1:00 p.m., New York City time, on each Auction Date or such other time on the Auction Date specified by the Auction Agent (the "Submission Deadline"), each Broker-Dealer will submit to the Auction Agent in writing all Orders obtained by it for the Auction to be conducted on such Auction Date.

(ii) The Auction Agent will, if necessary, round any rate specified in any Bid (expressed as a percentage) that contains more than three figures to the right of the decimal point up to the next highest one-thousandth of one per cent (.001%).

Prior to the Submission Deadline for each Auction for the Certificates, Broker-Dealers will contact Existing Holders of Certificates, by telephone or otherwise, to determine whether such Existing Holders desire to place Orders. Each Existing Holder, with respect to the Certificates that it then holds, may submit to a Broker-Dealer by telephone or otherwise:

(i) a "Hold Order": indicating the aggregate principal amount of Certificates that such Existing Holder desires to continue to hold without regard to the Applicable Rate for the next Coupon Accrual Period;

(ii) a "Bid": indicating the aggregate principal amount of Certificates that such Existing Holder desires to continue to hold, provided that the Applicable Rate for the next Coupon Accrual Period is not less than the per annum interest rate specified in such Bid; or

(iii) a "Sell Order": indicating the aggregate principal amount of Certificates that such Existing Holder desires to sell without regard to the Applicable Rate for the next Coupon Accrual Period.

## Treatment of Orders

(i) A Sell Order submitted by an Existing Holder will constitute an irrevocable offer to sell the aggregate principal amount of Certificates subject to that Order, and a Bid submitted by an Existing Holder will constitute an irrevocable offer to sell the Certificates subject to that Bid if the rate specified in such Bid is higher than the Applicable Rate determined in the Auction.

Any Bid submitted by an Existing Holder specifying an interest rate higher than the Maximum Applicable Rate will be deemed to be a Sell Order.

(ii) If Orders covering all of the Certificates held by an Existing Holder are not submitted to the Auction Agent (through the Existing Holder's Broker-Dealer) prior to the Submission Deadline, whether because a Broker-Dealer failed to contact such Existing Holder or because the Broker-Dealer failed to submit the Existing Holder's Orders by the Submission Deadline, or for any other reason, the Auction Agent will deem a Hold Order to have been submitted by that Existing Holder covering the aggregate principal amount of Certificates held by that Existing Holder and not subject to any Order submitted to the Auction Agent.

(iii) An Existing Holder may submit different types of Orders in an Auction with respect to the Certificates then held by that Existing Holder.

(iv) Any Order which specifies the Certificates to be held, purchased or sold in a principal amount which is not U.S. $100,000 or an integral multiple of U.S. $50,000 in excess thereof will be rounded down to the nearest Authorized Denomination and the Auction Agent will conduct the Auction Procedures as if such Order had been submitted in such lower amount.

**Allocation of Orders**

If one or more Orders covering in the aggregate more than the total principal amount of Certificates held by Existing Holders are submitted to the Auction Agent by an Existing Holder (through the Existing Holder's Broker-Dealer), those Orders will be considered valid as follows and in the following order of priority:

(i) any Hold Order submitted on behalf of that Existing Holder will be considered valid up to and including the aggregate principal amount of Certificates held by that Existing Holder, except that if more than one Hold Order is submitted on behalf of that Existing Holder and the aggregate principal amount of Certificates subject to those Hold Orders exceeds the aggregate principal amount of Certificates held by that Existing Holder, the aggregate principal amount of Certificates subject to each such Hold Order will be reduced pro rata so that those Hold Orders will cover exactly the aggregate principal amount of Certificates held by that Existing Holder;

(ii)

    (a) any Bid submitted on behalf of that Existing Holder will be considered valid up to and including the excess of the principal amount of Certificates held by that Existing Holder over the aggregate principal amount of Certificates subject to any Hold Order referred to in clause (i) above;

    (b) subject to sub clause (a), if more than one Bid with the same interest rate is submitted on behalf of that Existing Holder and the aggregate principal amount of Certificates subject to those Bids is greater than such excess, the aggregate principal amount of Certificates subject to each such Bid will be reduced pro rata so that those Bids will cover exactly the aggregate principal amount of Certificates equal to such excess;

    (c) subject to sub clause (a), if more than one Bid with different interest rates is submitted on behalf of that Existing Holder, those Bids will be considered valid in the ascending order of their respective interest rates up to and including the amount of such excess; and

    (d) in any such event, the number, if any, of such Certificates subject to Bids not valid under sub clause (a), (b) or (c) of this clause (ii) (i.e., Bids in excess of the Certificates held by the Existing Holder) will be treated as the subject of a Bid by a Potential Holder; and

(iii) any Sell Order submitted on behalf of that Existing Holder will be considered valid up to and including the excess of the principal amount of Certificates held by that Existing Holder over the principal amount of Certificates subject to valid Hold Orders by that Existing Holder

22

referred to in clause (i) and valid Bids by such Existing Holder referred to in clause (ii), except that if more than one Sell Order is submitted on behalf of any Existing Holder and the principal amount of Certificates subject to those Sell Orders is greater than such excess, the principal amount of Certificates subject to those Sell Orders will be reduced pro rata so that those Sell Orders will cover exactly the aggregate principal amount of Certificates equal to such excess.

**Existing Holders**

An "Existing Holder" of Certificates means with respect to any Auction, any Person that participates in the Auction by submitting Orders through a Broker-Dealer, to the extent such Orders relate to Certificates of which such Person is the beneficial owner.

**Potential Holders**

A "Potential Holder" means, with respect to any Auction, any Person that participates in the Auction by submitting Orders through a Broker-Dealer, to the extent such Orders are Bids that do not relate to Certificates of which such Person is the beneficial owner. When used with respect to a Potential Holder, "Bid" means an Order indicating the aggregate principal amount of Certificates that the Potential Holder offers to purchase if the Applicable Rate for the next Coupon Accrual Period is not less than the per annum interest rate specified in such Bid. A Bid submitted by a Potential Holder will constitute an irrevocable offer to purchase the aggregate principal amount of Certificates subject to that Bid if the rate specified in the Bid is less than or equal to the Applicable Rate determined in the Auction. An Existing Holder who submits a Bid for Certificates in excess of the aggregate principal amount of Certificates then held by that Existing Holder will be treated as a Potential Holder to the extent of such excess. Any Bid submitted by a Potential Holder specifying an interest rate higher than the Maximum Applicable Rate will be rejected. If more than one Bid is submitted on behalf of any Potential Holder, each Bid submitted will be deemed a separate Bid with the rate for the aggregate principal amount of Certificates specified therein.

**Sufficient Clearing Bids**

Not earlier than the Submission Deadline on each Auction Date, the Auction Agent will assemble all Orders submitted or deemed submitted to it by the Broker-Dealers (each Hold Order, Bid or Sell Order as submitted or deemed submitted by a Broker-Dealer being referred to herein as a "Submitted Hold Order," a "Submitted Bid" or a "Submitted Sell Order," as the case may be, or as a "Submitted Order") and will determine the excess, if any, of the aggregate principal amount of Certificates over the aggregate principal amount of Certificates subject to Submitted Hold Orders (such excess called the "Available Certificates").

(i)    If all of the Certificates are subject to Submitted Hold Orders, there will be no Available Certificates, and the Applicable Rate for the next Coupon Accrual Period for the Certificates will be the Minimum Applicable Rate.

(ii)   If there are Available Certificates, the Auction Agent will determine whether Sufficient Clearing Bids exist in the Auction. "Sufficient Clearing Bids" exist if the aggregate principal amount of Certificates that are the subject of Submitted Bids by Potential Holders (including Existing Holders who have submitted Bids to purchase additional Certificates) specifying interest rates not higher than the Maximum Applicable Rate equals or exceeds the aggregate principal amount of Certificates that are the subject of Submitted Sell Orders (including the aggregate principal amount of Certificates subject to Submitted Bids by Existing Holders specifying per annum interest rates higher than the Maximum Applicable Rate).

(iii)  If Sufficient Clearing Bids exist, the Auction Agent will determine the lowest interest rate specified in the Submitted Bids of Existing Holders and Potential Holders (the "Winning Bid") that would result in Existing Holders' continuing to hold (pursuant to Submitted Bids) and

Potential Holders' (including Existing Holders who have placed Bids to purchase additional Certificates) purchasing an aggregate principal amount of Certificates bearing interest at the Winning Bid at least equal to the aggregate principal amount of Available Certificates. If Sufficient Clearing Bids exist, the Applicable Rate for the next succeeding Coupon Accrual Period for all Certificates then outstanding will be the Winning Bid.

(iv) If Sufficient Clearing Bids have not been made in an Auction, the Applicable Rate for the next succeeding Coupon Accrual Period will be equal to the Maximum Applicable Rate on the date of such Auction. In that event, Existing Holders that have placed Sell Orders for Certificates will not be able to sell all, and may not be able to sell any, Certificates in the Auction.

(v) The "Maximum Applicable Rate" with respect to the Certificates for any Coupon Accrual Period will be specified in the Series Pricing Supplement.

(vi) The "Minimum Applicable Rate" with respect to the Certificates for a Coupon Accrual Period will be specified in the Series Pricing Supplement.

## Acceptance or Rejection of Bids and Orders

Based on the determinations made as described above, Submitted Bids and Submitted Sell Orders will be accepted or rejected by the Auction Agent with the result that Existing Holders and Potential Holders of Certificates will sell, continue to hold and/or purchase Certificates as described below and in such order of priority, Existing Holders that placed or were deemed to have placed Hold Orders will continue to hold Certificates subject to such Hold Orders. If Sufficient Clearing Bids exist, Submitted Orders will be accepted or rejected as follows in the following order of priority:

(i) each Existing Holder that placed a Submitted Bid specifying a per annum interest rate higher than the Winning Bid or a Submitted Sell Order will sell the aggregate principal amount of Certificates subject to such Submitted Bid or Submitted Sell Order;

(ii) each Existing Holder that placed a Submitted Bid specifying an interest rate lower than the Winning Bid will continue to hold the aggregate principal amount of Certificates subject to such Submitted Bid;

(iii) each Potential Holder that placed a Submitted Bid specifying an interest rate lower than the Winning Bid will purchase the aggregate principal amount of Certificates subject to such Submitted Bid;

(iv) each Existing Holder that placed a Submitted Bid specifying an interest rate equal to the Winning Bid will continue to hold the aggregate principal amount of Certificates subject to such Submitted Bid, unless the aggregate principal amount of Available Certificates not previously accounted for in clauses (ii) and (iii) above is less than the aggregate amount of Certificates subject to such Submitted Bids, in which event each Existing Holder with such a Submitted Bid will sell a portion of the Certificates held by such Holder, in an amount to be determined on a pro rata basis based on the aggregate principal amount of Certificates subject to all such Submitted Bids by such Existing Holders;

(v) each Potential Holder that placed a Submitted Bid specifying an interest rate equal to the Winning Bid will purchase any Available Certificates not accounted for in clause (ii), (iii) or (iv) above on a pro rata basis based on the aggregate principal amount of Certificates subject to all such Submitted Bids by such Potential Holders; and

(vi) the Submitted Bid of each Potential Holder specifying any rate that is higher than the Winning Bid will be rejected.

In the event that Sufficient Clearing Bids have not been made, Submitted Orders will be accepted or rejected as follows in the following order of priority:

24

(i) each Existing Holder that placed a Submitted Bid specifying an interest rate equal to or lower than the Maximum Applicable Rate will continue to hold the aggregate principal amount of Certificates subject to such Submitted Bid;

(ii) each Potential Holder that placed a Submitted Bid specifying an interest rate equal to or lower than the Maximum Applicable Rate will purchase the aggregate principal amount of Certificates subject to each Submitted Bid;

(iii) each Existing Holder that placed a Submitted Sell Order (including a Submitted Bid specifying a rate in excess of the Maximum Applicable Rate) will sell a portion of Certificates held by such holder, in an amount to be determined on a pro rata basis based on the aggregate principal amount of Certificates as are needed to be purchased as described in clause (ii) above; and

(iv) the Submitted Bid of each Potential Holder specifying any rate that is higher than the Maximum Applicable Rate will be rejected.

Certificates will be purchased and sold for a price equal to a pro rata portion of the Certificate Principal Balance on the Auction Date notwithstanding the fact that Orders were submitted based upon Authorized Denominations.

If, as a result of the procedures described above, any Existing Holder or Potential Holder would be required to purchase or sell an amount of the Certificates which is not an Authorized Denomination on any Auction Date, the Auction Agent will by lot, in such manner as it will determine in its sole discretion, round up or down the principal amount of the Certificates to be purchased or sold by any Existing Holder or Potential Holder on such Auction Date so that the amount of the Certificates purchased or sold by each Existing Holder or Potential Holder on such Auction Date will be an Authorized Denomination, even if such allocation results in one or more of such Existing Holders or Potential Holders not purchasing or selling any Certificates on such Auction Date.

### Fees to the Auction Agent and Broker-Dealer(s)

The Auction Agent will be paid the Auction Agent Fee by the Series following receipt of the same under the Basis Swap.

The Broker-Dealer will be paid the Broker-Dealer Fee by the Series following receipt of the same under the Basis Swap.

### Auction Schedule

Prior to the Final Distribution Date, the Auction Agent will conduct an Auction on each Auction Date in accordance with the schedule set forth below. If an Auction is not held as required under the Auction Procedures for any reason, the Applicable Rate for the immediately following Coupon Accrual Period will be the Maximum Applicable Rate.

The Auction Agent will conduct Auctions in accordance with the schedule set forth below. Changes that have no material adverse effect on beneficial owners, such judgment to be made by the Counterparty in its sole and absolute discretion, may be made to such schedule by the Auction Agent or any Broker-Dealer with the prior consent of the Trustee, each other Broker-Dealer, the Series Agent and the Counterparty, which consent shall not be unreasonably withheld or delayed and which consent shall promptly be confirmed in writing. Any Broker-Dealer requesting any such change will give written notice to any such change to the Auction Agent, and the Auction Agent will give written notice of any such change to each Broker-Dealer prior to the close of business on the Business Day immediately preceding the first Auction Date on which any such change shall be effective.

25

| Time | Event |
|------|-------|
| Between 9:30 a.m. and 1:00 p.m. | The Auction Agent will assemble information on each Submitted Order communicated to it by Broker-Dealers. The Submission Deadline will be 1:00 p.m. unless otherwise specified by the Auction Agent as provided above. |
| Not earlier than 1:00 p.m. | The Auction Agent will determine the aggregate principal amount of Available Certificates. If there are Available Certificates, the Auction Agent will then determine whether Sufficient Clearing Bids exist and then Submitted Orders will be accepted and rejected and the Certificates will be allocated pursuant to the Auction Procedures. Without limiting the generality of the foregoing, the Auction Agent will follow the Auction Procedures to ensure that the Certificates are only held in Authorized Denominations. |
| Not later than 4:00 p.m. | The Auction Agent will advise the Broker-Dealer, the Trustee and the Counterparty of the results of the Auction as determined pursuant to the Auction Procedures. |

In the event that the Auction Date for any Auction will be changed, the Auction Agent, by such means as the Auction Agent deems practicable, will give notice of such change to the Trustee, the Series Agent and each Broker-Dealer not later than the earlier of 9:15 a.m. on the new Auction Date and 9:15 a.m. on the old Auction Date. Thereafter, each Broker-Dealer will promptly notify its customers of such change in the Auction Date.

The Auction Agent will follow The Bond Market Association's Market Practice U.S. Holiday Recommendations for shortened trading days for bond markets (the "BMA Recommendation") unless the Auction Agent is instructed otherwise by the Trustee. In the event of a BMA Recommendation on an Auction Date, the Submission Deadline will be 11:30 a.m. instead of 1:00 p.m. and as a result the notice of Auction results will occur at an earlier time.

## Settlement Procedures

On each Auction Date not later than 4:00 p.m., the Auction Agent shall notify the Broker-Dealers, the Trustee and the Counterparty of:

(i)     the Applicable Rate fixed for the next succeeding Coupon Accrual Period (which, if such Applicable Rate is the Minimum Applicable Rate shall constitute notice to such persons that all of the Certificates were subject to Submitted Hold Orders);

(ii)    whether Sufficient Clearing Bids existed for the determination of the Winning Bid, if any, in respect of such Applicable Rate;

(iii)   the scheduled Auction Date of the next succeeding Auction;

(iv)    the Broker-Dealer Fees for each Broker-Dealer for the next succeeding Coupon Accrual Period;

(v)     the Auction Agent Fees for the next succeeding Coupon Accrual Period; and

(vi)    the Trustee Fees for the next succeeding Coupon Accrual Period.

In the event that the Auction Agent fails to calculate or, for any reason fails to provide the Applicable Rate for any Coupon Accrual Period, the Applicable Rate for the Coupon Accrual

Period will be the same as the Applicable Rate for the preceding Coupon Accrual Period unless no Auction has been held, in which case the Applicable Rate will be the Maximum Applicable Rate.

On each Auction Date not later than 4:00 p.m., the Auction Agent shall also notify the Broker-Dealers that participated in the Auction held on such Auction Date in respect of such Certificates and submitted an Order on behalf of any Existing Holder or Potential Holder of the following information in respect of such Certificates:

(i) if such Broker-Dealer submitted a Bid or a Sell Order on behalf of an Existing Holder, whether such Bid or Sell Order was accepted or rejected, in whole or in part, and the principal amount of the Certificates, if any, to be sold by such Existing Holder;

(ii) if such Broker-Dealer submitted a Bid on behalf of a Potential Holder, whether such Bid was accepted or rejected, in whole or in part, and the principal amount of the Certificates, if any, to be purchased by such Potential Holder; and

(iii) if the aggregate principal amount of the Certificates to be sold by all Existing Holders on whose behalf such Broker-Dealer submitted Bids or Sell Orders is different from the aggregate principal amount of the Certificates to be purchased by all Potential Holders on whose behalf such Broker-Dealer submitted a Bid, the name or names of one or more other Broker-Dealers (and the member of, or participant in, DTC, if any, of each such other Broker-Dealer) and the principal amount of the Certificates to be (x) purchased from one or more Existing Holders on whose behalf such other Broker-Dealers submitted Bids or Sell Orders, or (y) sold to one or more Potential Holders on whose behalf such other Broker-Dealers submitted bids.

On each Auction Date, each Broker-Dealer that submitted an Order on behalf of any Existing Holder or Potential Holder shall:

(i) advise each Existing Holder and Potential Holder on whose behalf such Broker-Dealer submitted a Bid or Sell Order whether such Bid or Sell Order was accepted or rejected, in whole or in part;

(ii) advise each Existing Holder on whose behalf such Broker-Dealer submitted an Order and each Potential Holder on whose behalf such Broker-Dealer submitted a Bid of the Applicable Rate for the next Coupon Accrual Period;

(iii) advise each Existing Holder on whose behalf such Broker-Dealer submitted an Order of the scheduled Auction Date of the next succeeding Auction; and

(iv) advise each Potential Holder on whose behalf such Broker-Dealer submitted a Bid that was accepted, in whole or in part, of the scheduled Auction Date of the next succeeding Auction.

In accordance with DTC's normal procedures, on the Business Day after the Auction Date, the transactions described above will be executed through DTC, so long as DTC is the depository, and the accounts of the respective Participants at DTC will be debited and credited and the Certificates delivered as necessary to effect the purchases and sales of the Certificates as determined in the Auction. Purchasers are required to make payment through their Participants in same-day funds to DTC against delivery through their Participants. DTC will make payment in accordance with its normal procedures, which now provide for payment against delivery by its Participants in immediately available funds. If any Existing Holder selling Certificates in an Auction fails to deliver such Certificates, the Broker-Dealer may deliver to any person that was to have purchased Certificates in such Auction a principal amount of Certificates that is less than the principal amount of Certificates that otherwise was to be purchased by such person but in any event in an applicable permitted denomination or any integral multiple thereof as specified herein. In such event, the principal amount of Certificates to be delivered will be determined by the Broker-Dealer. Delivery of such lesser principal amount of Certificates will constitute good delivery. Neither the Trustee nor the Auction Agent will have any responsibility or liability with respect to the failure of a Potential

Holder, Existing Holder or the Broker-Dealer or Participant to deliver the principal amount of Certificates or to pay for the Certificates purchased or sold pursuant to an Auction or otherwise. Any delivery or non-delivery of Certificates that represents any departure from the results of an Auction, as determined by the Auction Agent, shall be of no effect for purposes of the Bidding Rights Records unless and until the Auction Agent shall have been notified of such delivery or non-delivery.

## THE TRUST

The Trust was established under the laws of the State of Delaware pursuant to the terms of the Declaration of Trust.

The Trust was established for the primary purpose of creating separate Series. Each Series will be administered by the Trustee pursuant to the terms of a Series Agreement. Each Series will issue a separate series of Certificates, acquire the CLNs and enter into a Basis Swap. Each Series will not purchase or otherwise acquire any additional securities after the Issue Date and will not dispose of or create any lien on the CLNs, except as described herein.

No Holder shall be entitled to revoke or seek revocation of the Trust or the Series.

## THE SERIES AGREEMENT

Pursuant to the terms of the Series Agreement for each series of Certificates, The Bank of New York, as Trustee, will administer the Series and hold the Series Property for each Series in a segregated account. The Series will hold an ownership interest in the CLNs on behalf of the Holders.

The Trustee's fees and ordinary expenses (up to certain agreed per annum dollar limits) will be paid by the Series using monies received from the Counterparty under the Basis Swap.

An extraordinary expense and indemnity agreement (the "Trustee Extraordinary Expense and Indemnity Agreement") between the Trustee and the Counterparty, provides for indemnification of the Trustee by the Counterparty, and exculpates the Trustee for acts or omissions in respect of each Series except for the Trustee's own bad faith, wilful misconduct or negligence. The Trustee will not be obligated to take or pursue any action on behalf of the Series unless the Trustee is satisfied that it has adequate indemnification for such action and any related expenses. The Trustee may from time to time delegate certain of its responsibilities to third parties in good faith and in accordance with the terms of the Series Agreement. The Trustee will also maintain the register for the Certificates issued by the Series. The Trustee will be reimbursed for Extraordinary Expenses by the Counterparty subject to the terms of a fee schedule which will be appended to the Trustee Extraordinary Expense and Indemnity Agreement.

The Trustee's liability in connection with the issuance and sale of Certificates is limited solely to the express obligations of the Trustee as set forth in the Series Agreement. The source of payments on the Certificates will be payments by the Counterparty under the Basis Swap. Neither the Certificates nor the CLNs will represent an interest in or obligation of, or be guaranteed or insured by, the Trustee in its individual capacity. There will be no recourse to the Trustee in its individual capacity or any other entity if the proceeds of, or payments received in respect of, the CLNs and payments by the Counterparty are insufficient or otherwise unavailable to make all payments provided for under the Certificates issued by the Series.

The Trustee shall have no responsibility for the accuracy of any information provided to the Holders or any other person that has been obtained from, or provided to the Trustee by, the Counterparty or any of its Affiliates in any capacity.

The Bank of New York (Delaware), a Delaware banking corporation, will act as Delaware Trustee (the "Delaware Trustee") and will assume certain responsibilities for executing and delivering documents necessary for the maintenance of the Trust and each Series in Delaware. The Delaware Trustee will be entitled to all the benefits and protection to which the Trustee is entitled.

## The Series Agent

The Series will enter into an agreement (the "Series Agency Agreement") with Deutsche Bank Securities Inc., which will serve as an agent of the Series (the "Series Agent"), and, in that capacity will, among other things, on behalf of the Series, sell the CLNs in accordance with the Sale Procedures if and when required. The Series Agent will determine any tax or governmental charges that may be due in connection with any transfer or exchange of Certificates. The Series Agent may be removed by the Trustee upon 30 days' prior written notice and may resign upon 60 days' prior written notice to the Trustee. If the Series Agent provides notice of resignation or the Trustee provides notice of termination of the Series Agency Agreement, the Series Agent will continue to perform its services under the Series Agency Agreement until a replacement Series Agent has been appointed by the Counterparty.

## The Broker-Dealer

The Auction Agent will enter into broker-dealer agreements with persons acting as Broker-Dealers. The initial Broker-Dealer will be Deutsche Bank Securities Inc., although the Counterparty may appoint additional Broker-Dealers by instructing the Auction Agent to enter into a broker-dealer agreement with each such Broker-Dealer. The Broker-Dealer will submit Orders on behalf of Existing Holders and Potential Holders. The broker-dealer will notify the Auction Agent of any transfer of the Certificates made through such Broker-Dealer by an Existing Holder to another person other than pursuant to an Auction. The Series will pay to the Broker-Dealer the fees owed to the Broker-Dealer from monies received by the Series from the Counterparty under the Basis Swap.

Each of the Auction Agent (if directed by the Counterparty) and the relevant Broker-Dealer may terminate a Broker-Dealer Agreement at any time on five Business Days' notice to the other party. Each Broker-Dealer Agreement will terminate upon the termination of the Auction Agency Agreement (provided that the Series is not entering into a replacement Auction Agency Agreement).

## No Temporary Investment of Funds

The dates on which a Series is scheduled to make payments will coincide with the dates of expected receipt of the amounts that are to be applied to make such payments and accordingly there generally will not be any amounts in a Series to invest. If, however, a Series receives any amounts in advance of the date on which such amounts are to be distributed by the Trustee, such amounts will be held uninvested.

## Expenses

The Counterparty will be obligated under the Basis Swap to make payments equal in amount to the costs of establishing the Trust and each Series and to the fees and the ordinary and customary expenses of the Trustee and the Auction Agent, up to certain agreed per annum dollar limits (the "Trustee Ordinary Expenses" and "Auction Agent Ordinary Expenses" respectively) and

the fees of the Broker-Dealers. All other liabilities and expenses of the Series that may at any time be incurred by the Series will be paid out of Series Property prior to any distributions to the Holders. Under the Series Agreement the Trustee has agreed that it will use reasonable efforts not to take any action that, in the Trustee's opinion, would cause the Trust, the Series or the Trustee to incur costs, expenses or liabilities that are not Trustee Ordinary Expenses (any such "Extraordinary Expenses") and that it will promptly notify the Counterparty, each Rating Agency and the Holders if it anticipates that the Series will be required to incur any such Extraordinary Expenses. Unless within five Business Days of receipt of any such notice from the Trustee (or such longer period of time as agreed to by the Majority Holders or the Counterparty), the Trustee receives assurances from all Holders, satisfactory to the Trustee, that all Holders will reimburse the Trustee for any such Extraordinary Expenses or unless the Counterparty, in its sole discretion, has agreed to pay such Extraordinary Expenses on behalf of the Series, the Trustee shall cause the liquidation of the Series (such event, an "Expense Liquidation Event"). The Holders will be automatically liable, to the extent of their proportionate interests in the Series Property, for any Extraordinary Expenses incurred by the Series prior to or in connection with such liquidation except for any amounts for which the Counterparty or a Holder has agreed to be liable. Payment of any Extraordinary Expenses will reduce amounts available for distribution to the Holders. The Series Agreement provides that the Trustee shall not be liable for its failure to anticipate incurring Extraordinary Expenses as long as the Trustee acts in good faith based upon the facts reasonably available to it at the time of its determination.

## Liquidation of a Series

A Series will be liquidated (i) upon a determination by the Trustee that it has received all amounts due to the Series in respect of the Series Property and has distributed the proceeds of the Series Property in accordance with the terms of the Series Agreement; (ii) if the Certificate Principal Balance is reduced to zero; (iii) upon the occurrence of a CLNs Event; (iv) upon the occurrence of an Expense Liquidation Event; (v) at the direction of the Counterparty or Holders whose Certificates represent at least two-thirds of the principal amount of the Certificates, upon a determination by the Trustee that there is a material risk that (A) the Trust or the Series is subject to regulation as an "investment company" under the 1940 Act, (B) the Trust or the Series is, or will be, subject to any material tax on its income, (C) the purchase or holding of any Certificates constitutes a prohibited transaction within the meaning of ERISA for which no exemption from the prohibited transaction provisions of ERISA is available, (D) payments due to the Series in respect of the CLNs are or will be subject to withholding tax or (E) on any Coupon Distribution Date the Series is required to withhold tax on any distribution on the Certificates (except that the occurrences in clauses (D) and (E) above shall only cause the liquidation of the Series if the Trustee, the Counterparty or other appropriate Person has received any forms, documents or certificates that are required to avoid withholding on payments in respect of the CLNs or Basis Swap or on distributions on the Certificates) (the occurrence of an event specified in this clause (v), a "Series Regulatory/Tax Liquidation Event"); (vi) upon the early redemption of the CLNs in whole but not in part, or (vii) upon the termination of the Basis Swap other than as a result of an event described in (i) through (vi) above. Items (i) through (vii) above being, in each case, a "Series Liquidation Event."

"CLNs Event" means, any event or circumstance that constitutes an "Event of Default" pursuant to the Prospectus for the CLNs and which has not been cured or waived to the satisfaction of the trustee of the CLNs.

In connection with a liquidation of the Series, the Trustee will first pay any amounts due to the Counterparty (including in respect of any Termination Payment, unless the Basis Swap has been terminated because of a Default by the Counterparty) and will pay or make provision for the payment of any Extraordinary Expenses incurred by the Series. The Trustee will then distribute to the Holders the proceeds of the remaining Series Property. Notwithstanding the foregoing, if the Series is liquidated in connection with a Default by the Counterparty, any Termination Payments

and other amounts due to the Counterparty will be paid after payment (in the following order) of (i) all Extraordinary Expenses of the Series, (ii) any payments due to the Counterparty under the Basis Swap (other than any Termination Payment) and (iii) all amounts due on the Certificates to the Holders.

If upon payment in full by the Series of all obligations and liabilities of the Series and the remaining Certificate Principal Balance and accrued interest thereon, any Series Property remains in the Series, then all such remaining property shall be liquidated and its proceeds distributed to the Holders.

### Resignation and Replacement of the Trustee

The Series Agreement provides that Holders of a Series may not remove the Trustee. The Trustee may resign its duties with respect to a Series upon 90 days' written notice to the Series Agent and the Counterparty, and the Counterparty may relieve the Trustee of its duties with respect to the Series at any time and appoint a successor Trustee to act on behalf of the Series. Such resignation or removal will not take effect until a successor trustee is appointed by the Counterparty and has assumed the duties of trustee with respect to the Series as set forth in the Series Agreement. Any successor Trustee must be a bank or trust company having combined capital and surplus of at least U.S. $100,000,000 and must be approved by Fitch and S&P.

A resigning Trustee will continue, following appointment of any successor, to have the benefit of all indemnities, power and privileges and rights of recourse against the property of the Series conferred upon such Trustee with respect to the Series pursuant to the Series Agreement or applicable law in respect of the period during which such Trustee acted as Trustee with respect to the Series.

### Amendment of the Series Agreement

Without the approval of the Holders, the Trustee may amend the Declaration of Trust and any Series Agreement in such manner and to such extent as each may consider expedient (i) to cure any ambiguity or correct or supplement any provision of the Declaration of Trust and any Series Agreement that may be defective or inconsistent with any other provision thereof; (ii) to modify the restrictions on and procedures for resales and other transfers of the Certificates to reflect any change in applicable law or regulation (or the interpretation thereof) or in practices relating to the resale or transfer of restricted securities generally or to enable a Series to rely upon any exemption from registration under the Securities Act that may become available (and to remove existing restrictions to the extent not required under such exemption); (iii) to modify, eliminate or add to any of its provisions to such extent as shall be necessary or helpful to avoid or minimize the risk of the imposition of any tax on a Series that would be a claim against the Series Property; or (iv) to add, change or eliminate any other provision of the Series Agreement provided either (A) that such addition, change or elimination does not, as confirmed by an opinion of counsel to each affected Series of the Trust, adversely affect in any material respect the interests of the Holders or (B) Holders whose Certificates represent at least two-thirds in principal amount of the Certificates of a Series consent to such addition, change or elimination with respect to such Series. No amendment of the Declaration of Trust or any Series Agreement will be effective without the consent of all Holders unless the Rating Agency Condition has been satisfied. The Rating Agency Condition is a condition that is satisfied if each of Fitch and S&P has confirmed in writing that such amendment will not cause a downgrade or withdrawal of its rating of the Certificates of any Series. The Trustee shall not be obligated to consent to any amendment that would adversely affect its rights, duties, liabilities or immunities (the "Rating Agency Condition").

The Series Agreement will provide that unless the Counterparty is in Default under the Basis Swap or the Basis Swap has been terminated, no amendment shall become effective unless the Counterparty consents to the amendment. The Basis Swap provides that the Counterparty will so

consent unless, in its sole discretion, it concludes that the amendment would adversely affect its rights under the Basis Swap.

### Amendment of Other Documents

The Trustee and the Delaware Trustee shall, at the request of the Counterparty, consent to any amendment, waiver or substitution of the Basis Swap or any other agreement entered into in connection with the issuance of the Certificates with respect to which the Trustee and/or the Delaware Trustee has the right of such consent, unless such amendment, waiver or substitution will adversely affect in a material respect the interests of the Holders. The Trustee may conclusively presume that such amendment, waiver or substitution will not adversely affect in any material respect the interests of the Holders if the Trustee receives an opinion of counsel to that effect, or if Holders whose Certificates represent at least two-thirds in principal amount of each affected Series of the Certificates consent to such amendment. Notwithstanding the foregoing, no such amendment, waiver or substitution will be permitted without the consent of all Holders unless the Rating Agency Condition has been satisfied.

### Rights of Holders

The terms and conditions of the Declaration of Trust and each Series Agreement shall inure to the benefit of, and be binding on, all Holders as if each Holder had been a party to and had executed the Declaration of Trust and such Series Agreement, and as if each Holder had covenanted to observe and be bound by all the provisions of the Declaration of Trust and such Series Agreement and had thereby authorized the Trustee on behalf of the Series to do all such acts and things as the Series Agreement may or shall require the Trustee on behalf of the Series to do or that the Trustee on behalf of the Series shall do in accordance with the provisions thereof.

No Holder will have the contractual right to act directly with respect to the CLNs or the Basis Swap or to proceed directly against the CLNs Obligor or the Counterparty. Such rights are reserved to the Trustee. The Trustee, as holder of the CLNs, has the right to vote and give consent and waivers in respect of the CLNs, except as limited herein or in the Series Pricing Supplement. In the event that the Trustee receives a request from the trustee of the CLNs for its consent to any amendment, modification or waiver of the CLNs, their documentation or any other document relating thereto, or receives any other solicitation for any action with respect to the CLNs, the Trustee shall notify each Holder of record on such date of such proposed amendment, modification, waiver or solicitation to each Holder of record on such date. The Trustee shall request instructions from the Holders as to whether or not to consent to or to vote to accept such amendment, modification, waiver or solicitation. The Trustee shall consent or vote, or refrain from consenting or voting, in the same proportion as each Holder actually voted as of a date determined by the Trustee prior to the date on which such consent or vote is required. Notwithstanding anything to the contrary, the Trustee shall at no time vote or consent to any matter (i) unless such vote or consent would not (based on the opinion of counsel) alter the tax status of the Series or (ii) that would alter the timing or amount of any payment on the CLNs. The Trustee shall have no liability for any failure to act as a result of a Holder's late return of directions, or failure to return directions, requested by the Trustee from the Holders.

All notices received by the Trustee as holder of the CLNs that relate to the occurrence of a credit event under the Default Swap will be promptly sent to the Holders or record on such date.

No Holder will have any right to bring an action in the name of a Series except in accordance with applicable law and unless the Majority Holders of such Series join in bringing such action.

**Non-Petition**

Under the Declaration of Trust and each Series Agreement each of the Trustee, the Delaware Trustee, and each Holder, under the Basis Swap, the Counterparty, under each Broker-Dealer Agreement, each Broker-Dealer, under the Series Agency Agreement, the Series Agent and under the Auction Agency Agreement, the Auction Agent, will agree that prior to one year and one day after the termination of the related Series Agreement, it will not commence or sustain an action against the Trustee or the Series under any federal or state bankruptcy, insolvency or similar law, or appoint a receiver or other similar official of the Series, make an assignment for the benefit of creditors, or order the winding up or liquidation of the Series.

**Governing Law**

The Certificates, the Declaration of Trust and each Series Agreement will be governed by the laws of the State of Delaware. The remaining transaction documents will be governed by the laws of the State of New York.

## THE BASIS SWAP

### General

The following summary, as well as other information included herein and in the Series Pricing Supplement, describes the material terms of the Basis Swap but does not purport to be complete and is subject to, and is qualified in its entirety by reference to, all of the provisions of the Basis Swap, copies of which are available from the Broker-Dealer or the Trustee. The Holders will not be parties to and will have no right to enforce the Basis Swap.

The Basis Swap will be subject to the 1992 ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Master Agreement") published by the International Swaps and Derivatives Association, Inc. ("ISDA") and will incorporate any relevant standard definitions published by ISDA (collectively, the "ISDA Definitions"), except as otherwise expressly set forth therein.

### The Counterparty

The Counterparty will be Deutsche Bank AG, acting through its London branch ("Deutsche Bank AG London"). The Counterparty is an affiliate of Deutsche Bank Securities Inc.

Deutsche Bank Aktiengesellschaft ("Deutsche Bank") originated from the reunification of Norddeutsche Bank Aktiengesellschaft, Hamburg, Rheinisch-Westfälische Bank Aktiengesellschaft, Duesseldorf and Süddeutsche Bank Aktiengesellschaft, Munich; pursuant to the Law on the Regional Scope of Credit Institutions, these had been disincorporated in 1952 from Deutsche Bank which was founded in 1870. The merger and the name were entered in the Commercial Register of the District Court Frankfurt am Main on May 2 1957. Deutsche Bank is a banking institution and a stock corporation incorporated under the laws of Germany under registration number HRB 30 000. Deutsche Bank has its registered office in Frankfurt am Main, Germany. It maintains its head office at Taunusanlage 12, 60325 Frankfurt am Main and branch offices in Germany and abroad including in London, New York, Sydney, Tokyo and an Asia-Pacific Head Office in Singapore which serve as hubs for its operations in the respective regions.

Deutsche Bank is the parent company of a group consisting of banks, capital market companies, fund management companies, a real estate finance company, instalment financing companies, research and consultancy companies and other domestic and foreign companies (the "Deutsche Bank Group").

Deutsche Bank AG London is the London branch of Deutsche Bank AG. On January 12 1973, Deutsche Bank AG filed in the United Kingdom the documents required pursuant to Section 407 of the Companies Act 1948 to establish a place of business within Great Britain. On January 14 1993, Deutsche Bank registered under Schedule 21A to the Companies Act 1985 as having established a branch (Registration No. BR000005) in England and Wales. Deutsche Bank AG London is an authorized person for the purposes of Section 19 of the Financial Services and Markets Act 2000. In the United Kingdom, it conducts wholesale banking business and through its Private Wealth Management division, it provides holistic wealth management advice and integrated financial solutions for wealthy individuals, their families and selected institutions.

As of March 31 2006, Deutsche Bank's issued share capital amounted to Euro 1,325,118,960.64 consisting of 517,624,594 ordinary shares of no par value. The shares are fully paid up and in registered form. The shares are listed for trading and official quotation on all the German Stock Exchanges. They are also listed on the Stock Exchanges in Amsterdam, Brussels, London, Luxembourg, New York, Paris, Tokyo, Vienna and Zurich. The Management Board has decided to pursue delisting on certain stock exchanges other than Germany and New York in order to benefit from the integration of financial markets.

As of March 31 2006, Deutsche Bank Group had total assets of EUR 1,034,520 million, total liabilities of EUR 1,003,759 million and total shareholders' equity of EUR 30,761 million on the basis of United States Generally Accepted Accounting Principles ("U.S. GAAP").

Deutsche Bank's long-term senior debt has been assigned a rating of AA- (outlook stable) by Standard & Poor's, Aa3 (outlook stable) by Moody's Investors Services and AA- (outlook stable) by Fitch Ratings.

You can find additional information regarding Deutsche Bank at its website: www.db.com.

Deutsche Bank will provide without charge to each person to whom this Private Placement Memorandum is delivered, upon the written or oral request of such person, a copy of the most recent Annual Report of Deutsche Bank that contains the consolidated statements of Deutsche Bank, and the most recent Interim Report of Deutsche Bank showing unaudited figures. The Interim Reports of Deutsche Bank that are made available are for purposes of information only. Written requests should be directed to: Deutsche Bank AG New York Branch, 60 Wall Street, New York, NY 10005, Attention: Management.

### Transfer of the Basis Swap

The Basis Swap will permit the Counterparty to transfer all its rights and obligations thereunder to any of its direct or indirect subsidiaries or affiliates or to any branch of the Counterparty, provided that (i) such transfer does not result in a downgrade or withdrawal of the then current rating of the Certificates by Fitch or S&P, and (ii) such transferee satisfies any ratings criteria specified in the Basis Swap or has its payment obligations under the Basis Swap guaranteed by the Counterparty or an affiliate of the Counterparty that satisfies such ratings criteria.

### Payments under the Basis Swap

Payments made by the Series and the Counterparty under the Basis Swap will be based on an exchange of: (i) cash flows received by the Series on the CLNs in respect of interest, for (ii) amounts equal to the sum of (a) the Interest Amount payable on each Coupon Distribution Date, (b) the fees of the Broker-Dealers, Auction Agent and Trustee, (c) the Trustee Ordinary Expenses and the Auction Agent Ordinary Expenses up to agreed per annum dollar limits and (d) any interest payable on the Final Distribution Date. The cash flows to be received by the Series under the Basis Swap are designed to be sufficient to make scheduled distributions of interest in respect of the Certificates.

Payments by the Series and by the Counterparty made on the same date and in the same currency will be netted.

Neither the Series nor the Counterparty will be obligated, under the Basis Swap, to gross-up payments to be made by it to the other if withholding taxes are imposed on such payments, but the Basis Swap will be terminable in such event. See "—Early Termination" below.

### Early Termination

The Basis Swap may be terminated early upon the occurrence of any of the "Events of Default" or "Termination Events" specified therein which are summarized below. The Series will be liquidated upon the early termination of the Basis Swap. See "The Series Agreement—Liquidation of a Series."

*Events of Default.* The "Events of Default" under the Basis Swap are limited to: (i) the failure of the Series or the Counterparty to make when due any payment or delivery required to be made thereunder after giving effect to the applicable grace period, if any; and (ii) the occurrence of

certain events of insolvency or bankruptcy of the Series or the Counterparty as described in Sections 5(a)(i) and 5(a)(vii), respectively, of the ISDA Master Agreement.

*Termination Events*: The "Termination Events" under the Basis Swap consist of the following: (i) the termination events under the ISDA Master Agreement of "Illegality," "Tax Event," and "Tax Event Upon Merger," as described in Sections 5(b)(i), 5(b)(ii), and 5(b)(iii), respectively, of the ISDA Master Agreement, (ii) an Additional Termination Event if the Counterparty fails to take any of the actions described under "Counterparty Rating Downgrade" below (a "Counterparty Downgrade Default"), and (iii) "Automatic Additional Termination Events" consisting of the liquidation of the Series as a result of the occurrence of any event described in items (i) – (vi) of the definition of Series Liquidation Event. Upon the termination of the Basis Swap upon the occurrence of a Counterparty Downgrade Default, the Counterparty will pay to the Series on the Early Termination Date a sum equal to the aggregate of (i), any Unpaid Amounts (as defined in the Basis Swap) owed to the Series and (ii) without duplication, an amount calculated on the same basis as the Interest Amount but in respect of the period from and including the immediately preceding Coupon Accrual Date to but excluding the Early Termination Date; and the Series shall pay to the Counterparty any Unpaid Amounts owed to the Counterparty. No Termination Payment will be owed by either party. Upon the occurrence of an Automatic Additional Termination Event, the Basis Swap shall terminate without the need for any further action by either party and the date of liquidation of the Series shall be automatically designated as the Early Termination Date for the Basis Swap. For the avoidance of doubt, upon the occurrence of an Automatic Additional Termination Event as a result of any event described in items (iii) – (vi) of the definition of Liquidation Event, a Termination Payment may be payable by the Series or the Counterparty, as the case may be.

*Designation of Early Termination Date*: Upon the occurrence of any Event of Default under the Basis Swap, the non-defaulting party will have the right to designate an "Early Termination Date" (as defined in the Basis Swap). With respect to Termination Events (other than an Automatic Additional Termination Event"), an Early Termination Date may be designated by one of the parties (as specified in each case in the Basis Swap) and will occur only upon notice and, in certain cases, after any Affected Party (as defined in the Basis Swap) has used reasonable efforts to transfer its rights and obligations under the Basis Swap to a related entity within a limited period after notice has been given of the Termination Event, all as set forth in the Basis Swap.

Upon the occurrence of (i) an Event of Default in respect of which the Counterparty is the Defaulting Party, or (ii) the occurrence of a Termination Event (other than an Automatic Additional Early Termination Event, "Illegality" or "Tax Event") with respect to which the Counterparty is the sole "Affected Party" (together a "Default") the Holders of a majority in the aggregate in principal amount of the Certificates of the Series (the "Majority Holders") which term, for the avoidance of doubt, shall exclude the Counterparty or any of its affiliates, may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee under the Basis Swap, including, if so directed by the Majority Holders, terminating the Basis Swap. Holders will have no right directly to enforce any rights of the Series in the Basis Swap or directly to receive any payments thereunder. The Trustee is not obligated to pursue any action on behalf of the Series or the Holders unless the Trustee is satisfied that it has received adequate indemnification for such action and the expenses related thereto.

*Termination Payments*: A termination payment ("Termination Payment") may be payable by either the Counterparty or the Series if the Basis Swap terminates early because of an Event of Default or Termination Event thereunder. If the Basis Swap is terminated early the Termination Payment will be based on "Loss" as defined in the ISDA Master Agreement. *If the Series is obligated to make a Termination Payment to the Counterparty upon a termination of the Basis Swap, the loss to the Holders resulting from such payment could be substantial.*

*Sale of CLNs*: If as described herein, the Series is required to sell all or portion of the CLNs in connection with a termination of the Basis Swap or the Series Agreement, the Series Agent will sell

the CLNs in accordance with the Sale Procedures specified in the Series Agreement. The "Sale Procedures" generally require that the Series Agent solicit quotations from at least five bidders, one of which may be, at the Series Agent's option, the Series Agent. The Series Agent, in its sole judgment, may evaluate such bids on the basis of quotations for all or a portion of the CLNs being sold (or on any other basis selected in good faith by the Series Agent) on that day (the "Liquidation Date"). If on the Liquidation Date the Series Agent is unable to obtain any such quotation, it will seek to obtain such quotations on the next succeeding Business Day, and on each succeeding Business Day thereafter, if necessary, to obtain such quotations, until the date which is the 10th Business Day following the Liquidation Date, when the bid, if any, of the Series Agent shall be used. For the avoidance of doubt, if the Series Agent does not bid the CLNs will be worth zero. The proceeds from any sale of the CLNs will be distributed to Holders, decreased by the amount of any Termination Payment or other amount owed by the Series to the Counterparty and any Extraordinary Expenses owed by the Series, and increased by any Termination Payment or other amount owed and paid by the Counterparty to the Series.

## Counterparty Ratings Downgrade

If on any date on which there are Certificates outstanding the short term credit rating by Fitch of the Counterparty falls below "F1" or its long term credit rating by Fitch falls below "A+" or its short term credit rating by S&P falls below "A-1+" (each a "Counterparty Ratings Downgrade") then no later than 30 calendar days after the occurrence of such Counterparty Rating Downgrade, the Counterparty shall take such actions as are more fully described in the Basis Swap and which include:

(i)    obtaining a guarantee for its obligations to the Series under the Basis Swap; or

(ii)   novating, at the expense of the Counterparty, all (and not some only) of its obligations under the Basis Swap; or

(iii)  providing collateral for its obligations to the Series under the Basis Swap; or

(iv)   taking such actions as it may agree with Fitch or S&P, the effect of which is to maintain the ratings of the Certificates as if the Counterparty Ratings Downgrade had not occurred.

If the short term credit rating of the Counterparty falls below "F2" by Fitch or the long term credit rating of the Counterparty falls below "BBB+" by Fitch, the Counterparty shall take the actions as are more fully described in the Basis Swap and which include (i), (ii) or (iv) above.

## Counterparty Security Interest

The Series will grant to the Counterparty a security interest in all of the right, title and interest of the Series in all of its property (except its rights under the Basis Swap), whether owned on the Issue Date or thereafter acquired, including the CLNs. Such security interest will secure all payments, including any Termination Payments, owed by the Series to the Counterparty (net of all payments (if any) owed by the Counterparty to the Series) under the Basis Swap. The Bank of New York, acting in its commercial banking capacity, will act as agent of the Counterparty for purposes of perfecting such security interest. The Series will be obligated to take such actions as may be necessary or reasonably requested by the Counterparty to ensure that such security interest is a perfected security interest under the UCC during the term of the Basis Swap. Such security interest will be perfected by the filing of UCC financing statements in the appropriate jurisdictions. Notwithstanding such security interest, the rights of the Counterparty to receive payments from the Series pursuant to the Basis Swap will be subject to the provisions thereof and to the payment priorities under the Series Agreement. See "The Series Agreement."

## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS PRIVATE PLACEMENT MEMORANDUM IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS INCLUDED HEREIN ON BEHALF OF EACH SERIES IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE SERIES OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

The following is a summary of certain material U.S. federal income tax consequences of the acquisition, ownership and disposition of the Certificates by a U.S. Corporate Holder (as defined below). The summary is based on the tax laws of the United States, including the provisions of the Internal Revenue Code of 1986, as amended (the "Code"), its legislative history, existing and proposed regulations thereunder, published rulings by the Internal Revenue Service ("IRS") and court decisions, all as currently in effect and all subject to change at any time, possibly with retroactive effect. This summary deals only with U.S. Corporate Holders that will hold the Certificates as capital assets. This discussion does not cover all aspects of the U.S. federal income taxation that may be relevant to, or the actual tax effect that any of the matters described herein will have on, the acquisition, ownership or disposition of the Certificates by particular investors, and does not address state, local, foreign or other tax laws. In particular, this summary does not discuss all of the tax considerations that may be relevant to certain types of Holders subject to special treatment under the U.S. federal income tax laws (such as financial institutions, insurance companies, partnerships, investors liable for the alternative minimum tax, individual retirement accounts and other tax-deferred accounts, tax-exempt organizations, dealers in securities or currencies, investors that will hold the Certificates as part of straddles, hedging transactions or conversion transactions for U.S. federal income tax purposes or investors whose functional currency is not the U.S. dollar).

As used herein, the term "U.S. Corporate Holder" means a beneficial owner of Certificates that is, for U.S. federal income tax purposes, a corporation created or organized under the laws of the United States or any State thereof. References to "the Series" refer to each Series whose Certificates are offered by this Private Placement Memorandum and a related Series Pricing Supplement.

THE SUMMARY OF U.S. FEDERAL INCOME TAX CONSEQUENCES SET OUT BELOW IS FOR GENERAL INFORMATION ONLY. ALL PROSPECTIVE PURCHASERS SHOULD CONSULT THEIR TAX ADVISERS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF OWNING THE CERTIFICATES, INCLUDING THE APPLICABILITY AND EFFECT OF STATE, LOCAL, FOREIGN AND OTHER TAX LAWS AND POSSIBLE CHANGES IN TAX LAW.

Investors should note that no rulings have been or will be sought from the IRS with respect to any of the federal income tax consequences discussed below. Unlike a tax ruling, the opinions of counsel are not binding on the IRS and no assurance can be given that the IRS will not challenge the conclusion or propriety of counsel's opinion.

### Classification and Taxation of the Series

The Series should be classified as a grantor trust for U.S. federal income tax purposes and will not be subject to U.S. federal income taxation. The Trustee will report income, gain, loss and deductions to the IRS accordingly.

The Trustee will furnish or make available, within a reasonable time after the end of each calendar year, to each U.S. Corporate Holder, such information as the Trustee deems necessary or desirable to assist U.S. Corporate Holders in preparing their U.S. federal income tax returns, or to enable U.S. Corporate Holders to make this information available to owners or other financial intermediaries of U.S. Corporate Holders that hold such Certificates as nominees.

Subject to the Integration Regulations discussed below, under the U.S. federal income tax rules applicable to grantor trusts, a U.S. Corporate Holder will be treated as the owner of an undivided interest in the income and assets of the Series, including the CLNs, and as having entered into the Basis Swap, both to the extent of the Holder's proportionate interest in the Series. Similarly, the sale of Certificates will be considered a sale of a U.S. Corporate Holder's interest in the assets and income of the Series, and a termination of the Basis Swap with respect to that U.S. Corporate Holder. A U.S. Corporate Holder thus will be required to take into account its pro rata share of the income from the CLNs and the Basis Swap, as determined under the separate U.S. federal income tax rules applicable to those assets and to the Basis Swap. In addition, a U.S. Corporate Holder may deduct its pro rata share of the fees and other deductible expenses paid by the Series, at the same time and to the same extent as such items would be deducted by the U.S. Corporate Holder if the U.S. Corporate Holder paid directly a pro rata portion of the amounts paid by the Series.

## CLNs

Linklaters, special tax counsel to the Series, will deliver its opinion to the Series that the CLNs should constitute debt instruments for U.S. federal income tax purposes. It is assumed for purposes of the following discussion that each series of the CLNs will constitute debt instruments for U.S. federal income tax purposes. The Series Pricing Supplement will describe the relevant tax consequences in the event this assumption is inapplicable.

## Integration Regulations

Treasury Regulations under Section 1275 of the Code (the "Integration Regulations") permit holders of certain debt instruments and certain financial instruments to elect to treat the combined cash flows on such assets as a single "synthetic debt instrument." **A taxpayer that elects to integrate a debt instrument with a financial instrument would generally not account for each asset separately, but would instead be treated as owning a single synthetic debt instrument having payment terms identical to the net cash flows under the integrated debt instrument and swap.**

A U.S. Corporate Holder could elect to integrate the CLNs and the Basis Swap into a single instrument (a "Synthetic Debt Instrument"), if, as the Series believes, they qualify under the Integration Regulations. These regulations in general require, among other conditions, that: (1) the U.S. Corporate Holder satisfies certain identification requirements provided in Treasury Regulations 1.1275-6(e); (2) the Synthetic Debt Instrument qualifies as a variable rate debt instrument and pays interest at a qualified floating rate or rates as defined in Treasury Regulations; and (3) the CLNs are not tax-exempt obligations, certain interests in or mortgages held by a REMIC, certain other debt instruments subject to acceleration, and certain contingent payment debt instruments. The CLNs will not be treated as a contingent payment debt instrument that fails to satisfy the requirement in (3) if, as the Series believes, the contingencies are remote or incidental. In order to meet the identification requirements, a U.S. Corporate Holder must, on or before the date the U.S. Corporate Holder is treated as having entered into the Basis Swap, enter and retain as part of its books and records: the date the U.S. Corporate Holder is treated as having acquired the CLNs and the date the U.S. Corporate Holder is treated as having entered into the Basis Swap, a description of the CLNs and the Basis Swap, and a summary of the cash flows and accruals on the Synthetic Debt Instrument resulting from integration.

Failure to elect to integrate, or failure of the CLNs and the Basis Swap to qualify for integration, would result in accounting for the CLNs and the Basis Swap separately, which could affect the character and timing of income, deductions, gains, or losses, which would include, without limitation, certain timing or character mismatching. No assurance can be given that the CLNs or the Basis Swap will qualify as an integrated transaction under the Integration Regulations.

Each U.S. Corporate Holder should consult with its own tax advisors to determine whether making such an election under the Integration Regulations is permitted or advisable, the consequences of a failure to elect integration, and the identification and information requirements necessary for making such an election.

The following discussion assumes that each U.S. Corporate Holder will be entitled to and will elect to treat the CLNs and the Basis Swap as an integrated transaction under the Integration Regulations.

## Payments of Interest

A U.S. Corporate Holder will be required to include the interest on a Synthetic Debt Instrument in gross income as ordinary income at the time it is received or accrued, depending on the Holder's method of accounting for tax purposes. Interest paid on a Synthetic Debt Instrument constitutes income from sources outside the United States.

*Original Issue Discount.* The Series intends to take the position, and this summary assumes, that the CLNs and the Synthetic Debt Instrument will not be issued with original issue discount ("OID").

*Market Discount.* The Series anticipates that the purchase of a Certificate by a U.S. Corporate Holder at an Auction will generally not result in market discount or premium, and that therefore the discussion under "Market Discount" and "Notes Purchased at a Premium" will generally not be applicable.  However, these rules could be applicable to purchases that occur outside of an Auction, or in the event that, contrary to expectations, market discount or premium arises at an Auction.

A Synthetic Debt Instrument  generally will be treated as purchased at a market discount (a "Market Discount Note") if the "revised issue price" of a Synthetic Debt Instrument exceeds the amount for which the U.S. Corporate Holder is treated as having purchased the Synthetic Debt Instrument by at least 0.25 per cent of the revised issue price of the Synthetic Debt Instrument multiplied by the number of complete years from the date the U.S. Corporate Holder is treated as having acquired the Synthetic Debt Instrument to the maturity of the Synthetic Debt Instrument. If this excess is not sufficient to cause the Synthetic Debt Instrument to be a Market Discount Note, then the excess constitutes "*de minimis* market discount." For this purpose, the "revised issue price" of a Synthetic Debt Instrument generally equals its issue price. Generally, the issue price of a Synthetic Debt Instrument will be the first price at which a substantial amount of Synthetic Debt Instruments included in the issue of which the Synthetic Debt Instrument is a part is sold to persons other than bond houses, brokers, or similar persons or organizations acting in the capacity of underwriters, placement agents, or wholesalers. Under current law, any gain recognized on the maturity or disposition of a Market Discount Note will be treated as ordinary income to the extent that the gain does not exceed the accrued market discount on the Synthetic Debt Instrument. Alternatively, a U.S. Corporate Holder of a Market Discount Note may elect to include market discount in income currently over the life of the Synthetic Debt Instrument. This election applies to all debt instruments with market discount acquired by the electing U.S. Corporate Holder on or after the first day of the first taxable year for which the election is made. This election may not be revoked without the consent of the IRS. A U.S. Corporate Holder that does not elect to include market discount in income currently generally will be required to defer deductions for interest on borrowings incurred to purchase or carry a Market Discount Note that is in excess of the interest on the Synthetic Debt Instrument includible in the U.S. Corporate Holder's income, to the extent

40

that this excess interest expense does not exceed the portion of the market discount allocable to the days on which the Synthetic Debt Instrument was held by the U.S. Corporate Holder.

Under current law, market discount on a Market Discount Note will accrue on a straight-line basis unless the U.S. Corporate Holder elects to accrue the market discount on a constant-yield method. This election applies only to the Synthetic Debt Instrument with respect to which it is made and is irrevocable.

*Election to Treat All Interest as Original Issue Discount.* A U.S. Corporate Holder may elect to include in gross income all interest that accrues on a Synthetic Debt Instrument (including interest, market discount and *de minimis* market discount) using the constant-yield method normally used for OID and described below, with certain modifications. This election generally applies only to the Synthetic Debt Instrument with respect to which it is made and may not be revoked without the consent of the IRS. If the election to apply the constant yield method to all interest on a Note is made with respect to a Market Discount Note, the electing U.S. Corporate Holder will be treated as having made the election described above under "Market Discount" to include market discount in income currently over the life of all debt instruments held or thereafter acquired by the U.S. Corporate Holder. U.S. Corporate Holders should consult their tax advisors concerning the propriety and consequences of making this election.

If a U.S. Corporate Holder makes the election described above, then the Holder must include interest in income calculated on a constant-yield method before the receipt of cash attributable to the income, and generally will have to include in income increasingly greater amounts of interest over the life of the Synthetic Debt Instrument. The amount of interest includible in income by a U.S. Corporate Holder is the sum of the daily portions of interest with respect to the Synthetic Debt Instrument for each day during the taxable year or portion of the taxable year on which the U.S. Corporate Holder holds the Synthetic Debt Instrument ("accrued interest"). The daily portion is determined by allocating to each day in any "accrual period" a pro rata portion of the interest allocable to that accrual period. Accrual periods with respect to a Synthetic Debt Instrument may be of any length selected by the U.S. Corporate Holder and may vary in length over the term of the Synthetic Debt Instrument as long as (i) no accrual period is longer than one year; and (ii) each scheduled payment of interest or principal on the Synthetic Debt Instrument occurs on either the final or first day of an accrual period. The amount of interest allocable to an accrual period equals the excess of (a) the product of the issue price of the Synthetic Debt Instrument at the beginning of the accrual period and the yield to maturity of the Synthetic Debt Instrument (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period) over (b) the sum of the payments of interest on the Synthetic Debt Instrument allocable to the accrual period. The "adjusted issue price" of a Synthetic Debt Instrument at the beginning of any accrual period is the issue price of the Synthetic Debt Instrument increased by the amount of accrued interest for each prior accrual period.

*Notes Purchased at a Premium.* As already noted above under "Payments of Interest—Market Discount," this discussion will generally not be applicable, unless the purchase occurred outside of an Auction, or in the event that, contrary to expectations, market discount or premium arises at an Auction.

A U.S. Corporate Holder that purchases a Synthetic Debt Instrument for an amount in excess of its stated redemption price at maturity may elect to treat the excess as "amortizable bond premium," in which case the amount required to be included in the U.S. Corporate Holder's income each year with respect to interest on the Synthetic Debt Instrument will be reduced by the amount of amortizable bond premium allocable (based on the yield to maturity of the Synthetic Debt Instrument) to that year. Any election to amortize bond premium applies to all bonds (other than bonds the interest on which is excludible from gross income for U.S. federal income tax purposes) held by the U.S. Corporate Holder at the beginning of the first taxable year to which the election applies or thereafter acquired by the U.S. Corporate Holder, and is irrevocable without the consent

of the IRS. See also "Original Issue Discount—Election to Treat All Interest as Original Issue Discount" above.

**Sale or Retirement**

A U.S. Corporate Holder will generally recognize gain or loss on the sale, retirement or other taxable disposition of a Synthetic Debt Instrument equal to the difference between the amount realized on the sale or retirement and the tax basis of the Synthetic Debt Instrument. The amount realized does not include the amount attributable to accrued but unpaid interest, which will be taxable as interest income to the extent not previously included in income. Except to the extent described under "Market Discount" above, gain or less recognized by a U.S. Corporate Holder on the sale or a retirement of a Synthetic Debt Instrument will be capital gain or loss and will be long-term capital gain or loss if the Synthetic Debt Instrument was held by the U.S. Corporate Holder for more than one year.

## CERTAIN ERISA CONSIDERATIONS

The U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA") imposes fiduciary standards and certain other requirements on employee benefit plans subject thereto, including collective investment funds, separate accounts, and other entities or accounts whose underlying assets are treated as assets of such plans pursuant to the U.S. Department of Labor "plan assets" regulation, 29 CFR Section 2510.3-101 (collectively, "ERISA Plans"), and on those persons who are fiduciaries with respect to ERISA Plans.

Section 406 of ERISA and Section 4975 of the Code prohibit certain transactions involving the assets of an ERISA Plan (as well as those plans that are not subject to ERISA but which are subject to Section 4975 of the Code (together with ERISA Plans, "Plans")) and certain persons (referred to as "parties in interest" or "disqualified persons") having certain relationships to such Plans, unless a statutory or administrative exemption applies to the transaction. In particular, a sale or exchange of property or an extension of credit between a Plan and a "party in interest" or "disqualified person" may constitute a prohibited transaction. A party in interest or disqualified person who engages in a prohibited transaction may be subject to excise taxes or other liabilities under ERISA and the Code.

The Series or the Counterparty, directly or through affiliates, may be considered a party in interest or disqualified person with respect to many Plans. Prohibited transactions within the meaning of Section 406 of ERISA or Section 4975 of the Code may arise if the Certificates are acquired by a Plan with respect to which the Series or the Counterparty or an affiliate is a party in interest or a disqualified person, unless the Certificates are acquired pursuant to and in accordance with an applicable exemption. Certain exemptions from the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code may apply depending in part on the type of Plan fiduciary making the decision to acquire a Certificate and the circumstances under which that decision is made.

Under a "look-through rule," if a Plan invests in an "equity interest" of an entity and no other exception applies, the Plan's assets include both the equity interest and an undivided interest in each of the entity's underlying assets. This rule will only apply where equity participation in an entity by benefit plan investors is significant, which will be the case if 25 per cent. or more of the value of any class of equity interest in the entity is held by "benefit plan investors." The term "benefit plan investor" includes (a) an employee benefit plan (as defined in Section 3(3) of ERISA) whether or not subject to ERISA, (b) a plan described in Section 4975(e)(1) of the Code, or (c) any entity whose underlying assets include "plan assets" by reason of any such plan's investment in the entity.

The Certificates will be regarded for ERISA purposes as equity interests in the Series whose assets are the CLNs and the Basis Swap. The Series will not monitor the Holders' possible status as benefit plan investors. Accordingly, the Certificates should not be acquired by any benefit plan investor.

BY ITS PURCHASE AND HOLDING OF A CERTIFICATE, EACH PURCHASER AND EACH TRANSFEREE WILL BE DEEMED TO HAVE REPRESENTED AND WARRANTED THAT (1) IT IS NOT AN EMPLOYEE BENEFIT PLAN AS DESCRIBED IN SECTION 3(3) OF ERISA, OR A PLAN DESCRIBED IN SECTION 4975(E)(1) OF THE CODE, OR AN ENTITY WHOSE ASSETS ARE TREATED AS ASSETS OF ANY SUCH PLAN AND (2) IT WILL NOT SELL OR OTHERWISE TRANSFER ANY SUCH CERTIFICATE TO ANY PERSON WITHOUT FIRST OBTAINING THESE SAME FOREGOING REPRESENTATIONS, WARRANTIES AND COVENANTS FROM THAT PERSON.

## OFFERING AND SALE

The Certificates will be offered initially to prospective investors at a price of 100%.

Each prospective purchaser is hereby offered the opportunity to ask questions of, and receive answers from, the Trustee, the Initial Purchaser and the Broker-Dealer concerning the terms and conditions of this offering and the Series and to obtain additional information that the Trustee possesses or can acquire without unreasonable effort or expense that is necessary to verify the accuracy of the information furnished in this Private Placement Memorandum and the Series Pricing Supplement. See "General Information—Further Information." Inquiries concerning such additional information should be directed to The Bank of New York, 101 Barclay Street, 8th Floor East, New York, New York, 10286 Attention: Corporate Trust Dealing and Trading Group, telephone (212) 815-2898, fax (646) 835-4321; or to Deutsche Bank Securities Inc. - New York, 60 Wall Street, New York, New York 10005, Attention: Yury Gruzglin, telephone (212) 250-8206 or Ernest Goodrich, telephone (212) 250-7636.

Deutsche Bank Securities, Inc. will be the initial purchaser (the "Initial Purchaser") of the Series for the private placement of Certificates. In order to facilitate the offering of Certificates by the Initial Purchaser, the Initial Purchaser may temporarily acquire and hold the Certificates as principal for resale at prices determined by the Initial Purchaser to reflect the current market for the related CLNs and the rights and obligations under the Basis Swap as well as selling concessions and costs and expenses associated with the establishment of the Series. Certificates are being offered by the Initial Purchaser, subject to prior sale, when as and if issued and subject to acceptance by the Trustee, and approval of certain legal matters by counsel for the Trustee and the Initial Purchaser and certain other conditions.

The Series Agreement will prohibit the sale or transfer of Certificates to any investors other than investors who are Qualified Institutional Buyers. The Series Agreement will only allow sales or transfers of Certificates in minimum denominations of U.S. $100,000 (and in integral multiples of U.S. $50,000 in excess thereof).

No sale or transfer of Certificates shall be permitted that would require registration of the Certificates under the Securities Act or result in a violation of any federal or state securities law or regulation. See "Description of the Certificates—Transfer Restrictions." The Certificates will be subject to significant restrictions on transfer, and purchasers are advised to consult legal counsel prior to making any purchase, resale, pledge or other transfer of any Certificate. Inquiries concerning transfers of Certificates shall be made to: Deutsche Bank Securities Inc. - New York, 60 Wall Street, New York, New York 10005, Attention: Yury Gruzglin, telephone (212) 250-8206.

By acquiring a Certificate, each Holder appoints the Trustee to act on its behalf pursuant to the terms of the Series Agreement and agrees to be bound by the terms and conditions of the Series Agreement to the same extent as if such Holder were a signatory thereto.

## GENERAL INFORMATION

### Financial Information

Within 90 days of the liquidation of the Series, the Trustee will distribute unaudited financial statements of the Series to all Holders. The Trustee will require an audit to be performed at the end of one or more of the Series' fiscal years only if and to the extent the Holder or Holders have agreed to reimburse the Series for any expenses incurred in connection with the audit in a manner satisfactory to the Trustee.

### Further Information

Further information concerning the Certificates, the Basis Swap, the Counterparty, the CLNs, the Series Agent and the operations of the Series is available from the Trustee or Deutsche Bank Securities Inc. upon request.

## LEGAL MATTERS

Certain legal matters will be passed upon for Deutsche Bank Securities Inc. and the Counterparty by Linklaters, New York and The Bayard Firm.

## INDEX OF DEFINED TERMS

1940 Act ........................................... iii
Accrued Interest Amount ........................ 3
Additional Interest Amount...................... 3
Affected Party .................................. 36
Applicable Rate............................... 4, 19
Auction......................................... 19
Auction Agency Agreement ...................... 19
Auction Agent .............................. 1, 19
Auction Agent Ordinary Expenses ............. 29
Auction Date .................................. 21
Auction Procedures ............................ 19
Authorized Denominations.................... 2, 15
Available Certificates ........................ 23
Basis Swap....................................ii, 7
Basis Swap Early Termination Unwind ....... 5
Bid ........................................ 21, 23
Bidder ........................................ 21
Bidding Rights Records ........................ 20
BMA Recommendation............................ 26
Broker-Dealer .................................. 1
Business Day Convention........................ 2
Business Days.................................. 2
Certificate Exchange........................... 4
Certificate Principal Balance................... 1
Certificates...................................ii, 1
CLNs..........................................ii
CLNs Event ................................. 5, 30
CLNs Obligor...................................v
CLNs Redemption Proceeds ................... 17
Code.......................................... 38
Counterparty ...............................ii, 1
Counterparty Call.............................. 4
Counterparty Downgrade Default ............. 36

Counterparty Ratings Downgrade .............37
Coupon Accrual Dates............................2
Coupon Accrual Period...........................2
Coupon Distribution Dates.......................2
Currency .......................................2
Current Factor .................................1
Declaration of Trust ....................... ii, 1, 15
Default........................................36
Default Swap ...................................7
Delaware Trustee ...........................1, 29
DTC ..........................................16
ERISA.........................................42
ERISA Plans...................................42
Event of Default..............................30
Existing Holder ...............................23
Expense Liquidation Event.....................30
Extraordinary Expenses .......................30
Final Distribution Date ........................3
Fitch.........................................iii
Hold Order....................................21
Holders ......................................ii
Illegality .....................................36
Indirect Participants ..........................16
Initial Certificate Principal Balance ..............1
Initial Purchaser ..........................1, 43
Integration Regulations.......................39
Interest Amount ...............................3
Interest Rate..................................4
IRS ..........................................38
ISDA .........................................34
ISDA Definitions .............................34
ISDA Master Agreement........................34
Issue Date ....................................2

Issue Price ............................................. 2
Liquidation Date ................................... 37
Majority Holders .................................. 36
Market Discount Note .......................... 40
Maximum Applicable Rate .................... 24
Minimum Applicable Rate .................... 24
OID ...................................................... 40
Order .................................................. 21
Original Principal Amount ...................... 1
Participants ........................................ 16
Plans .................................................. 42
Potential Holder .................................. 23
Priority of Payments ............................. 5
QIB ...................................................... v
Qualified Institutional Buyer .................. v
Rating Agency ...................................... 6
Rating Agency Condition ...................... 31
Record Date .......................................... 2
Reference Entities .............................. 10
Rule 144A .............................................. v
Rules ................................................. 16
S&P .................................................... iii
Sale Procedures ................................ 37
Scheduled Coupon Accrual Dates ........ 2
Scheduled Final Distribution Date ........ 3
Securities Act ........................... ii, v, 18
Sell Order ........................................... 21

Series ............................................. ii, 1, 15
Series Agency Agreement ..................... 29
Series Agent ................................... 7, 29
Series Agreement .......................... ii, 1, 15
Series Liquidation Event ................... 5, 30
Series Pricing Supplement ...................... ii
Series Property ...................................... 7
Series Regulatory/Tax Liquidation Event .... 30
Submission Deadline ............................. 21
Submitted Bid ...................................... 23
Submitted Hold Order ........................... 23
Submitted Order ................................... 23
Submitted Sell Order ............................. 23
Sufficient Clearing Bids ........................ 23
Synthetic Debt Instrument ..................... 39
Tax Event ............................................. 36
Termination Payment ............................ 36
Trust .............................................. ii, 1, 15
Trustee .................................................. 1
Trustee Extraordinary Expense and
Indemnity Agreement ............................ 28
Trustee Ordinary Expenses .................. 29
U.S. Corporate Holder .......................... 38
U.S. GAAP ............................................ 35
Unpaid Amounts .............................. 5, 36
Weighted Average Certificate  Principal
Balance .................................................. 2
Winning Bid ........................................... 23