Meister Seelig & Fein LLP
Attorney for Defendant
Xethanol Corporation
By: Howard S. Koh
140 East 45th Street, 19th Floor
New York, New York 10017
Tel. No. (212) 655-3500

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

XETHANOL CORPORATION,                            :
                                                 :
                        Plaintiff,               :
                                                 :    **Case No. 07 CV 11161 (AKH)**
        -against-                                :
                                                 :
DEUTSCHE BANK SECURITIES, INC.,                  :
PIVOT MASTER TRUST, and                          :
CAMBER MASTER TRUST,                             :
                                                 :
                        Defendants.              :
-------------------------------------------------------------X

## MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION
## <u>TO DISMISS THE AMENDED COMPLAINT</u>

**Meister Seelig & Fein LLP**
140 East 45th Street, 19th Floor
New York, New York 10017
(212) 655-3500

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................ii

PRELIMINARY STATEMENT ........................................................................1 - 3

FACTS ...........................................................................................................3 - 6

ARGUMENT ...............................................................................................7 - 19

    I.    Xethanol's 12(a)(1) claim, as set forth in the Amended Complaint meets the plausibility standard that applies on motions to dismiss. .........................7

        A.    Recent precedent makes clear that as long as a complaint states a plausible claim it should not be dismissed on a motion pursuant to Fed. R. Civ. P. 12(b)(6)...............................................................7

        B.    The Amended Complaint plausibly alleges that title to the ARS passed directly from one or more of the Defendants to Xethanol. ...............8

        C.    The Amended Complaint plausibly alleges that DB solicited the purchase of the ARS in violation of section 12(a). ...................................10

    II.    Plaintiff, in its Amended Complaint, has sufficiently pled Defendants' violations of Section 10(b) and Rule 10b-5. .............................................................13

        A.    The Amended Complaint properly alleges misrepresentations and omissions.............................................................................................15

        B.    Xenthanol has adequately alleged scienter ....................................................16

        C.    Xenthanol has properly alleged reliance and damages ..................................17

    III.    Like Xethanol's Federal Securities Fraud claims, Xethanol's common law fraud claim is sufficiently pled. ..............................................................................18

CONCLUSION................................................................................................19

## TABLE OF AUTHORITIES

<u>Cases</u>

<u>AIG Global Sec. Lending Corp. v. Bank. Of Amer. Sec., LLC</u>
No. 01 Civ 11448, 2005 WL 2385854 (S.D.N.Y. Sept. 26, 2005)........................................18

<u>Bell Atlantic Corp. v. Twombly</u>
127 S. Ct. 1955 (2007)..................................................................................................7, 8

<u>Capri v. Murphy</u>
856 F.2d 473 (2nd Cir. 1998)............................................................................................11

<u>Conley v. Gibson</u>
355 U.S. 34 (1957)..............................................................................................................8

<u>Crigger v. Fahnestock & Co.</u>
443 F.3d 230 (2nd Cir. 2006)............................................................................................18

<u>Degulis v. LXR Biotechnology</u>
928 F. Supp. 1301 (S.D.N.Y. 1996)..................................................................................11

<u>Dorchester Investors v. Peak Trends Trust</u>
2003 WL 223466 (S.D.N.Y. Feb. 3, 2003).................................................................11, 12

<u>Ellison v. American Image Motors Co.</u>
36 F. Supp. 2d 628 (S.D.N.Y. 1999)................................................................................12

<u>Erickson v. Pardus</u>
127 S. Ct. 2197 (2007)........................................................................................................8

<u>Forman v. Davis</u>
371 U.S. 178 (1957)..........................................................................................................19

<u>Iqbal v. Hasty</u>
490 F.3d 143 (2nd Cir. 2007)..............................................................................................7

<u>Jo Ann Homes at Bellmore, Inc. v. Dworetz</u>
25 N.Y.2d 112, 302 N.Y.S.2d 799, 250 N.E.2d 214 (1969)............................................18

<u>Lerner v. Fleet Bank, N.A.</u>
459 F.3d 273 (2nd Cir. 2006)............................................................................................13

<u>Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.</u>
500 F.3d 171 (2nd Cir. 2007)............................................................................................18

Novak v. Kasaks
    216 F.3d 300 (2nd Cir. 2000)........................................................................14

Openwave Systems Securities Litigation
    528 F.Supp.2d 236 (S.D.N.Y. 2007)............................................................13

OPUS360 Corp. Securities Litigation
    2002 WL 31190157 (westlaw) (S.D.N.Y. Oct. 2, 2002) .......................................11

Pinter v. Dahl
    486 U.S. 622, 108 S. Ct. 2063 (1988)........................................................8, 10

Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co.
    794 F. Supp. 1265 (S.D.N.Y. 1992)............................................................12

Scheuer v. Rhodes
    416 U.S. 232 (1974).................................................................................7

Scholastic Corp. Securities Litigation
    252 F.3d 63 (2nd Cir. 2001)......................................................................13

Shain v. Duff & Phelps Credit Rating Co.
    915 F. Supp. 575 (S.D.N.Y. 1996) .............................................................12

Tellabs, Inc. v. Makor Issues & Rights, Ltd., et al.
    127 S.Ct. 2499 (2007)..........................................................................13, 14

Vivendi Universal, S.A. Securities Litigation,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003)....................................................8, 10, 11

Wilson v. Saintine Exploration and Drilling Corp.
    872 F.2d 1124 (2nd Cir. 1989)...................................................................10

**Statutes**

15 U.S.C. §77d..............................................................................................4

15 U.S.C. §77e..............................................................................................4

15 U.S.C. §78u-4(b)(1) ..................................................................................21

15 U.S.C. §78u-4(b)(2) ..................................................................................13

15 U.S.C. 78j(b) (2007) ..................................................................................13

Section 2(a)(51)(A) of the Investment Company Act of 1940 .......................................5

Securities Act of 1933 §12(a), 15 U.S.C §77 l(a) ...................................................................................passim

Securities Exchange Act of 1934 §10(b), 15 U.S.C. §78 j(b) ..............................................................3, 13, 15

**Rules & Regulations**

17 C.F.R. 240.10b-5 (2007) ...........................................................................................................................13

Fed. R. Civ.  P. 12(b)(6) .................................................................................................................................7

Fed. R. Civ.  P. 8(a)(2) ...................................................................................................................................8

Fed. R. Civ.  P. 8(a)(3) .................................................................................................................................10

Fed. R. Civ. P. 15(a)(2) ................................................................................................................................19

Fed. R. Civ. P. 9(b) ......................................................................................................................................13

SEC Rule 144A ...............................................................................................................................................4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
XETHANOL CORPORATION,

                          Plaintiff,                    **Case No. 07 CV 11161 (AKH)**

          -against-

DEUTSCHE BANK SECURITIES, INC.,
PIVOT MASTER TRUST, and
CAMBER MASTER TRUST,

                          Defendants.
-------------------------------------------------------------------X


## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Plaintiff, Xethanol Corporation ("Xethanol"), submits this Memorandum of Law in opposition to Defendants' Motion to dismiss Xethanol's Amended Complaint in this action ("Defendants' Motion").

### Preliminary Statement

Defendants' Motion ignores both the text of the Amended Complaint and the applicable law. The Amended Complaint[1] plainly alleges that title to the auction rate securities (the "ARS") at issue in this case passed from one or more of the Defendants directly to Xethanol and that Northeast Securities, Inc. acted as a broker or an agent but never took title to the ARS. Additionally, Defendants actually solicited Xethanol's purchases of the ARS. Thus, Xethanol's Amended Complaint satisfies both prongs of the test for liability under section 12(a) of the Securities Act of 1933 (the "Securities Act").

---

[1] For the convenience of the Court, a Copy of the Amended Complaint is attached as Exhibit A to the accompanying Declaration of Howard S. Koh ("Koh Dec.").

First, the Amended Complaint alleges that Defendants sold to Xethanol certain auction rate securities known as Pivot-1 and Camber-8 (Pivot-1 and Camber-8 are referred to herein collectively as the "ARS") without registering them with the Securities & Exchange Commission as required by Section 5 of the Securities Act and without a valid exemption from registration.[2] The allegation that Defendants, including defendant Deutsche Bank Securities, Inc. ("DB") sold the ARS to Xethanol appears in at least six separate paragraphs of the Amended Complaint.  These paragraphs include:

- Amended Complaint ¶ 2 ("DB was the underwriter of, and sold to Plaintiff . . . .");

- Amended Complaint ¶ 8 ("Defendants sold Xethanol the ARS. . . .");

- Amended Complaint ¶ 20 ("DB acquired the ARS and offered the ARS for sale to the public as the sole underwriter.");

- Amended Complaint ¶ 35 ("Thus title to the ARS passed from DB to Xethanol.");

- Amended Complaint ¶ 56 ("Defendants [have] offered to sell and sold the ARS to Xethanol within the meaning of the Securities Act."); and

- Amended Complaint ¶ 58 ("The ARS that Defendants offered and sold to Xethanol were not registered with the Securities and  Exchange Commission and there was no effective registration statement as to the ARS when Defendants sold the ARS to Xethanol.").

The Amended Complaint alleges that Defendants solicited purchasers of the ARS in that Defendants, among other things, prepared private placement memorandum in

---

[2] As explained in the Amended Complaint, "Auction rate securities are debt instruments with long term nominal maturity for which the interest rate is periodically reset via reverse, or 'dutch,' auctions." (Amended Complaint ¶ 4).  Auction rate securities have been much in the news lately as a large number of auctions have been failing because the number of investors wishing to sell the auction rate securities has, apparently, been far in excess of the number of investors wishing to buy.   Copies of news articles concerning the auction rate securities market are attached to the Koh Dec. as Exhibit B.

connection with the offering of the ARS (Amended Complaint ¶ 22.).  Defendants plainly were seeking buyers for the ARS.  These facts, which at the motion to dismiss stage are presumed true, easily set forth a plausible claim that Defendants violated Section 12(a) of the Securities Act.

The Amended Complaint, especially as supplemented by the Declaration of Boaz Rahav, executed May 21, 2008 ("Rahav Dec."), also sets forth a plausible claim that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder and for common law fraud. DB told Xethanol's agent, Northeast, that DB would provide daily liquidity if it received any request to sell the ARS prior to 3 p.m.  This representation was false.  DB also failed to inform Northeast or Xethanol that the ARS had not been registered with the SEC and therefore could only be sold to qualified institutional buyers ("QIBs") and qualified purchasers ("QPs").

These facts bear the hallmark of an intent by DB to deceive purchasers, such as Xethanol, as to the type and risk of securities the ARS actually were.  Taken as a whole, these facts yield a cogent inference of scienter that is at least as compelling as any other inference that could be drawn from these facts.  For these reasons, the Court should not dismiss Xethanol's 10b-5 or common law fraud claims.

### Facts

Xethanol is an alternative energy company.  In mid 2007 it was looking to invest approximately $13 million in a safe, liquid investment as part of its cash management program.  DB is an investment bank.  DB was the underwriter of certain auction rate securities called Pivot-1 and Camber-8, which were issued by defendants Pivot Master

Trust and Camber Master Trust respectively.    Pivot-1 and Camber-8 are referred to collectively herein as the ARS.   (Amended Complaint ¶ 2.)

Auction rate securites have been much in the news lately as the market for them has recently "frozen-up."   That is to say that purchasers of auction rate securities have been unable to sell them.   Like all securities, auction rate securities may be sold to the general public if they are registered with the Securities and Exchange Commission (the "SEC"), pursuant to Section 5 of the Securities Act.  (15 U.S.C. § 77e.) There is however, an exemption to the registration requirement of Section 5 of the Securities Act which is found in Section 4 of the Securities Act (15 U.S.C. § 77d) that permits unregistered securities to be sold in a so-called "private placement." (Amended Complaint ¶ 6-7.)

In the case of the ARS, in order to ensure that they could be sold in a private placement and qualify for the exemption from registration, the ARS were to be offered for sale only to certain buyers that presumably were capable of evaluating the risks of the purchase of the ARS and had the financial resources to shoulder such risks.   To that end, the private placement memoranda ("PPMs") prepared for the ARS specifically limited their sale to certain qualified institutional buyers ("QIBs") and qualified purchasers ("QPs").   (Amended Complaint ¶ 7.)   Copies of drafts of the PPM's, which were never provided to Xethanol and only obtained after the auctions for the ARS failed, appear as Exhibits A and B of the Rahav Dec.

The PPMs defined QIBs as that term is defined by SEC Rule 144A.   That rule provides that a QIB is an entity such as an insurance company, investment company, employee benefit plan, 501(c)(3) organization, or investment advisor, acting for its own account or the accounts of other QIBs that in the aggregate owns and invests on a

discretionary basis at least $100 million of securities of issuers that are not affiliated with the entity. (Amended Complaint ¶ 22-23.)

The PPMs defined QPs as that term is defined by section 2(a)(51)(A) of the Investment Company Act of 1940. That section defines a QP as any person, including a company, acting for its own account or the accounts of other qualified purchasers, who in the aggregate owns and invests on a discretionary basis, not less than $25,000,000 in investments. (Amended Complaint ¶ ¶ 24-26.)

Xethanol is neither a QIB nor QP and, thus, by the very terms of Defendants' PPMs should never have been permitted to purchase the ARS. As discussed in the accompanying Rahav Dec., the typical procedure when an investment bank sells an unregistered auction rate security is that the investment bank requires the purchaser, *i.e.* the end-user, to certify in writing that it is qualified to purchase the auction rate security. That is to say, the end-user certifies that it is a QIB or QP. Sometimes these unregistered auction rate securities are referred to as being on a "QIB List." (Rahav Dec. ¶ 5.)

Here, none of the Defendants took any steps to determine if Xethanol was a QIB or QP. None of the Defendants ever sought any written certification from Xethanol that is was a QIB or QP and the Defendants never informed Xethanol or Northeast that the ARS were on a QIB List. (Amended Complaint ¶ ¶ 38-40; Rahav Dec. ¶ ¶ 7-8.)

On June 4, 2007 and June 13, 2007, Xethanol purchased the ARS for a total of $13.3 million. Northeast, acting as an agent, placed the orders for the ARS on Xethanol's behalf. Defendants knew or should have reasonably known that Northeast was acting as an agent and not a principal trading for its own account. (Amended Complaint ¶ 32-38; Rahav Dec ¶ 4.)

In July 2007, Andreas Ponce a trader at DB's auction bond desk told Northeast that the ARS were of solid AAA quality and that DB would assure same day liquidity for investors that wish to sell their investments in the ARS, provided that the request to sell was made before 3 p.m.  (Amended Complaint ¶ ¶ 29-31, 65, 70; Rahav Dec. ¶ 8.) Because Xethanol was looking for a safe liquid investment as part of its cash management program, Xethanol relied on these statements and elected to hold its investment in the ARS.

In August 2007, Xethanol attempted to liquidate its position in the ARS.  At that time, however, DB informed Northeast that the auctions for the ARS had failed and the sales Xethanol had ordered could not be completed.  By late August 2007, DB suggested that the ARS might only be liquidated at discounted prices.  In September 2007, faced with a need for cash, Xethanol sold the ARS at a discount from their par values at a loss of a total of $1,588,500.  Xethanol has brought this suit to recover this loss.  (Amended Complaint ¶ ¶ 45-53.)

## Argument

## I.

**Xethanol's 12(a)(1) claim, as set forth in the Amended Complaint, meets the plausibility standard that applies on motions to dismiss.**

The law provides that a court should deny a motion to dismiss where the claims set forth in the complaint – or in this case, the Amended Complaint – are "plausible." *Iqbal v. Hasty*, 490 F.3d 143, 157-158 (2nd Cir. 2007). This plausibility standard is a low threshold.

### A. Recent precedent makes clear that as long as a complaint states a plausible claim it should not be dismissed on a motion pursuant to Fed. R. Civ. P. 12(b)(6).

After the United States Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), the law now provides that the factual allegations in the complaint must be enough only "to raise a right to relief above the speculative level." *Bell Atlantic*, 127 S. Ct. at 1965. In applying its holding in the *Bell Atlantic* case, the Supreme Court wrote, "Asking for plausible grounds to infer an agreement [in violation of the Sherman Antitrust Act] does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Bell Atlantic*, 127 S. Ct. at 1966. The *Bell Atlantic* Court continued "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable and 'that a recovery is very remote and unlikely.'" *Bell Atlantic*, 127 S. Ct. at 1965, quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

The United Stated Court of Appeals for the Second Circuit interpreted the *Bell Atlantic* decision in *Iqbal v. Hasty*, 490 F.3d 143 (2nd Cir. 2007). In *Iqbal* the Second

Circuit wrote, "we believe the Court is not requiring a universal standard of heightened fact pleading, but instead is requiring a flexible 'plausibility standard,' which obligates a pleader to amplify a claim with some factual allegations where such amplification is needed to render the claim *plausible*." *Ibqal*, 490 F.3d at 157-158 (emphasis in original).

Support for the Second Circuit's low threshold plausibility interpretation of *Bell Atlantic* is found in *Erickson v. Pardus*, 127 S. Ct. 2197, which was decided by the United States Supreme Court just two weeks after *Bell Atlantic*. In *Erickson*, the Supreme Court quoted *Bell Atlantic*, and wrote, "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests'." *Erickson*, 127 S. Ct. at 2200, quoting *Bell Atlantic*, 127 S. Ct. at 1965 (*Bell Atlantic* was itself quoting *Conley v. Gibson*, 355 U.S. 34, 47 (1957)).

**B. The Amended Complaint plausibly alleges that title to the ARS passed directly from one or more of the Defendants to Xethanol.**

Here, it is manifest that the Amended Complaint meets the low threshold plausibility standard. Indeed, Xethanol's 12(a)(1) claim is not only plausible; it is almost certain to succeed. The law provides that in order to sustain a claim under Section 12(a)(1) of the Securities Act the defendant must be a "seller" as defined by the Securities Act. That is, the defendant must be a person who passes title to the securities to the plaintiff or who solicits the purchases of the securities for his financial gain. *Pinter v. Dahl*, 486 U.S. 622, 648, 108 S. Ct. 2063, 2079 (1988); *see also In re Vivendi Universal, S.A. Securities Litigation*, 381 F. Supp. 2d 158, 186 (S.D.N.Y. 2003).

The Amended Complaint plausibly alleges that title to the ARS passed from one or more of the Defendants to Xethanol. The two trusts, Pivot Master Trust and Camber Master Trust are the issuers of the ARS. DB was the underwriter on the offering of these securities. The Amended Complaint plainly alleges that title to the ARS passed from either the trusts or DB to Xethanol. The Amended Complaint further states no less than six times that DB sold the ARS to Xethanol. This is not just a label or formulaic recitation of an element of a 12(a)(1) cause of action. It is supported by allegations of actual specific facts. Thus, the Amended Complaint alleges that Xethanol engaged Northeast Securities, Inc. ("Northeast") as its agent to assist Xethanol with its cash management program and that Northeast acted as an agent to place "buy" orders for the ARS on Xethanol's behalf. (Amended Complaint ¶¶28 and 34; *see also* Rahav Dec ¶ 4.) The Amended Complaint further alleges that DB knew or reasonably should have known that Northeast was acting as a broker or agent. (Amended Complaint ¶ 37.)

The Amended Complaint next alleges that when selling unregistered securities which may only be sold to so-called "qualified institutional buyers" (a "QIB") or "qualified purchasers" (a "QP") it is standard practice in the securities industry to obtain a written representation from the purchaser that it is a QIB or QP. (Amended Complaint ¶ 38.) With respect to auction rate securities it is the standard practice in the securities industry that where a security's sale is restricted to QIBs or QPs that the underwriting investment bank requires a written representation from the *end-user* (*i.e.* the party that would own the security upon the completion of the transaction). (Amended Complaint 38; Rahav Dec. ¶ 5.) Here, DB never obtained such a representation and Xethanol could

not provide such a representation because it was not – and is not – a QIB or QP. (Amended Complaint ¶¶ 40-43.)

These facts demonstrate that Xethanol's allegation that it purchased the ARS from DB is plainly plausible. DB underwrote the ARS and, acting for its own account, sold them to the public.[3] Xethanol purchased the ARS from DB. Northeast acted as the broker and never took title to the securities. Allegations that the plaintiff purchased the securities from the defendant are sufficient to state a claim under section 12(a)(1) of the Securities Act. *See Pinter v. Dahl*, 486 U.S. 622, 642 (1988) ("At the very least, however, the language of [section 12(a)(1) of the Securities Act] contemplates a buyer-seller relationship not unlike traditional contractual privity.")

### C. The Amended Complaint plausibly demonstrates that DB solicited the purchase of the ARS in violation of section 12(a).

Persons who are not in privity with the plaintiff remain statutory sellers for purposes of  Section 12(a) of the Securities Act, as interpreted by *Pinter v. Dahl*, provided that they solicited the sales of the securities in question for financial gain. *Wilson v. Saintine Exploration and Drilling Corp.*, 872 F.2d 1124, 1126 (2nd Cir. 1989); *See also In re Vivendi Universal, S.A. Securities Litigation*, 381 F. Supp. 2d 158, 186 (S.D.N.Y. 2003). Defendants do not dispute and there is no question that Defendants participated in the sales of the ARS for financial gain. Defendants do contend, however, that in order for liability to attach under section 12(a), solicitation must be direct and personal. Defendants are wrong on the law.

---

[3] Because of the possibility that DB did not take title to the ARS, the Amended Complaint names Pivot Master Trust and Camber Master Trust as defendants on the theory that these trusts are liable for Xethanol's losses on the 12(a)(1) claim if DB is not. Such alternative pleading is expressly permitted by Fed. R. Civ. P. 8(a)(3).

Recent decisions in this district make clear that actual communication between the plaintiff and defendant are not required to successfully allege that the plaintiff solicited the defendant's purchase of securities for purposes of section 12(a).  In *In re Vivendi Universal, S.A. Securities Litigation*, 381 F. Supp. 2d 158, 186 (S.D.N.Y. 2003) the Court wrote "Since *Capri* [*v. Murphy*, 856 F.2d 473 (2nd Cir. 1998)], it has become well settled in this Circuit that the seller need not have 'personal' contact with the purchaser . . . to be held liable under § 12(a)(2)." *See also, Dorchester Investors v. Peak Trends Trust*, 2003 WL 223466, *2 (westlaw) (S.D.N.Y. Feb. 3, 2003) (listing factors for determining if solicitation occurred.); *In re OPUS360 Corp. Securities Litigation*, 2002 WL 31190157, *9-*10 (westlaw) (S.D.N.Y. Oct. 2, 2002) (signature on registration statement established that defendant was a seller for section 12(a) purposes.); *Degulis v. LXR Biotechnology*, 928 F. Supp. 1301, 1315 (S.D.N.Y. 1996) (same).

*Dorchester Investors* is particularly instructive.   In *Dorchester Investors*, the Court lists four factors to be considered in determining whether a complaint sufficiently alleges solicitation to withstand a motion to dismiss.  The factors are: (1) the signing of a registration statement; (2) allegations that the person participated in the preparation of the registration statement; (3) assistance in promotion of the security by attending road shows; (4) participation in the decision to hire the underwriters.  *Dorchester Investors v. Peak Trends Trust*, 2003 WL 223466, *2 (westlaw) (S.D.N.Y. Feb. 3, 2003).

Here, the Defendants meet the *Dorchester Investors* factors.  Because the ARS were offered in a private placement, there is no registration statement.  Nevertheless, DB clearly signed and participated in preparing the PPMs. (*See* Rahav Dec. Exhibits A and B.) In a private offering, the private placement memorandum is the key disclosure

document and, for these purposes, analogous to a registration statement.  The PPMs were issued on behalf of the Pivot Master Trust and Camber Master Trusts respectively.  Thus, all Defendants meet the first two *Dorchester Investments* factors by virtue of their signing the PPMs and participation in their preparation.

DB also satisfies the third *Dorchester Investments* factor.  While the Amended Complaint does not allege DB did road shows, it certainly sought buyers for the ARS.  Indeed, DB, as the underwriter, was the only party seeking buyers for the ARS.  This sort of seeking of buyers is analogous to participation in a road show and thus DB meets the third *Dorchester Investments* factor.  The Defendants also meet the last *Dorchester Investments* factor: participation in hiring the underwriter.  Here DB *was* the underwriter and the Pivot Master Trust and Camber Master Trust chose DB as their underwriter.  Accordingly, the fourth *Dorchester Investments* factor is met.[4]

In sum, Xethanol's section 12(a)(1) claim meets the low plausibility standard that is necessary to defeat a motion to dismiss on both the direct title passage prong of a 12(a)(1) claim and the solicitation prong of a 12(a)(1) claim and the Court should deny the Defendants' motion to dismiss the Amended Complaint and its Section 12(a)(1) claim.

---

[4] All of the cases Defendants cite for the proposition that solicitation for purposes of a section 12(a) claim must be direct are distinguishable.  *Shain v. Duff & Phelps Credit Rating Co.*, 915 F. Supp. 575 (S.D.N.Y. 1996) involved a claim against a rating agency.  This is a far cry from the claims here which are against an issuer and underwriter.  In *Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co.*, 794 F. Supp 1265 (S.D.N.Y. 1992), the Court dismissed the section 12(a) claims against the Options Clearing Corp. and the Chicago Board Options Exchange, Inc., again, defendants much different than here.  In *Ellison v. American Image Motors Co.*, 36 F. Supp. 2d 628 (S.D.N.Y. 1999) the motion to dismiss of a market maker of a stock and its head trade was *denied.*

## II.

**Plaintiff, in its Amended Complaint, has sufficiently pled Defendants' violations of Section 10(b) and Rule 10b-5.**

To state a claim under Section 10(b) of the Exchange Act, 15. U.S.C. 78j(b) (2007), and Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5 (2007), a plaintiff must allege: (1) a misrepresentation or omission of a material fact, (2) made with scienter, (3) on which plaintiff justifiably relied, and (4) that proximately caused plaintiff's loss." *In re Scholastic Corp. Securities Litigation*, 252 F.3d 63, 69 (2d Cir. 2001) (reversing Southern District Court's dismissal of complaint alleging securities fraud for lack of particularity).

Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") requires that a complaint sounding in fraud "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *In re Openwave Systems Securities Litigation*, 528 F.Supp.2d 236, 248 (S.D.N.Y. 2007), citing *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006). Fed. R. Civ. P. 9(b) applies to claims under SEC Rule 10b-5. *In re Scholastic*, 252 F.3d at 69-70.

The Private Securities Litigation Reform Act of 1995's ("PSLRA") 15 U.S.C.§ 78u-4(b)(2), requires that allegations of fraud include (1) each statement alleged to have been false or misleading, and the reasons why the statement is misleading, and (2) the facts, stated with particularity, giving rise to a strong inference that the defendant acted with the required state of mind, i.e. scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd., et al.*, 127 S.Ct. 2499, 2508 (2007) citing 15 U.S.C. § 78u-4(b)(2). Scienter is a "mental

state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc.*, 127 S.Ct. at 2507.

Courts must "consider the complaint in its entirety" when reviewing the facts alleged by a plaintiff in opposition to a motion to dismiss. *Tellabs, Inc.*, 127 S.Ct. at 2509 ("The inquiry… is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.") (emphasis in original).

In order to determine if a plaintiff has alleged facts that give rise to a "strong inference" of scienter, a court "must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc.*, 127 S.Ct. at 2510. However, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id.*

The Supreme Court has stated that "motive can be a relevant consideration [when analyzing the scienter element of a securities fraud action], and personal financial gain may weigh heavily in favor of a scienter inference… [though] the absence of a motive allegation is not fatal [to a securities fraud allegation]." *Tellabs, Inc.*, 127 S.Ct. at 2511. In the Second Circuit, a "strong inference" of fraud can be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).

**A. The Amended Complaint properly alleges misrepresentations and omissions.**

The Amended Complaint alleges that Defendants misrepresented the risk of loss of liquidity of the ARS by describing them as akin to money market funds, AAA rated and guarantying same day liquidity.   Additionally, the Defendants failed to provide Xethanol with the PPM's prior to Xethanol's purchasing the ARS and omitted critical, material facts, specifically that the ARS were being sold under an exception to the registration requirements of Section 5 of the Securities Act, that no registration statement was in effect for the ARS, and that the ARS were to be sold exclusively to QIBs and QPs. These facts individually and taken as a whole, satisfy the first element of the test under Section 10(b) and Rule 10b-5.   Thus, there is no doubt as to what material facts, Xethanol contends that Defendants failed to disclose or misstated.    Accordingly, Xethanol's allegations of both misstatements and omissions are well-pled and should not be dismissed.

With respect to Defendant's affirmative misstatements the Rahav Dec. supplies the who, when, where and how of Defendant's fraud with sufficient specificity to meet the requirements of Fed. R. 9(b) and the PSLRA.   As explained in the Rahav Dec. Andreas Ponce, a trader at DB's auction desk, in mid-July, on a conference call explained that the ARS were of solid AAA quality and assured daily liquidity for clients wishing to sell the ARS provided the sell order was placed before 3 p.m.  Thus the "who" is Andreas Ponce; the "when" is mid July 2007; the "where" is on a conference call and the "how" is that the statements misrepresented the risk of illiquidity.  (Rahav Dec. ¶ 8).

### B. Xethanol has adequately alleged scienter.

The Amended Complaint demonstrates that Defendants had both motive and opportunity to commit fraud. Motive is simple. Defendants wished to sell the ARS by any means necessary because they earned commissions on each sale. The ARS were supposed to be sold only to certain investors, *i.e.* QIBs and QPs that were in a position to take on the true risk actually associated with the ARS. Defendants put no protocol in place and took no steps to insure that unqualified buyers did not purchase the ARS. This lack of monitoring whether the purchasers of the ARS were qualified to purchase, demonstrates that Defendants were prepared to liquidate their holdings of ARS no matter who purchased. When Xethanol, through its agent Northeast, expressed an interest in acquiring the ARS, Defendants had an opportunity to make their sale and never bothered to check to determine if Xethanol was qualified to make the purchases. Thus, the motive and opportunity elements are satisfied.

Failing to ensure that Xethanol was a qualified investor in the ARS also demonstrates a conscious misbehavior, or, at a minimum, recklessness. First, DB must have known that auction failure was a possibility, that it could not assure daily liquidity and that the ARS were a more risky investment than a money market fund. Such risks were, in fact, set forth in the draft PPMs which Defendants failed to provide to Xethanol. Additionally, as explained in the Rahav Dec., the standard practice in the industry is to have the end-user/purchaser of unregistered auction rate securities certify, in writing, that it is qualified to make the purchase. (Rahav Dec. ¶ 5.) Here, Defendants never sought or obtained such a certification.

The making of statements clearly at odds with the disclosure in the draft PPMs and the failure to take any steps to ensure Xethanol was qualified to purchase the ARS, a significant departure from the industry standard of care, creates a strong, powerful and cogent inference of conscious misbehavior or recklessness. Moreover, the breadth of Defendants' scienter is revealed by the fact that even when the auctions were failing (a circumstance that Defendants assured Plaintiff could not happen) Defendants did not inform Plaintiff and did not repurchase the securities at par value, refusing to even discuss the failed auctions. (Amended Complaint ¶ 49; Rahav Dec. ¶ 9.) [5]

## C. Xethanol has properly alleged reliance and damages.

Xethanol was seeking an investment with low risk and absolute liquidity. Xethanol, through its agent Northeast, expressed its anxiety and concerns that they avoid, at all costs, high risk securities with subprime exposure and retain liquidity in their investment. Xethanol was met with assurances and guarantees from Defendants that the ARS were a low risk investment with daily liquidity without subprime exposure.

Had Defendants told Xethanol the truth, that the ARS were a more risky investment than a money market fund and that there was a possibility of failed auctions, and that the ARS could become illiquid, Xethanol would have sold its position in the ARS sooner, before auctions began to fail. Had Defendants not omitted that the ARS was to be exclusively purchased by QIBs and QPs, and had Plaintiff known that the ARS were to be purchased only by QIBs and QPs, Xethanol would never have invested in the ARS. However, based on Defendants material misstatements and omissions, Xethanol

---

[5] Defendants mistakenly suggest in Defendants' Motion that because the PPMs contained the limitation that the ARS were to be sold only to QIBs and QPs that there was no omission of such material facts by Defendants. However, the draft PPMs were only provided to Plaintiff *after* Xethanol completed its purchase and *after* the ARS auctions had failed.

invested $13.3 million with Defendants and then continued to hold the investment. This is the definition of justifiable reliance.

Plaintiff's purchase of the ARS and Plaintiff's subsequent loss was proximately caused by Defendants' misrepresentations and omissions, because the misrepresentation and omissions were instrumental in inducing Plaintiff's purchase and continue to hold the ARS. Had Xethanol known the truth of there misrepresented and omitted facts, it would not have purchased the ARS or would have sold its position before the auctions of the ARS began to fail and would not have suffered its $1,588,500 loss.

In sum, all of the elements of a 10b-5 claim are met and the Court should not dismiss Xethanol's Amended Complaint.

## III.

**Like Xethanol's Federal Securities Fraud claims, Xethanol's common law fraud claim is sufficiently pled.**

Common law fraud, under New York law, requires a plaintiff to allege: (1) the defendant knowingly or recklessly misrepresented a material fact; (2) intending to induce the plaintiff's reliance; (3) that the plaintiff relied on the misrepresentation; and (4) suffered damages as a result. *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007); *See, e.g., Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006); *Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 250 N.E.2d 214 (1969).

As Defendants note in Defendants' Motion, the elements of common law fraud in New York are "substantially identical to those governing §10(b), [thus,] the identical analysis applies." *Defendants' Motion*, p. 23, citing *AIG Global Sec. Lending Corp. v. Bank. Of Amer. Sec., LLC*, No. 01 Civ 11448 2005 WL 2385854, at *16 (S.D.N.Y. Sept.

26, 2005).    Because Plaintiff's pleading of its Rule 10b-5 claims are sufficient to withstand Defendants' Motion, so too must Plaintiff's common law fraud claim survive. [6]

### Conclusion

For all the reasons set forth above, the Court should deny Defendant's motion to dismiss the Amended Complaint or alternatively, grant Xethanol leave to file a Second Amended Complaint.

Dated: New York, New York
      May 23, 2008

MEISTER SEELIG & FEIN LLP

*Howard S. Koh*

By: Howard S. Koh (HK 4730)
    Howard S. Davis (HD 4452)
2 Grand Central Tower
140 East 45th Street – 19th Floor
New York, New York 10017
(212) 655-3500

---

[6] If this Court believes that additional facts must be included in the complaint to support any of the claims, Xethanol requests that it be granted leave to file a Second Amended Complaint. Pursuant to Fed. R. Civ. P. 15(a)(2) leave to file such an amended pleading should be liberally granted. *See Forman v. Davis*, 371 U.S. 178, 182 (If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, etc. – the leave sought [*i.e.* to amend the complaint] should, as the rules require, be 'freely given.'").